**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA FORT LAUDERDALE DIVISION**

U.S. STRUCTURAL PLYWOOD INTEGRITY COALITION, an unincorporated association, COASTAL PLYWOOD COMPANY, a North Carolina corporation, SCOTCH PLYWOOD CO., INC., an Alabama corporation, VENEER PRODUCTS ACQUISITIONS, LLC, a Delaware limited liability company doing business as SOUTHERN VENEER PRODUCTS, SOUTHERN VENEER SPECIALTY PRODUCTS, LLC, a Georgia limited liability company, HUNT FOREST PRODUCTS, LLC, a Louisiana Limited Liability Company, FRERES LUMBER CO., INC., an Oregon corporation, HARDEL MUTUAL PLYWOOD CORPORATION, a Washington corporation, MURPHY COMPANY, an Oregon corporation, SDS LUMBER CO., a Washington corporation, and SWANSON GROUP, INC. an Oregon corporation,

Plaintiffs,

v.

PFS CORPORATION, a Wisconsin corporation, dba PFS-TECO, TIMBER PRODUCTS INSPECTION, INC., a Georgia corporation, and INTERNATIONAL ACCREDITATION SERVICE, INC., a California nonprofit corporation,

Defendants.

**COMPLAINT**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 3

III. PLAINTIFFS .......... 5

IV. DEFENDANTS .......... 7

V. BRAZILIAN PLYWOOD MILLS IN STATES OF PARANÁ AND SANTA CATARINA .......... 7

A. PFS-TECO Certified Mills .......... 7

B. Timber Products Inspection, Inc. ("TPI") Certified Mills .......... 9

VI. HISTORY AND SIGNIFICANCE OF PLYWOOD IN THE UNITED STATES .......... 12

VII. THE IMPORTANCE OF A STRINGENT QUALITY ASSURANCE PROGRAM IN PRODUCING AN ENGINEERED WOOD PRODUCT LIKE PLYWOOD .......... 15

VIII. PS-109'S STRUCTURAL STANDARDS ARE IMPORTANT TO HEALTH AN SAFETY IN AREAS PRONE TO HIGH WIND EVENTS, SEISMIC ACTIVITY OR HEAVY SNOW .......... 17

IX. DEFENDANTS' FACILITATION OF MASSIVE FALSE ADVERTISING SCHEME BY BRAZILIAN PLYWOOD PRODUCERS .......... 21

A. The Brazilian Plywood Industry .......... 21

B. Defendants Facilitated and Promoted a Massive False Advertising Scheme .......... 25

X. FIRST CLAIM FOR RELIEF – False Advertising in Violation of the Lanham Act .......... 35

XI. SECOND CLAIM FOR RELIEF – Negligence .......... 38

PRAYER FOR RELIEF .......... 40

JURY DEMAND .......... 40

# COMPLAINT

Plaintiffs U.S. Structural Plywood Integrity Coalition, Coastal Plywood Company, Scotch Plywood Co., Inc., Veneer Products Acquisitions, LLC, Southern Veneer Specialty Products, LLC, Hunt Forest Products, LLC, Freres Lumber Co., Inc., Hardel Mutual Plywood Corporation, Murphy Company, SDS Lumber Co., and Swanson Group, Inc. (collectively "Plaintiffs") by and through their below signed attorneys, hereby file this Complaint against PFS Corporation, dba PFS-TECO ("PFS-TECO"), Timber Products Inspection, Inc. ("TPI"), and International Accreditation Service, Inc. ("IAS") (collectively "Defendants") stating as follows:

## I. INTRODUCTION

1. This is a false advertising case under the Lanham Act that seeks to expose and close the gaping hole in the entirely voluntary and private system regulating the production and sale of structural plywood in the United States, a building material used in most of this country's residential and commercial building construction. Thirty companies operating 35 plywood plants in two states in southern Brazil (Paraná and Santa Catarina) are falsely stamping millions of square feet of structural plywood panels imported into the United States as meeting the U.S. Voluntary Product Standard PS 1-09 for structural plywood. Tests by the American Plywood Association in 2018 and commissioned by Plaintiffs in 2019 show that the Brazilian plywood panels produced in southern Brazil experience massive failure rates with respect to the stringent strength properties of the PS 1-09 standard, specifically bending stiffness and deflection.

2. This testing demonstrates that PS 1-09 quality plywood simply cannot be consistently produced from the two fast-growing non-native plantation species used by the Brazilian plywood producers in the states of Paraná and Santa Catarina, which are loblolly pine and slash pine.

3. Building codes adopted throughout the United States require that structural grade plywood panels incorporated into the roofs, floors and walls of residential and commercial buildings in the U.S. meet the PS 1-09 structural standards. These same building codes require that each panel bear a stamp from an accredited certifying agency that identifies the certifier of by name. The stamp must also display the PS 1-09 grade stamp and the number of the plywood plant which produced the panel. Defendants PFS-TECO and TPI are the only two certifying agencies issuing PS 1-09 compliance certificates authorizing each of the 35 Brazilian plywood plants to stamp plywood panels as meeting the PS 1-09 structural grade requirements.

4. As the certifiers of all 35 Brazilian plywood plants exporting PS 1-09 stamped plywood panels to the U.S., Defendants PFS-TECO and TPI provide the gateway into the United States for these falsely advertised panels. The only explanation for the pervasiveness of the false advertising and the number of years over which it has persisted, is the intentional or negligent failure of PFS-TECO and TPI to rigorously perform their certification obligations and regularly verify through testing that the plywood produced by their Brazilian clients actually meets the PS 1-09 standard.

5. As certifying agencies authorized to issue certificates vouching for plywood panel quality, PFS-TECO and TPI are accredited by International Accreditation Service, Inc. The role and responsibility of IAS as the accreditor of PFS-TECO and TPI is to independently audit these building product certifiers on a regular basis to verify that each is performing its certification services and licensing its PS 1-09 grade stamp for structural plywood in a professional manner. IAS has been grossly negligently in failing to perform its accreditation function.

6. The failure of PFS-TECO and TPI to perform their quality control functions as authorized licensors of the PS 1-09 grade stamp has resulted in millions of square feet of falsely advertised off-grade Brazilian plywood moving into the U.S. and being incorporated into residential and commercial buildings. As a result, U.S. residents who live or work in buildings constructed with off-grade Brazilian plywood are exposed to significant risk of serious injury or death, particularly in the event of a hurricane or significant earthquake. Because it is impossible for PS 1-09 compliant structural grade plywood to be consistently or reliably manufactured from the extraordinarily fast-growing plantation pine species in southern Brazil, Plaintiffs seek preliminary and permanent injunctions requiring PFS-TECO and TPI to revoke the PS 1-09 compliance certificates that each Defendant has issued to 35 plywood plants operating in the states of Paraná and Santa Catarina in southern Brazil.

## II. JURISDICTION AND VENUE

7. This Court has subject matter over Plaintiffs' claims brought under the Lanham Act, 15 U.S.C. § 1051 et. seq. pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338(a) and 15 U.S.C. § 1221(a). This Court also has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a) because that claim is so related to the federal Lanham Act claim that they form part of the same case and controversy under Article III of the U.S. Constitution.

8. This Court has personal jurisdiction over all Defendants because Defendants have done and continue to do business in the State of Florida, have sufficient contacts within the State and in this judicial district, have purposely availed themselves within this district, or have certified as meeting structural standards for plywood panels produced in Brazil that have been disproportionately imported, sold, offered for sale and distributed in this judicial district.

