**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-62225-CIV-ALTMAN**

**U.S. STRUCTURAL PLYWOOD**
**INTEGRITY COALITION**, *et al.*,

   *Plaintiffs*,

v.

**PFS CORPORATION**, *et al.*,

   *Defendants*.

_____/

## ORDER

This dispute centers around a stamp—the PS 1-09 stamp—that all structural-grade plywood must bear in order to be used as building material in the United States. *See* Amended Complaint [ECF No. 106] ¶ 3. The Plaintiffs are a collection of ten American plywood companies who formed the U.S. Structural Plywood Integrity Coalition.[1] Together, they filed this action on September 5, 2019 against the Defendants—PFS Corporation ("PFS-TECO"), Timber Products Inspection, Inc. ("Timber Products"), and International Accreditation Service, Inc. ("IAS").[2] *See* Original Complaint [ECF No. 1]. The two remaining Defendants, PFS-TECO and Timber Products, are the sole licensors of the PS 1-09 stamp to 34 Brazilian plywood mills. *See* Motion for a Preliminary Injunction (the "Motion") [ECF No. 146] at 2–4. The Plaintiffs allege that these

---

[1] The Plaintiff Coalition members are: Coastal Plywood Company; Scotch Plywood Co., Inc.; Veneer Products Acquisitions, LLC; Southern Veneer Specialty Products, LLC; Hunt Forest Products, LLC; Freres Lumbers Co., Inc.; Hardel Mutual Plywood Corporation; Murphy Company; SDS Lumber Co.; and Swanson Group, Inc. *See* Docket.

[2] From June 1–2, 2020, the parties engaged in a mediation, at which the Plaintiffs reached a settlement with IAS. *See* Mediation Report [ECF No. 143].

mills are incapable of producing PS 1-09-compliant plywood. *Id.* Despite this, the Plaintiffs say, the Defendants continue to certify the Brazilian plywood as meeting the PS 1-09 grade. *Id.*

The Defendants do this, the Plaintiffs allege, by failing to require their Brazilian clients to comply with the PS 1-09 standards. *Id.* And, the Plaintiffs add, by knowingly certifying faulty plywood as PS 1-09-compliant, the Defendants have facilitated the widespread dissemination of defective structural plywood throughout the United States, all in violation of the Lanham Act, 15 U.S.C. § 1125. *Id.* As relief, the Plaintiffs ask the Court (1) to order the Defendants to revoke the Brazilian mills' PS 1-09 certifications and (2) to enjoin the Defendants from issuing any new PS 1-09 certifications to these Brazilian plywood mills until this case is resolved on the merits. *Id.* at 2. This the Court will not do. For the reasons set out below, the Court **DENIES** the Plaintiffs' Motion.

## THE FACTS

Every piece of plywood used in construction in the United States must be certified and stamped as PS 1-09-compliant. *See* Motion at 3, 4, 16; *see also* Response at 6. The PS 1-09 Standard—most recently updated in 2010—is a voluntary product standard that establishes certain requirements for structural-grade plywood in the United States. *See* Voluntary Product Standard PS 1-09 Structural Plywood ("Product Standard") [ECF No. 201-1] at 14.[3] The PS 1-09 Standard touches on (almost) every aspect of the plywood's composition and performance—including the wood's species, its veneer grading, adhesive bonds, panel construction, workmanship, dimensions, tolerances, markings, moisture content, and packaging. *Id.* These standards, while voluntary, have become industry custom since the National Institute of Standards and Technology ("NIST")—

---

[3] The Plaintiffs have also attached the same product standards as Exhibit 16 to the Declaration of Michael Haglund [ECF No. 146-8].

then-known as the National Bureau of Standards—first issued them in 1965. *Id.* at 61. And, while the Department of Commerce, which oversees NIST, has no regulatory authority or enforcement power to require industry participants to comply with these standards, the standards are routinely implemented (and enforced) through sales contracts, federal specifications, purchase invoices, and advertising. *Id.* at 5. Indeed, building codes across all fifty states require the use of PS 1-09 structural-grade plywood. *Id.*; *see also* Motion at 4; Amended Complaint ¶ 3.

The PS 1-09 grade stamp that each plywood panel bears must indicate the name of the accredited certifying agency and the number of the plywood plant that produced the specific panel. *See* Amended Complaint ¶ 3. And, in turn, these certifying agencies, like the Defendants here, are supposed to ensure that the plywood panels bearing their stamps conform to the PS 1-09 Standard by either (1) inspecting the manufacturer or (2) testing a random sample of the finished plywood panels. *See* Product Standard at 54.