9. Venue is proper in this District under 28 U.S.C. § 1391(a) because Defendants are subject to personal jurisdiction in this district at the time the action is commenced, and under 28 U.S.C. § 1391(b) and (c) because a substantial share of the events or omissions giving rise to the claims occurred in this district, Defendants transact business within this district and have engaged in business activities within this District.

10. Specifically, the fact that a substantial share of the events or omissions giving rise to the claims occurred in this District is demonstrated by the large share of off-grade Brazilian plywood that is imported into Florida and sold to builders and consumers throughout Florida. In 2018, for example, approximately 20% of all Brazilian pine plywood exports into the United States were delivered to ports in the state of Florida. Of those deliveries in 2018, 89.6% was offloaded at Port Everglades.

11. With respect to the massive quantities of off-grade Brazilian structural plywood falsely advertised as meeting the strength requirements of the PS 1-09 grade standard, all three Defendants made false descriptions of fact through certifications that authorized 35 Brazilian plywood producers to export plywood into Florida that Defendants knew or should have known did not meet the PS 1-09 grade standard. These misrepresentations of fact were material because they were likely to influence purchasing decisions by builders and consumers who relied on the PS 1-09 stamp as warranting the fitness of the plywood panel as meeting building code requirements for residential and commercial construction. Defendants' false statements were made throughout the entire transit of the off-grade Brazilian PS 1-09 stamped plywood from the point of its departure from a port in Brazil, through its ocean transit, through its delivery to a Florida port and then in interstate commerce through delivery to retail outlets or distributors and

then to the ultimate buyer, typically either a builder or consumer disproportionately located in this district.

12. Defendants' authorization and licensing of the PS 1-09 grade stamp for use on panels that Defendants knew or should have known were off-grade resulted in significant diversion of sales from U.S. plywood producers to the Brazilian plywood producers who, but for the certifications issued by Defendants, would not have been authorized to export massive quantities of PS 1-09 stamped structural plywood into the United States. As a direct and proximate result of Defendants' actions, the ten Plaintiff companies, each of which sells PS 1-09 structural plywood on a nationwide basis, suffered loss of sales of PS 1-09 plywood in Florida that were diverted to the off-grade falsely advertised Brazilian plywood imports.

## III. PLAINTIFFS

13. Plaintiffs U.S. Structural Plywood Integrity Coalition is an unincorporated association of the 10 U.S. plywood producers who are named as Plaintiffs in this action.

14. Plaintiff Coastal Plywood Company is a North Carolina corporation which owns and operates plywood plants in Havana, Florida and Chapman, Alabama. The two plants employ 750 workers.

15. Plaintiff Scotch Plywood Co., Inc., is an Alabama corporation which owns and operates three plywood mills in Beatrice and Fulton, Alabama and in Waynesboro, Mississippi. The three plants employ 425 workers.

16. Plaintiff Veneer Products Acquisitions, LLC, which does business as Southern Veneer Products, is a Delaware limited liability company which owns and operates a plywood plant in Fitzgerald, Georgia. Plaintiff Southern Veneer Specialty Products, LLC is a Georgia

limited liability company that owns and operates a plywood mill in Moncure, North Carolina. The two mills employ over 400 workers.

17. Plaintiff Hunt Forest Products, LLC is a Louisiana corporation which owns and operates a plywood plant in Pollock, Louisiana, a hardwood sawmill in Olla, Louisiana and is one of two owners of a joint venture sawmill, LaSalle Lumber Co., in Urania, Louisiana. Hunt Forest Products, LLC is headquartered in Ruston, Louisiana and employs over 500 workers in its wood products manufacturing facilities.

18. Plaintiff Freres Lumber Co., Inc. is an Oregon corporation which owns and operates two veneer plants, a plywood mill, a lumber mill, a cogeneration facility and a mass timber manufacturing plant in Lyons, Oregon. These facilities employ a total of 475 workers.

19. Plaintiff Hardel Mutual Plywood Corporation is a Washington corporation which owns and operates a plywood plant in Chehalis, Washington that employs 285 workers including 114 worker-owners who own the company in equal shares.

20. Plaintiff Murphy Company is an Oregon corporation that currently employs more than 850 workers who operate six wood products manufacturing facilities. These include a plywood plant in Rogue River, Oregon, three veneer plants peeling logs in White City and Sweet Home, Oregon and in Elma, Washington, a hardwood plywood mill in Eugene, Oregon and a laminated veneer lumber plant in Sutherlin, Oregon.

21. Plaintiff SDS Lumber Co. is a Washington corporation which owns and operates a plywood plant doing business as Bingen Plywood in Bingen, Washington as well as a sawmill, chipping facility, cogeneration plant, logging and trucking divisions. SDS Lumber Co. employs a total of 320 workers.

22. Plaintiff Swanson Group, Inc. is an Oregon corporation which owns and operates plywood plants in Glendale and Springfield, Oregon and a sawmill in Roseburg, Oregon. These manufacturing plants employ 670 workers.

## IV. DEFENDANTS

23. Defendant PFS Corporation is a Wisconsin for profit corporation doing business as PFS-TECO. PFS-TECO is engaged in the business of certifying a broad range of wood products utilized in building and construction nationwide and in Florida including the certification of structural grade plywood panels. PFS-TECO certifies these structural panels produced by 25 plywood plants throughout the world, 14 of which are located in the states of Paraná and Santa Catarina in southern Brazil.

24. Defendant Timber Products Inspection, Inc., is a Georgia corporation engaged in the business of certifying wood products utilized in the construction industry nationwide and in Florida including structural plywood panels. TPI certifies 30 plywood plants throughout the world, 21 of which are located in the states of Paraná and Santa Catarina in southern Brazil.

25. Defendant International Accreditation Service, Inc. is a California nonprofit corporation that has been providing a wide range of accreditation services since 1975. IAS is the accrediting agency for both Defendants PFS-TECO and TPI.

## V. BRAZILIAN PLYWOOD MILLS IN STATES OF PARANÁ AND SANTA CATARINA

### A. PFS-TECO Certified Mills.

26. Randa Indústria e Comércio de Portas e Compensados Ltda. is a PFS-TECO certified manufacturer that operates plywood mills in Bituruna, Paraná, Brazil (Mill # 307), and Bituruna, Paraná, Brazil (Mill # 907). The date of certification for both Mill #307 and Mill #907 is April 15, 2019.

27. Placa Comércio de Madeiras e Compensados Ltda. is a PFS-TECO certified manufacturer that operates a plywood mill in Porto União, Santa Catarina, Brazil (Mill #868). The date of certification for Mill #868 is August 1, 2018.

28. Compensados Relvaplac Ltda. is a PFS-TECO certified manufacturer that operates a plywood mill in Imbituva, Paraná, Brazil (Mill #354). The date of certification for Mill #354 is January 30, 2019.

29. Indústria de Compensados Guararapes Ltda. is a PFS-TECO certified manufacturer that operates plywood mills in Palmas, Paraná, Brazil (Mill #252), and Santa Cecilia, Santa Catarina, Brazil (Mill #352). The dates of certification for both Mill #252 and Mill #352 are April 15, 2019.

30. Industrial Arbhores Compensados Ltda. is a PFS-TECO certified manufacturer that operates a plywood mill in Palmas, Paraná, Brazil (Mill #296). The date of certification for Mill #296 is March 20, 2018.

31. Marini Indústria de Compensados Ltda. is a PFS-TECO certified manufacturer that operates a plywood mill in Palmas, Paraná, Brazil (Mill #302). The date of certification for Mill #302 is April 15, 2019.

32. Faganello Indústria de Compensados Ltda. is a PFS-TECO certified manufacturer that operates a plywood mill in União da Vitoria, Paraná, Brazil (Mill #358). The date of certification for Mill #358 is March 20, 2019.