In our case, once a Brazilian mill passes the Defendants' certification testing, the Defendants will license their PS 1-09 certification stamps to the mills. *See* Response at 5–6. As of this writing—so far as the Court can discern—the Defendants license their PS 1-09 grade stamps to 34 Brazilian plywood plants. *See id.* at 1–2, 5–6; Motion at 2; Amended Complaint ¶ 95.

In the Plaintiffs' view, the Defendants' PS 1-09 stamps are a powerful form of advertising—through which the Brazilian plywood companies can market their products as conforming to an important American safety standard. *See* Motion at 15–19. Unfortunately, the Plaintiffs say, those stamps are—at least when applied to the Brazilian mills at issue in this case— a form of false advertising because (the Plaintiffs submit) the stamped Brazilian plywood doesn't comport with the PS 1-09 Standard. *Id.*; Amended Complaint ¶¶ 13, 121–22, 128–29, 135–36. As the Plaintiffs see things, it would be "impossible" for "PS-109 compliant structural plywood to be

3

consistently or reliably manufactured from two extraordinarily fast-growing plantation pine species in southern Brazil, loblolly and slash pine." Motion at 3–4. These accelerated growth rates, the Plaintiffs insist, inevitably result in weaker (and less dense) plywood, even when the plywood panels are produced from the same pine species that are commonly used in North America. *See* Amended Complaint ¶¶ 91–93.

Beginning in 2015, U.S. imports of lower-priced Brazilian structural plywood increased substantially. *Id*. ¶¶ 136–37. By 2017, these cheaper imports had pushed down the price of plywood across the United States. *Id*. ¶¶ 136–37, 146–49. This undercutting of the nationwide market, the Plaintiffs allege, has significantly decreased their profits. *Id*.; *see also* Response at 13. What's more, the Plaintiffs argue, once the fraud is revealed—that is, once consumers realize that the PS 1-09 standard isn't worth the wood it's (im)printed on—construction companies and general contractors will turn away from plywood in favor of its newer, cheaper competitors (like oriented strand board). *See* Motion at 20; *see also* Declaration of John Murphy [ECF No. 156] at 4–5.

In June 2018, the American Plywood Association ("APA")—the non-profit organization to which all of our Plaintiffs belong—issued a product advisory: the Defendants' Brazilian licensees, the APA announced, had failed the APA's PS 1-09 testing. *See* Amended Complaint ¶¶ 1, 98–103, 161; *see also* APA Product Advisory [ECF No. 106-1]. In August 2019, the Plaintiffs commissioned a second test of the Brazilian plywood—this time at Clemson University—which, again, revealed shocking failure rates. Motion at 4.

Now a bit of procedural history—which, though less interesting, is necessary to dispose of this Motion. The Plaintiffs filed their Original Complaint on September 5, 2019. *See* Original Complaint [ECF No. 1]. On February 2, 2020, they filed the (now-operative) Amended Complaint. *See* [ECF No. 106]. The Defendants moved to dismiss the Amended Complaint on February 24,

4

2020. *See* Motions to Dismiss [ECF Nos. 113, 114]. On March 16, 2020, the Defendants, citing the global pandemic, moved to stay the case. *See* Motion to Stay [ECF No. 125]. Notably, the Plaintiffs did not oppose the stay. *See* Plaintiffs' Response to the Motion to Stay [ECF No. 129] at 2 ("Plaintiffs have opposed . . . previous requests to stay discovery . . . . Nevertheless, plaintiffs agree that the unprecedented national emergency posed by the increasing spread of COVID-19 is paramount at this time. Plaintiffs therefore do not oppose defendants' motion for a stay of the case . . . ."). And so, on March 20, 2020, without opposition, the Court entered a stay of all proceedings and denied all pending motions as moot. *See* Order to Stay [ECF No. 130].

On June 4, 2020—at the Plaintiffs' request—the Court lifted the stay and reopened the case. *See* Order to Reopen [ECF No. 145]. And it wasn't until the following day—June 5, 2020—that the Plaintiffs (finally) filed their Motion for a Preliminary Injunction. *See generally* Motion.[4] That delay of two years—from June 2018 (when the APA made its announcement) to June 2020 (when the Motion was filed)—is simply too long to wait.