33. Madeireira Thomasi S.A. is a PFS-TECO certified manufacturer that operates a plywood mill in União da Vitoria, Paraná, Brazil (Mill #247). The date of certification for Mill #247 is June 5, 2018.

34. Rochembach Plywood Ltda. is a PFS-TECO certified manufacturer that operates a plywood mill in União da Vitoria, Paraná, Brazil (Mill #347). The date of certification for Mill #347 is March 19, 2019.

35. Somapar Sociedade Madeireira Paranáense Ltd. is a PFS-TECO certified manufacturer that operates a plywood mill in União da Vitoria, Paraná, Brazil (Mill #351). The date of certification for Mill #351 is August 11, 2017.

36. Compensados e Laminados Lavrasul S.A. is a PFS-TECO certified manufacturer that operates a plywood mill in Timbo Grande, Santa Catarina, Brazil (Mill #384). The date of certification for Mill #384 is April 15, 2019.

37. Compensados Fuck Ltda. (FComp) is a PFS-TECO certified manufacturer that operates a plywood mill in Três Barras, Santa Catarina, Brazil (Mill #327). The date of certification for Mill #327 is April 15, 2019.

**B. Timber Products Inspection, Inc. ("TPI") Certified Mills.**

38. Pinustan Industria e Comercio de Madeiras Ltda. is a TPI certified manufacturer that operates a plywood mill in Bocaiuva do Sul, Paraná, Brazil (Mill #391). The date of certification for Mill #391 is April 4, 2019.

39. Compensados FivePly Ltda. is a TPI certified manufacturer that operates a plywood mill in Clevelandia, Paraná, Brazil (Mill #379). The date of certification for Mill #379 is April 8, 2019.

40. Conply Industria de Compensados LTDA is a TPI certified manufacturer that operates a plywood mill in Contenda, Paraná, Brazil (Mill #264). The date of certification for Mill #264 is April 4, 2019.

41. Macasil Industria Comercio de Compensados Ltda. is a TPI certified manufacturer that operates a plywood mill in União da Vitoria, Paraná, Brazil (Mill #398). The date of certification for Mill #398 is April 18, 2018.

42. Guaratu Indústria e Comércio de Madeiras e Compensados LTDA is a TPI certified manufacturer that operates a plywood mill in Guarapuava, Paraná, Brazil (Mill #257). The date of certification for Mill #257 is April 4, 2019.

43. Repinho Reflorestadora Madeiras E Compensados LTDA is a TPI certified manufacturer that operates a plywood mill in Guarapuava, Paraná, Brazil (Mill #251). The date of certification for Mill #251 is April 4, 2019.

44. Industria de Compensados Sudati LTDA is a TPI certified manufacturer that operates plywood mills in Ibaiti, Paraná, Brazil (Mill #279), Ventania, Paraná, Brazil (Mill #297), Palmas, Paraná, Brazil (Mill #256). The date of certification for Mill #279 is October 15, 2016. The date of certification for both Mill #297 and Mill #256 is April 4, 2019.

45. Industria e Comercio de Compensados Sul Paraná is a TPI certified manufacturer that operates a plywood mill in Irati, Paraná, Brazil (Mill #331). The date of certification for Mill #331 is April 9, 2019.

46. Palmasola S.A. Madeiras e Agricultura is a TPI certified manufacturer that operates a plywood mill in Curitiba, Paraná, Brazil (Mill #370). The date of certification for Mill #370 is April 8, 2019.

47. Itamarati Industria de Compensados Ltda. is a TPI certified manufacturer that operates a plywood mill in Palmas, Paraná, Brazil (Mill #325). The date of certification for Mill #325 is April 9, 2019.

48. Tableros Industria e Comercio de Panels LTDA is a TPI certified manufacturer that operates plywood mills in Palmas, Paraná, Brazil (Mill #263), and Cascavel, Paraná, Brazil (Mill #384). The date of certification for both Mill #263 and Mill #384 is April 4, 2019.

49. Madeireira Rio Claro Ltda. is a TPI certified manufacturer that operates a plywood mill in Rio Azul, Paraná, Brazil (Mill #330). The date of certification for Mill #330 is April 9, 2019.

50. Miraluz Industria e Comercio de Madeiras Ltda. is a TPI certified manufacturer that operates a plywood mill in Senges, Paraná, Brazil (Mill #365). The date of certification for Mill #365 is April 8, 2019.

51. Madeireira EK Ltda. is a TPI certified manufacturer that operates a plywood mill in Mafra, Santa Catarina, Brazil (Mill #312). The date of certification for Mill #312 is April 4, 2019.

52. Compensa Industria e Comercio de Compensados Ltda. is a TPI certified manufacturer that operates a plywood mill in Porto União, Santa Catarina, Brazil (Mill #333). The date of certification for Mill #333 is April 8, 2019.

53. G 13 Madeiras LTDA is a TPI certified manufacturer that operates a plywood mill in Presidente Getulio, Santa Catarina, Brazil (Mill #368). The date of certification for Mill #368 is April 8, 2019.

54. Brasnile Industrial LTDA is a TPI certified manufacturer that operates a plywood mill in Três Barras, Santa Catarina, Brazil (Mill #259). The date of certification for Mill #259 is April 4, 2019.

55. Compewit is a TPI certified manufacturer that operates a plywood mill in Witmarsum, Santa Catarina, Brazil (Mill #369). The date of certification for Mill #369 is April 8, 2019.

## VI. HISTORY AND SIGNIFICANCE OF PLYWOOD IN THE UNITED STATES.

56. Plywood is an engineered wood product that is manufactured by using glue to bond layers of veneer to form a composite panel that is stronger and stiffer than the sum of its components. The structural advantage of plywood is a function of the effect of cross-laminating layers of veneer (with each veneer layer running perpendicular to the next) improves the structural durability of the wood panel by distributing along-the-grain strength of the panel in both directions.

57. The origins of plywood or laminated wood are ancient, dating back to items found in the tombs of Egyptian pharaohs, furniture products made by the Chinese over 1,000 years ago and to cabinets, chests, desktops and doors made by the English and French in the 17th through 19th centuries. Most of these items were typically made from decorative hardwoods.

58. Construction grade plywood made from softwood species was first introduced in 1905 in Portland, Oregon, which was hosting a World' s Fair as part of the 100th anniversary celebration of the Lewis and Clark Expedition. Portland Manufacturing Company, a small wooden box factory in Portland, used a veneer lathe to peel veneer that was then dried and laminated into panels. The workers used paint brushes as glue spreaders and ordinary house jacks as presses. This new panel product, which was called "3-ply veneer work," sparked interest from fairgoers that included door, cabinet and trunk manufacturers who placed orders. By 1907, Portland Manufacturing had upgraded its manufacturing process with an automatic glue spreader and a sectional hand press that increased its production to 420 panels per day.

59. For its first 15 years, the softwood plywood industry sold most of its production to door panel manufacturers. There was a dramatic increase in demand in 1920 when the growing automobile industry in the U.S. started using plywood for running boards. Increasing demand from the automobile industry generated steady growth in the softwood plywood industry and by 1929, there were 17 plywood mills in the Pacific Northwest.

60. The technological breakthrough that dramatically expanded U.S. plywood production was the discovery in 1934 of a fully waterproof adhesive by Dr. James Nevin, a chemist at Harbor Plywood Corporation in Aberdeen, Washington. While this new technology made plywood suitable for exterior exposure, growth of the plywood industry progressed slowly because the industry remained highly fragmented with grading systems and product quality varying widely from mill to mill.