## THE LAW

A preliminary injunction is an extraordinary and drastic remedy. To secure a preliminary injunction, a movant must show: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." *Commodores Ent. Corp. v. McClary*, 648 F. App'x 771, 774 (11th Cir. 2016). The

---

[4] On June 26, 2020, the Defendants filed their Response [ECF No. 201], and the Motion ripened on July 10, 2020, when the Plaintiffs filed their Reply [ECF No. 208]. On October 7, 2020, the Court held a hearing on the Motion, at which the parties introduced evidence and presented their oral arguments. *See* Oct. 7, 2020 Hearing Transcript [ECF No. 297].

movant must "clearly establish[] the burden of persuasion" for each of these four elements. *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (internal quotation marks omitted). Because a litigant must meet all four prerequisites to obtain a preliminary injunction, failure to satisfy just one dooms the request. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (affirming the district court's denial of a preliminary injunction because the litigant's "unexplained five-month delay in seeking a preliminary injunction, by itself, fatally undermined any showing of irreparably injury").

"A showing of irreparable injury is 'the *sine qua non* of injunctive relief.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (cleaned up) (emphasis added). And that showing of irreparable injury "must be neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."). When the movant fails to prove irreparable harm, the court need not analyze the remaining elements. *See City of Jacksonville*, 896 F.2d at 1285 ("We need not address each element because we conclude that no showing of irreparable injury was made.").

## ANALYSIS

The Plaintiffs' failure to move for a preliminary injunction until *nine months* after they filed this lawsuit weighs strongly against their position on irreparable harm. As the Eleventh Circuit has explained: "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal*, 840 F.3d at 1248 (citing *Siegel*, 234 F.3d at 1176–77). "Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can

be resolved on its merits." *Id.*; *see also Seiko Kabushki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002) (noting that a plaintiff's "dilatory prosecution of its rights somewhat vitiates the notion of irreparable harm . . . and undercuts any sense of urgency . . .").

To recap: the Plaintiffs filed their Motion *two years* after the APA issued the product advisory that forms the gravamen of *both* their Complaint *and* their Motion.[5] Indeed, even after they filed this lawsuit (which was some *15 months* after the APA released its findings), the Plaintiffs waited *another nine months* before submitting their Motion—an inexcusable delay, especially so for a group of litigants who claim that even the money damages they hope to recover at the end of this case will be insufficient to compensate them for the "irreparable harm" each passing day causes them. *See* Motion at 19. The Court cannot agree that a litigant who waits fifteen months to file its complaint, agrees to a protracted stay of the case, and then waits several more months before filing for a preliminary injunction can establish irreparable harm—at least where, as here, that litigant (1) has known about the facts that gave rise to its complaint from the very beginning; (2) relies on those very same (long-understood) facts to support its request for a preliminary injunction; and (3) has asked for a significant sum in compensatory damages.[6] *See*

---

[5] As members of the APA, the Plaintiffs (very) likely learned about the APA's findings when they were published in June of 2018. *See* Amended Complaint ¶¶ 100–01 (noting that APA published its product advisory in June 2018).

[6] To this last point, see *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 487 (11th Cir. 1990) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough [to constitute irreparable injury]." (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974))). The Plaintiffs try to parry *Snook*'s central teaching by suggesting that the harm they here seek to avoid is (principally) a reputational one. *See* Reply at 9, 12–13. As the Plaintiffs see it, the "[D]efendants' disregard for the PS 1-09 standard is jeopardizing the reputation of structural plywood as a reliable high-quality commodity, and with it the long-term viability of plaintiffs' business." *Id.* at 14. But, despite introducing hundreds of exhibits over the course of a seven-hour injunction hearing, the Plaintiffs failed to submit a single shred of evidence—not a line of testimony or even so much as an email—to support their reputational-risk theory. *See generally* Oct. 7, 2020 Hearing Transcript. In fact, in response to the Court's question during oral argument—as to whether the Plaintiffs had adduced *any* evidence that

7

*Kohmetscher et al. v. NextEra Energy Resources, LLC*, No. 19-80281-CV-ALTMAN, 2020 WL 5639950, at *5 (S.D. Fla. Sept. 21, 2020) ("But, even putting aside the substantial time gap between the commencement of the 'irreparable harm' and the initial complaint, the Plaintiffs still waited *another* nine months before moving for an injunction.").

Against all this, the Plaintiffs advance four arguments—all unavailing.[7]

*First*, the Plaintiffs ask the Court to excuse their delay because they were "just days away from filing this motion when the March 20 stay order was issued." Motion at 5. But this argument ignores two obvious details. *One*, the Plaintiffs *agreed* to that stay—and, in doing so, never mentioned that they were on the brink of filing for a preliminary injunction. *See generally* Response to Motion to Stay [ECF No. 129]. *Two*, as we've just explained—q.v. the above discussion on the (extreme) untimeliness of this Motion—by the time the stay was entered, the Plaintiffs had *already* waited far too long.