61. The holding power of this waterproof glue was rigorously tested. The panels were boiled in water for seven hours a day for 15 days, with inspections at regular intervals after being cooled down to various temperatures. Some panels were frozen and then put back into the boiling caldron. Ultimately, the panels were put to and passed 100 different performance tests.

62. To address the lack of uniform product grades and consistent quality assurance programs, the Pacific Northwest plywood industry established the Douglas Fir Plywood Association ("DFPA") in 1933. In 1938, this association was one of the first in the U.S. to take advantage of a 1938 law authorizing the registration of industry-wide trademarks, which enabled plywood to be sold as a standardized commodity rather than through multiple company brand names. In late 1938, the Federal Housing Authority accepted exterior plywood for home construction based in part on DFPA standards that tied plywood grades to performance tests for both interior and exterior plywood.

63. At the same time, the DFPA introduced a rigorous qualification and inspection program and established two laboratories to conduct continuous random testing of mill member plywood and to perform research.

64. In the late 1930's and early 1940's, the use of plywood in home construction boomed with plywood used for subflooring, interior and exterior paneling, roofs, basements and garages. The 31 plywood plants in operation in 1941 had trouble meeting the growing demand.

65. With the onset of World War II, plywood was declared an essential war material and its production and distribution were under strict government control. World War II became a proving ground for softwood plywood in the U.S. Plywood sped up the construction of military barracks, built the Navy's high speed PT boats, was a primary construction material in the building of Liberty ships and tankers, built the Army's assault boats that made the historic Rhine River crossing and was used in thousands of war accessories from crating for parts to Seabee huts in the South Pacific to thousands of life boats.

66. After World War II ended, the plywood industry geared up to meet the demands of the booming post-war economy. In 1944, the industry's 30 mills produced 1.4 billion square feet of plywood. This number grew to 101 mills by 1954 and production approached four billion square feet. With this growing demand, five Canadian companies in 1950 founded a trade association that eventually spearheaded the adoption of uniform grade standards adopted by the Canadian Standards Association in 1953.

67. The American South followed suit shortly thereafter. Research and development efforts in the late 1950's and early 1960's discovered how to effectively glue together veneer from southern pine species. In 1964, Georgia-Pacific Corporation opened the first southern pine plywood mill in Fordyce, Arkansas. The plywood production in the U.S. South expanded

substantially over the next 50 years with approximately two-thirds of all U.S. plywood production now manufactured in the U.S. South including Florida.

## VII. THE IMPORTANCE OF A STRINGENT QUALITY ASSURANCE PROGRAM IN PRODUCING AN ENGINEERED WOOD PRODUCT LIKE PLYWOOD.

68. The APA-The Engineered Wood Association is a 501(c)(6) non-profit trade association that represents 66 plywood mills in the United States and Canada. APA's corporate headquarters is located in Tacoma, Washington where it operates a 42,000 square foot research center and testing laboratory that performs year-round quality control testing of the plywood products produced by its members. APA also operates a regional quality testing laboratory in Atlanta, Georgia. APA was founded in 1933 as the Douglas Fir Plywood Association and renamed as the American Plywood Association in 1964. The name change to APA-The Engineered Wood Association occurred in 1994.

69. A central component of APA's mission is quality assurance, managing a stringently enforced quality inspection program designed to ensure that APA-member plywood mills such as the Plaintiffs' mills conform to all product standards. One such standard is the PS 1-09 grade standard governing structural plywood sold in the United States. Originally drafted by APA, Voluntary Product Standard PS 1-09 was adopted as a nationwide product standard by the National Institute of Standards and Technology ("NIST"), which is part of the U.S. Department of Commerce. The PS 1-09 standard was originally published in 1966. The current edition of the standard published in 2010 covers the manufacture of structural plywood from some 70 wood species and superseded the Product Standard published by NIST in 2007.

70. As noted in the foreword to Voluntary Product Standard PS 1-09, the federal government has no authority to police this or any other of the voluntary product standards published by NIST. The relevant disclaimer is as follows:

> It must be emphasized that the Department of Commerce has no regulatory authority or enforcement power to police the provisions of this or other Product Standards; but, inasmuch as the Standard represents the consensus of the industry, its provisions are established by trade custom and are made effective through incorporation by reference in sales contracts, federal specifications, building codes, purchase invoices, advertising and similar means.

71. In the U.S., APA is accredited through Defendant International Accreditation Service as an inspection body pursuant to standards issued by the International Standards Organization ("ISO"), specifically ISO 17020. Through this accreditation, APA certifies U.S. plywood plants to produce multiple plywood grades that conform to product standards such as PS 1-09.

72. Throughout its more than 80 years of certifying U.S. plywood mills as consistently meeting the highly technical product standards of an engineered wood product like plywood, APA has utilized a well-trained and experienced staff of inspectors or quality auditors who regularly audit each mill's quality control system and procedures and make unannounced visits to each mill throughout every year to perform independent inspections and to take randomly selected panel samples for testing at APA's laboratories in Tacoma and Atlanta. The purpose of these stringent quality assurance inspections and procedures is to verify that each APA member plywood plant is producing plywood that fully complies with the defined technical criteria for each product being produced such as PS 1-09 structural plywood.

73. APA' s quality management system includes testing and inspection of the finished plywood panel product for such critical attributes as bending strength and stiffness, dimensional stability, bond durability and impact resistance. Test results are

compared with established minimum performance criteria as set forth in performance standards such as PS 1-09.

74. APA member plywood plants are required to perform an array of tests at in-mill labs and provide all data to APA on a weekly basis. In addition, APA auditors make twice per year random visits to each APA member mill to verify compliance with APA quality assurance requirements and to take a sample of at least ten panels to an APA lab for a battery of tests. Because bending stiffness and bending strength are the most important properties for many plywood uses, the PS 1-09 samples taken by APA auditors from each member mill are tested to determine whether each panel meets the bending stiffness requirement of PS 1-09. If even one of the ten panels fails, that member mill is subject to additional inspections and additional reporting that is designed to ensure that whatever quality assurance issue generated the failure is promptly addressed.

## VIII. PS 1-09's STRUCTURAL STANDARDS ARE IMPORTANT TO HEALTH AND SAFETY IN AREAS PRONE TO HIGH WIND EVENTS, SEISMIC ACTIVITY OR HEAVY SNOW.

75. If plywood is used on the exterior walls or roofs of a residential home or commercial building in the U.S., local building codes uniformly require that the plywood panels are of a structural grade, specifically PS 1-09. The structural plywood utilized in the U.S. must either be produced from so called Group 1 species -- which are the wood species that have tested to be the strongest -- or panels manufactured from species that are performance tested and meet or exceed the strength properties of plywood manufactured from Group 1 species.

76. If the plywood installed on the roof and exterior walls of a residential home has a bending stiffness and other strength properties that are below those required

by PS 1-09, there is significant risk that the structural performance of that home will fail in a high wind, seismic or heavy snow event.

77. One of the best ways to protect a home from damage in a hurricane is to install shutters over all windows and glass doors. Over the last decade, Florida and specifically the counties in this district have been leaders in upgrading local building codes to prevent the type of structural failure in a hurricane that can cause injury or death and significant property damage. One of the most significant building code upgrades in Florida has been the requirement of hurricane shutters to protect glass openings in structures against the impact of wind-borne debris, and use of plywood in High Velocity Hurricane Zones.