*Second*, the Plaintiffs try to distinguish *Wreal* by pointing out that the plaintiff there conducted no discovery over the five months between its filing of the complaint and its motion for a preliminary injunction. *See* Reply [ECF No. 208] at 13–14 (citing *Wreal*, 840 F.3d at 1247–49). And it's true that the Plaintiffs here have been busy with discovery. *See generally* Docket. But the Plaintiffs are wrong to narrow *Wreal* to this single (and somewhat peripheral) factor. *Wreal* did not, as the Plaintiffs suggest, turn solely (or even mostly) on the amount of discovery the plaintiff had conducted. Nor has the Eleventh Circuit ever intimated—in *Wreal* or after—that it was

_____

even a single customer has left (or threatened to leave) plywood behind as a result of the Defendants' (alleged) PS 1-09 fraud—the Plaintiffs candidly conceded that they had none. *See* Oct. 7, 2020 Hearing Transcript at 176 ("Mr. Haglund: I'm not aware of any evidence of that precise issue."). Their silence is—as they say—dispositive on this question.

[7] At the hearing, the Plaintiffs really only pushed the last two of these—this, despite the Court's repeatedly pronounced concerns about the Plaintiffs' delay. *See generally* Oct. 7, 2020 Hearing Transcript.

somehow collapsing the irreparable-harm analysis into a single-issue inquiry on (say) the number of interrogatories a party has propounded. Ultimately, as the Eleventh Circuit reiterated in *Wreal*, "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." 840 F.3d at 1248 (emphasis in original). Because the Plaintiffs' years-long delay belies their insistence on any such "need for speedy and urgent action"—indeed, because their pace in this litigation has been the very opposite of "speedy" and "urgent"—their Motion fails to satisfy *Wreal*'s central holding.

*Third*, the Plaintiffs tell the Court that they needed all this extra time to adduce evidence— and prepare arguments—in support of their preliminary-injunction request. *See* Reply at 13–14. In saying so, however, the Plaintiffs forget that preliminary injunctions are drastic and extraordinary remedies—reserved only for those rare situations in which it's *impossible* to wait for the Court (or a jury) to resolve the merits of the claim. If what the Plaintiffs mean to say, then, is that they were amenable to waiting *two years* to establish—to their satisfaction—the viability of their claims, then they cannot complain when the Court elects to take a few more months before deciding whether to eliminate (at least in part) the Defendants (and their Brazilian clients) from the marketplace.

*Fourth*, the Plaintiffs insist that their delay is irrelevant because (they say) in cases, like ours, "[w]hen a Lanham Act defendant's literal false advertisement compares competing products, irreparable harm is presumed." Motion at 18 (citing *Star-Brite Distrib., Inc. v. Kop-Coat, Inc.*, 664 F. Supp. 2d 1246, 1255 (S.D. Fla. 2009)). But, even assuming that the Defendants' stamps constitute false advertising under the Lanham Act—a question the Court does not here resolve— those stamps do not, as the Plaintiffs suggest, draw *any* comparisons between the (infringing) Brazilian plywood and the Plaintiffs' products. *Cf. N. Am. Medical Corp. v. Axiom Worldwide,*

*Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008) (presuming irreparable harm only "in the context of comparative advertising between the plaintiff's and the defendant's products"). The stamps, in fact, nowhere mention the Plaintiffs' plywood and never even refer to it. And, while the Plaintiffs are right to say that—in some (obliquely) general sense—the stamps suggest to consumers a comparison among *all* certified plywood products, *see* Motion at 18–19, there's no indication that the stamps themselves draw any comparison (direct or otherwise) between the Defendants' and *the Plaintiffs'* plywood.

The Plaintiffs, in short, have waited far too long—and their arguments to the contrary are unpersuasive.[8]

*** 

Having carefully reviewed the parties' briefs, the record, and the governing law, the Court hereby **ORDERS AND ADJUDGES** that the Plaintiffs' Motion for Preliminary Injunction [ECF No. 146] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 4th day of November 2020.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[8] Because the Plaintiffs have failed to establish irreparable harm, the Court need not address the three remaining elements of a preliminary injunction. *See City of Jacksonville*, 896 F.2d at 1285 ("We need not address each element because we conclude that no showing of irreparable injury was made.").