78. Hurricane shutter design requirements in Florida are a good example of the importance of PS 1-09 plywood meeting its strict strength requirements. In Dade and Broward Counties, windows and glass doors are required to be covered with sturdy shutters in the event of a hurricane. The whole purpose is to prevent windborne debris from breaking a window or glass door, which will depressurize a house in a hurricane and likely result in a catastrophic failure of the entire structure.

79. The figure below is a map of the wind-borne debris regions in Florida and the contours for determining the applicable level of hurricane shutter protection required by Florida building codes.

///

///

///

///




80. The building codes in southern Florida specify the types and spacing between fasteners on each shutter depending upon the panel span and whether the panels must have stiffener attachments such as two-by-four or six-by-six structural grade lumber. With respect to panel strength, these building codes require that the shutters deflect to no more than the shutter span in inches divided by 30. For example, a 40-inch span should not bend more than 40 inches/30 = 1.33 inches in the storm. The panels must also bend less than two inches maximum and should remain at least one inch away from the window under full wind force. A three quarter inch thick PS 1-09 plywood

panel with a 48/24 span rating would deflect a maximum of 0.79 inches with a three second wind gust of 190 miles per hour. Plywood panels that fall substantially below the PS 1-09 bending stiffness requirement could easily deflect by two inches or more, fracture the window and cause a catastrophic loss.

81. PS 1-09 plywood is all labeled on the face of the panel with a stamp that designates the certifying agency such as APA, TPI or TECO, the Group 1 species or span rating, the PS 1-09 grade, the panel thickness and the number of the mill manufacturer. The mill number is used to identify the panel manufacturer in the event of a panel failure. A typical APA PS 1-09 grade stamp used by Plaintiff Freres Lumber Co. is reproduced below:



82. The health and safety of millions of U.S. residents who live in residential homes or apartments constructed with PS 1-09 structural plywood is dependent upon a well-functioning quality assurance system that makes certain that all PS 1-09 stamped plywood panels meet or exceed the strength and other performance requirements of this structural grade product. As alleged below, the quality assurance system administered by Defendants TECO, TPI and IAS has been so deficient that 75% or more of the 1.5 billion square feet of Brazilian PS 1-09 stamped plywood exported to the U.S. in 2017-18 failed to meet the most important property of structural plywood panels, specifically bending stiffness.

83. Because Brazilian PS 1-09 plywood imports into the United States in 2018 and 2019 to date represent approximately 15% of total U.S. structural plywood consumption, this means that 1.5 out of every 10 PS-109 panels installed in the United States during this period may be at serious risk of catastrophic failure. In Florida, however, the penetration of Brazilian PS 1-09 stamped structural plywood exceeds 50% of the Florida market for structural plywood, meaning that four or more of every ten panels sold in the state fail to meet the strength requirements of the PS 1-09 grade standard.

## IX. DEFENDANTS' FACILITATION OF MASSIVE FALSE ADVERTISING SCHEME BY BRAZILIAN PLYWOOD PRODUCERS

### A. The Brazilian Plywood Industry.

84. In the early 1990's, the Brazilian government offered incentives to landowners in southern Brazil to plant loblolly pine and slash pine. There are now over five million acres of these plantations, which has caused massive growth in the production of the softwood plywood made from these two species in southern Brazil. In

turn, this has generated a surge in Brazilian PS 1-09 exports to the United States. In 2015, Brazil exported 285 million square feet of softwood plywood to the U.S. That volume more than doubled in 2016 to 599 million square feet and increased to 721 million square feet in 2017 and 900 million square feet in 2018. In 2017 and 2018, Brazilian plywood made up an estimated 15% of the consumption of plywood panels in the U.S.

85. The dramatic increase in Brazilian plywood exports to the United States coincides with an equally dramatic increase in the certification of Brazilian plywood plants by Defendants PFS-TECO and TPI. Remarkably, TPI had no presence in Brazil prior to July 2016, but certified no less than 15 plants in that year. TPI certified an additional six plants in 2018. PFS-TECO has certified 14 plants, the earliest of which dates back to 2002.

86. In the early 2000's, PFS-TECO on behalf of its Brazilian plywood clients proposed to the leading standards organization in the European Union that plywood panels produced from loblolly and slash pine in southern Brazil be treated as having the same strength and mechanical properties as those same two species grown in North America. In PS 1-09, extensive testing of more than 50 North American species led to the classification of those species into groups one through five, with Group 1 having the highest level of strength properties and the relative strength properties of Groups 2 through 5 moving downward in order.

87. At the time of the PFS-TECO request, there was test data showing that the strength properties for loblolly and slash pine grown in South America fell significantly below those for the same species grown in North America. This is a function of the fact

that loblolly and slash pine grow at extraordinarily fast rates in southern Brazil. Veneer manufactured from these fast-growing plantations is less dense and therefore not as strong as the same veneer produced from a loblolly or slash pine grown in the southern U.S.

88. Based upon the then available data, the European Committee for Standardization refused to grant PFS-TECO' s request to treat South American grown loblolly and slash pine as having the same properties as those same species grown in North America. This also resulted in a clarification of the PS 1-09 standard to make clear in the 2007 edition of the standard that the Table 1 classification of species clearly segregated the strength property groups one through five according to where the trees were grown, specifically whether they were in North America or were non-North American grown species.

89. The 2007 edition of PS 1-09 also established a procedure for adding new species to the species classification Table 1 in the standard. Appendix A lays out the procedures under which new species, following extensive testing, can be added to the appropriate one of five groups in Table 1 and thus be incorporated into the manufacture of plywood that meets the PS 1-09 standard.

90. Rather than subject the loblolly and slash pines grown in southern Brazil to the necessary testing to determine which species group those South American grown species should be placed in, PFS-TECO and TPI have issued PS 1-09 compliance certificates to 35 Brazilian plywood plants under an alternative to the use of listed and grouped Table 1 species. This alternative set out in the PS1-09 standard is the performance testing. In other words, a plywood producer in Brazil can rely on actual

tests of the quality and strength properties of its plywood panels to meet the PS 1-09 strength properties and other standards set out in PS 1-09.

91. However, PFS-TECO and TPI have failed to require and audit plywood producers in southern Brazil (in Paraná and Santa Catarina) to ensure that their performance tests comply with PS 1-09. In fact, it is impossible to consistently manufacture PS 1-09 compliant plywood from the extraordinarily fast-growing loblolly and slash pine plantations in southern Brazil which are the source of the raw materials for all of the Brazilian plywood producers in southern Brazil.

92. Both loblolly and slash pine are tree species native to North America. In the southern Brazil states of Paraná and Santa Catarina, these two species (which are not native to South America) grow extraordinarily fast and, unlike loblolly and slash pine trees in the U.S. South, do not put on what is referred to as strength or compression wood each winter. In North American grown loblolly and slash pine trees, each growth ring is characterized by a lighter colored zone of faster growing wood in the spring and summer followed by a darker, narrower and much slower growing zone of wood from the late fall and winter when little to no tree growth is occurring. It is during this slow growth time when the darkened area of a growth ring is produced that gives the tree its strength because the wood fiber that the tree adds during the late fall/winter is much denser and thus much stronger than the fast growing spring/summer wood.

93. The average annual temperature range in the Brazilian states of Paraná and Santa Catarina dedicated to loblolly and slash pine plantations is relatively narrow compared to the average annual temperature range in the U.S. South, which results in fast growth throughout the entire year in those two states and a lack of strength or

compression wood in the late fall/winter. With the exception of those relatively rare micro-sites where elevation or other topographic features produce some compression or strength wood in loblolly and slash pine trees grown in the Brazilian states of Paraná and Santa Catarina, it is simply not possible for nature to produce loblolly and pine trees in those two states that have the strength properties that will allow for the consistent and reliable production of PS 1-09 compliant structural plywood. The tests performed by the API in 2018 and then by Plaintiffs in conjunction with a major university in 2019 bear this out.

**B. <u>Defendants Facilitated and Promoted a Massive False Advertising Scheme</u>.**

94. As the certifiers of the 35 Brazilian plywood manufacturing plants in southern Brazil, PFS-TECO and TPI utterly failed to perform the independent testing that these certifying organizations should be conducting to make certain that the plywood panels being produced by their Brazilian clients in fact meet the strength requirements of the PS 1-09 standard.

95. APA-The Engineered Wood Association, which has long been the premiere plywood certifying organization in the world, had reason to suspect that it was impossible for plywood produced from loblolly and slash pine grown in southern Brazil to consistently meet the bending and stiffness requirements of the PS 1-09 standard. This led the APA in 2017 and 2018 to secure Brazilian PS 1-09 stamped panels from a variety of producers and to test whether those panels met the PS 1-09 requirements for bending stiffness and maximum deflection.

96. In a product advisory issued in June 2018, a copy of which is attached as Exhibit A, the APA found that 100% of the Brazilian panels secured from nine mills

operated by seven different Brazilian manufacturers failed both standards by significant margins. The Brazilian panels failed the bending stiffness strength requirement by margins of 23-55% and failed the maximum deflection requirement by margins of 15-41%.

97. Less than 30 days after the issuance of the APA's product advisory, both PFS-TECO and TPI issued letters rejecting the APA findings and strongly vouching for the quality of the Brazilian plywood bearing the PS 1-09 grade stamp. Remarkably, the PFS-TECO letter, a copy of which is attached as Exhibit B, was issued jointly by PFS-TECO and the Export Sales Director for Guararapes, PFS-TECO' s largest plywood client in Brazil. A copy of TPI's letter responding to the APA's Product Advisory is attached as Exhibit C.

98. Since the issuance of the APA's product advisory, PFS-TECO and TPI not only rejected those findings, but also recertified 29 Brazilian plywood plants in the first four months of 2019. Since those recertifications, the U.S. Structural Plywood Integrity Coalition contracted with a major university to perform testing of Brazilian PS 1-09 stamped panels for compliance with that standard. That testing, which is ongoing, shows overall failure rates of 69%.

99. The testing performed by a major university on behalf of Plaintiffs involved over 100 panels from nine different plywood plants in southern Brazil operated by a total of six companies. Of the nine plants, two were certified by PFS-TECO and seven by TPI.

100. The two PFS-TECO certified plants were the Abrores Mill No. 296, where the testing showed a 75% failure rate, and the Guararapes Mill No. 52, which had a 56.25% failure rate.

101. The Brazilian plywood plants certified by TPI involved in the testing performed on behalf of Plaintiffs included the following companies, mill numbers and testing failure rates:

1. Conply Mill, No. 264 – 100% failure rate;
2. Madeireira EK, Mill No. 312 – 75% failure rate;
3. Miraluz Mill, No. 365 – 56.6% failure rate;
4. Miraluz Mill, No. 365 – 85% failure rate;
5. Sudati Mill, No. 297 – 73.6% failure rate;
6. Sudati Mill, No. 279 – 4.5% failure rate; and
7. Sudati Mill, No. 256 – 95% failure rate.

102. The testing described above shows that the panels from only one of the nine mills tested experienced a relatively low failure rate, the Sudati Mill No. 279, which had its panel samples fail at a 4.5% rate. Notably, two sister mills operated by the very same company, Sudati Mill Nos. 256 and 297, had their panel samples fail at rates of 95% and 73.6%, respectively.

103. The overall failure rate for all the samples tested to date was 69.0%. Excluding the one Sudati mill with the relatively low 4.5% failure rate, the overall failure rate for the other seven mills was 77.7%. Discovery in this case will ultimately reveal why the Sudati Mill No. 279 experienced its relatively low failure rate, but the bottom line performance of the Brazilian plywood producers – as demonstrated by two sets of

tests in June of 2018 and in 2019 yield the same result: there is no legitimate reason for the Defendants to believe, much less certify and advertise, that plywood from loblolly and slash pine in the states of Paraná and Santa Catarina, Brazil can be utilized to produce on-grade PS 1-09 compliant structural plywood.

104. The panel failure rates found by the APA and now by a major university testing laboratory also demonstrate that PFS-TECO and TPI, as the certifiers of the Brazilian PS 1-09 plywood producers in the states of Paraná and Santa Catarina in southern Brazil, have completely failed to perform their quality control and oversight functions independently and with any integrity. This problem is only compounded and facilitated by the failure of IAS to implement a reasonably robust process in accrediting PFS-TECO and TPI as certifiers of a structural building product designed to meet the health and safety standards of U.S. building codes.

105. A significant contributor to the massive failure of the entirely private quality control system that is supposed to ensure that all structural plywood panels sold in the United States meet the stringent PS 1-09 standards is the fact that both PFS-TECO and TPI are for-profit corporations, a very unusual characteristic for a U.S. organization acting as an inspection agency certifying building products in the United States.

106. The for-profit character of PFS-TECO and TPI creates a built-in conflict of interest where these two Defendants' profit motive – each is paid a dues rate based upon the production of its licensees – causes both certifiers to look the other way on product quality issues that would otherwise reduce the production-based level of dues from each of their Brazilian licensees and the profitability of both Defendants. Nonprofit organizations like the American Plywood Association and 16 of the 17 lumber inspection

agencies serving U.S. lumber producers have no such incentive. As nonprofit organizations, their dues rates are established at a level designed to cover only costs and not to generate profit.

107. In the U.S. lumber industry, for example, there are 17 accredited inspection agencies that perform the regular inspections designed to ensure that U.S. sawmills manufacturing structural grade lumber incorporated into residential and commercial building construction are producing on-grade lumber. All but one, which is Defendant TPI, is a nonprofit. Each one of these inspection agencies is licensing grade stamps to its member mills and then performs inspections of randomly selected packages of structural lumber at least monthly to make certain that the producing mill is manufacturing lumber that meets the structural standards incorporated into building codes throughout the United States. Noncomplying product is red-tagged and prohibited from being sold into the market until it is regraded or remanufactured. Noncompliant sawmills are subject to disciplinary action including suspension and termination in the event the licensed sawmill fails to address product quality issues.

108. As accredited inspection bodies, PFS-TECO and TPI are required to conform to International Standard ISO/IEC 17020. Defendants PFS-TECO and TPI are violating multiple ISO/IEC 17020 standards as alleged below without IAS penalizing them in any fashion.

109. ISO/IEC 17020 Section 4.1.2 requires an inspection body to be "responsible for the impartiality of its inspection activities and shall not allow commercial, financial or other pressures to compromise impartiality." PFS-TECO and TPI are in blatant violation of this standard.

110. ISO/IEC 17020 Section 6.3.1 states as follows:

> The inspection body shall itself normally perform the inspections that it contracts to undertake. Where an inspection body subcontracts any part of the inspection, it shall ensure and be able to demonstrate that the subcontractor is competent to perform the activities in question and, where applicable, complies with the relevant requirements stipulated in this International Standard or in other relevant conformity assessment standards.

111. Defendants PFS-TECO and TPI perform inspections of the Brazilian plywood mills each certifies entirely through subcontractors who reside in southern Brazil. These individuals are not performing competent or comprehensive inspections to determine whether the Brazilian plywood mills being inspected are producing PS 1-09 compliant plywood. Further, PFS-TECO and TPI are utterly failing to put in place systems designed to ensure competent and professional inspections by Defendants' subcontractors.

112. ISO/IEC 17020 Section 7.1.6 states:

> When the inspection body uses information supplied by any other party as part of the inspection process, it shall verify the integrity of such information.

113. Throughout the history of the Brazilian plywood certification programs implemented by Defendants PFS-TECO and TPI, both Defendants have relied on information supplied by third-parties including certified Brazilian mills, government officials and subcontracted inspectors and utterly failed to verify the integrity of that information.

114. A second contributing factor to the massive quality control failure is the fact that PFS-TECO and TPI are accredited by IAS, an organization that employs fundamentally deficient and weak certification procedures. The multiple failures of IAS to exercise serious and rigorous oversight have enabled PFS-TECO and TPI to facilitate

false advertising by their 35 Brazilian licensees. As a result, huge volumes of off-grade structural plywood that is stamped as PS 1-09 compliant have entered the U.S. and specifically, the Florida, market, both endangering human health and safety in an earthquake or hurricane and threatening the long term viability of the U.S. plywood industry that consistently manufactures on-grade structural plywood.

115. IAS has no staff with any expertise in engineered wood products such as plywood, certifies PFS-TECO and TPI every two years using minimal audit procedures and does not perform regular inspections of its own of the Brazilian plywood licensees of PFS-TECO and TPI.

116. As an accreditation body, IAS must conform to International Standard ISO/IEC 17011. Section 6 of that standard requires IAS to conduct the oversight function that underlies the accreditation process with reasonably competent personnel. IAS is in blatant violation of the relevant ISO/IEC 17011 standards governing the competence of its oversight and accreditation personnel as alleged below.

117. ISO/IEC 17011 Section 6.1.1 states:

> The accreditation body shall have processes to ensure its personnel have appropriate knowledge and skills relevant to the accreditation schemes and geographic areas in which it operates.

With no personnel on the IAS staff with any knowledge of plywood manufacture in the U.S. or in Brazil, IAS is in blatant violation of the above standard.

118. ISO/IEC 17011 Section 6.1.3.3 states:

> The accreditation body shall identify training needs and shall provide access to specific training to ensure all personnel involved in accreditation processes are competent for the accreditation activities they perform.

IAS has blatantly failed to identify the necessary training required to enable its personnel to competently perform their oversight function in accrediting PFS-TECO and TPI.

119. ISO/IEC 17011 Section 6.2.1 states that an accreditation body "shall have access to a sufficient number of competent personnel to manage and support all its accreditation activities for all accreditation schemes." With no personnel with knowledge or expertise regarding the manufacture of an engineered wood product like plywood, IAS is failing to properly perform its oversight and accreditation function in accrediting PFS-TECO and TPI.

120. The shockingly weak certification procedures of IAS stand in stark contrast to the system that governs the production and sale of structural grade lumber sold in U.S. lumber markets. Every one of the 17 inspection agencies licensing grade stamps and performing regular inspections of both U.S. and foreign producers of structural lumber bearing the relevant grade stamp is certified by the American Lumber Standard Committee, Inc. ("ALSC")

121. ALSC is a nonprofit corporation that, unlike IAS, maintains a significant staff that has deep knowledge of lumber production and the details of all of the lumber grades which ALSC's accredited inspection agencies inspect and certify through licensing agreements with U.S. and foreign sawmills. The ALSC staff includes multiple experienced lumber inspectors.

122. On at least a twice-per-year basis, the ALSC staff randomly selects a group of the sawmills certified by each of the lumber inspection agencies that it accredits such as Plaintiffs. ALSC inspectors then travel to the randomly selected sawmills on an unannounced basis and perform an inspection that includes the grading of randomly

selected packages of that sawmill's lumber production to determine whether it is on-grade. The ALSC also performs inspections alongside the inspectors of its accredited agencies to make certain that these agencies are performing their critically important quality control function in a thorough and professional manner.

123. In addition, ALSC inspectors regularly visit lumber retailers such as Home Depot to verify that lumber bearing the structural grade stamp of one of its accredited lumber inspection agencies is in fact on-grade. The ALSC staff also has the authority to randomly inspect imported lumber production at U.S. ports of entry that has been produced by European companies that have been licensed to produce structural grade lumber.

124. In 2017, it was ALSC inspectors who uncovered significant levels of off-grade structural lumber being sold into the United States by several unscrupulous European sawmills who were then licensed to produce lumber meeting certain U.S. structural grades by one of the ALSC' s accredited inspection agencies, the West Coast Lumber Inspection Bureau ("WCLIB"). The ALSC immediately demanded that the WCLIB take multiple steps to stop the flow of off-grade structural lumber into the United States. When the WCLIB failed to meet ALSC' s expectations, the organization was served with notice of a hearing at which the ALSC Board of Review would consider suspending the WCLIB' s accreditation, which would have put a more than 60-year accredited agency of the ALSC out of business. The WCLIB responded on multiple fronts and defended its prior efforts. Ultimately, the ALSC did not suspend the WCLIB's accreditation, but did impose a one-year probation with conditions in May 2018 that the WCLIB successfully met.

125. If a quality control regulatory system like that of the ALSC and its accredited lumber inspection agencies inspecting structural lumber sold in the United States existed with respect to structural plywood sold into U.S. markets, there is no question that advertising and sale of off-grade PS 1-09 stamped structural plywood would never have occurred. Defendants PFS-TECO, TPI and IAS have been the gateway for huge volumes of off-grade structural plywood from Brazil flowing into U.S. markets and are the proximate cause of the damages that the Plaintiffs and Florida consumers here incurred.

126. As a direct result of the systemic failure of PFS-TECO and TPI as PS 1-09 certifiers and their accreditor IAS, those Florida residents who live and work in or around buildings that incorporate falsely advertised PS 1-09 panels are exposed to the risk of serious injury or death because substantially off-grade Brazilian panels will fail in a hurricane due to the manufacture of each with veneer with inferior strength and mechanical properties.

127. The importation of off-grade Brazilian structural plywood into the United States has increased substantially during the period of 2015 to the present. The low prices charged for these off-grade Brazilian plywood products masquerading as PS 1-09 structural plywood caused, beginning in September 2017, a substantial decline in the price of PS 1-09 structural panels in the United States.

128. Prices have dropped to such low levels at present that many U.S. plywood producers including multiple Plaintiffs are operating at a loss. If these conditions persist, the Plaintiff U.S. plywood producers will be forced to curtail operations and/or

permanently shut down their facilities and layoff thousands of family wage earning workers.

129. Injunctive relief is necessary to stop the importation of off-grade Brazilian plywood panels into U.S. markets from southern Brazil (Paraná and Santa Catarina). Plaintiffs request that this Court enter preliminary and permanent injunctions requiring PFS-TECO and TPI to revoke each of the certificates that these certifying agencies have issued to 35 plywood plants in southern Brazil that are falsely advertising their plywood panels as meeting the PS 1-09 standard.

130. Plaintiffs have hired the undersigned law firm to represent them in this matter and are obligated to pay their attorneys a reasonable fee for their services.

131. All conditions precedent to the filing of this lawsuit have been performed, have occurred or have been waived.

## X. FIRST CLAIM FOR RELIEF

**(False Advertising in Violation of the Lanham Act)**

132. Plaintiffs reallege paragraphs 1 through 131.

133. For multiple years dating back to at least January 1, 2016, Defendants PFS-TECO and TPI have certified producers of structural plywood in southern Brazil (Paraná and Santa Catarina) operating 35 plywood mills as being authorized to stamp that plywood as complying with the PS 1-09 structural standard when both inspection agencies knew or should have known that none of these producers could consistently and reliably produce PS 1-09 compliant structural plywood from the loblolly and slash pine plantations growing in southern Brazil.

134. Defendants made false statements of fact through certifications that authorized 35 Brazilian plywood producers to export plywood into Florida that Defendants knew or should have known did not meet the PS 1-09 structural grade standard.

135. Defendants' misrepresentations of fact through false advertising were material because they were likely to influence purchasing decisions by builders and consumers who relied on the PS 1-09 stamp as warranting the fitness of the Brazilian plywood as meeting building code requirements for structural applications in residential and commercial construction including south Florida's rigorous building standards. In fact, due to the extraordinarily fast-growing character of the loblolly and slash pine resource available to the Brazilian plywood producers in southern Brazil, it is not ordinarily possible to reliably produce on grade PS 1-09 compliant structural plywood.

136. Defendants' false statements persisted throughout the entire transit of off-grade Brazilian PS 1-09 stamped plywood from its point of departure in Brazil, through its ocean transit, through its delivery to a Florida port and then in interstate commerce throughout delivery to a retail outlet or distributor and then to the ultimate buyer, typically a builder or consumer.

137. As a direct result of Defendants' actions, the Plaintiffs companies, each of which sells PS 1-09 structural plywood on a nationwide basis including in Florida, suffered loss of sales of PS 1-09 plywood throughout the United States that were diverted to the purchase of off-grade Brazilian plywood imports that were falsely advertised as meeting the PS 1-09 standard.

138. The actions of Defendants in certifying or authorizing the certification of plywood plants in southern Brazil to produce PS 1-09 structural plywood when in fact none of these plants could reliably and consistently produce on-grade structural plywood for the U.S. market has caused and will continue to cause substantial economic loss and damage to each of the Plaintiffs manufacturing consistent on-grade PS 1-09 structural plywood.

139. Plaintiffs currently estimate that the massive volumes of off-grade plywood flowing into U.S. markets from southern Brazil since September 5, 2017 have resulted in at least a $50 per 1,000 square feet average drop in the market price for PS 1-09 structural plywood in the United States. On a collective basis, the ten U.S. plywood producers who are Plaintiffs in this action produce approximately 1.5 billion square feet of PS 1-09 structural plywood annually.

140. At a $50 average loss per 1,000 square feet resulting from the massive false advertising of off-grade Brazilian plywood that was aided, abetted, and facilitated by Defendants' wrongful actions as alleged above, Plaintiffs have suffered losses of roughly $75 million in each of the last two years dating back to September 1, 2017. As of the date of this filing, Plaintiffs have suffered collective damages of roughly $150 million.

141. Under the circumstances, Plaintiffs are entitled to an award of exemplary damages as well as an award of their reasonable attorney's fees incurred in prosecuting this action.

142. Until appropriate injunctive relief is issued requiring Defendants PFS-TECO and TPI to revoke their certifications of Brazilian plywood producers to

manufacture PS 1-09 structural plywood, Plaintiffs will continue to suffer damages in an amount to be proven at trial.

## XI. SECOND CLAIM FOR RELIEF

**(Negligence)**

143. Plaintiffs reallege paragraphs 1 through 142.

144. Defendants PFS-TECO and TPI were negligent in the following particulars:

a. Failing to perform rigorous and regular independent testing of southern Brazilian plywood producer licensees, which would have revealed their false advertising; and

b. After receiving the American Plywood Association's product advisory in June 2018 showing that seven of their Brazilian plywood producer licensees experienced 100% failure rates for the PS 1-09 bending stiffness and deflection standards, Defendants failed to rigorously investigate the reasons for those failures and then to take steps to revoke the certifications for southern Brazilian producers of noncompliant PS 1-09 structural plywood.

145. The negligence of Defendant IAS created an environment that facilitated the intentional and/or negligent actions of PFS-TECO and TPI as alleged above in the following particulars:

a. Failing to have any IAS staff personnel with expertise in engineered wood products such as plywood;

b. Failing to utilize robust auditing procedures in certifying PFS-TECO and TPI every two years;

c. Failing to independently inspect the Brazilian plywood licensees of PFS-TECO and TPI on a regular and consistent basis over many years; and

d. Failing to take any action to independently investigate the reasons for the 100% failure rates found by the American Plywood Association' s testing of panels produced by seven Brazilian

plywood licensees, all of which was described in detail in the APA' s product advisory issued in June 2018.

146. The actions of Defendants in certifying or authorizing the certification of plywood mills in southern Brazil (Paraná and Santa Catarina) to produce PS 1-09 structural plywood when in fact none of these plants could reliably and consistently produce on-grade structural plywood for the U.S. market has caused and will continue to cause substantial economic loss and damage to each of the Plaintiffs manufacturing consistent on-grade PS 1-09 structural plywood.

147. Plaintiffs currently estimate that the massive volumes of off-grade Brazilian plywood flowing into U.S. markets since September 5, 2017 have resulted in at least a $50 per 1,000 square feet average drop in the market price for PS 1-09 structural plywood in the United States. On a collective basis, the ten U.S. plywood producers who are Plaintiffs in this action produce approximately 1.5 billion square feet of PS 1-09 structural plywood annually.

148. At a $50 average loss per 1,000 square feet resulting from the massive false advertising of off-grade Brazilian plywood that was aided, abetted, and facilitated by Defendants' wrongful actions as alleged above, Plaintiffs have suffered losses of roughly $75 million in each of the last two years dating back to September 1, 2017. As of the date of this filing, Plaintiffs have suffered collective damages of roughly $150 million.

149. Until appropriate injunctive relief is issued requiring Defendants PFS-TECO and TPI to revoke their certifications of Brazilian plywood producers to manufacture PS 1-09 structural plywood, Plaintiffs will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this court award the following relief:

1. For preliminary and permanent injunctions requiring PFS-TECO and TPI to immediately revoke the certifications of Defendants' Brazilian licensees to manufacture PS 1-09 structural plywood;

2. On its First Claim for Relief, for an award of damages against Defendants PFS-TECO and TPI, jointly and severally, in the amount of single damages of $150 million, plus an additional amount to be specifically proven at trial;

3. On its Second Claim for Relief, for an award of damages against all three Defendants, jointly and severally in the amount of single damages of $150 million, plus an additional amount to be specifically proven at trial;

4. For an award of prejudgment interest on all damages awarded;

5. For an award of Plaintiffs' reasonable attorney's fees and costs incurred herein; and

6. Granting such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues triable of right by a jury.

Date: September 5th 2019.

Respectfully Submitted,

*/s/ Nathan Adams*
Nathan Adams, Ph.D., Esq., Fla Bar. No. 90492
nathan.adams@hklaw.com
**HOLLAND & KNIGHT LLP**
315 South Calhoun Street, Suite 600
Tallahassee, Florida 32301
(850) 425-5640 (T)
(850) 224-8832 (F)

Lee P. Teichner, Fla. Bar No. 816280
Lee.Teichner@hklaw.com
**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3300
Miami, FL 33131
(305) 349-2279(T)

Michael E. Haglund, OSB No. 772030
(*pro hac vice* petition pending)
mhaglund@hk-law.com
Michael K. Kelley, OSB No. 853782
(*pro hac vice* petition pending)
mkelley@hk-law.com
Eric J. Brickenstein, OSB No. 142852
(*pro hac vice* petition pending)
ebrickenstein@hk-law.com
Christopher T. Griffith, OSB No. 154664
(*pro hac vice* petition pending)
cgriffith@hk-law.com
**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR 97201
(503) 225-0777 (T)
(503) 225-1257) F)
Attorneys for Plaintiffs