UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-62225-CIV-ALTMAN

U.S. STRUCTURAL PLYWOOD
INTEGRITY COALITION, *et al.*,

       *Plaintiffs*,

v.

PFS CORPORATION, *et al.*,

       *Defendants*.

_____/

## ORDER

    If you want to build with plywood in the United States, you generally need a certification—called a PS 1-09 stamp. The Plaintiffs are a coalition of ten American structural-plywood mills who manufacture and sell their plywood in the United States. The Defendants are two companies that inspect structural plywood and, if it conforms to the PS 1-09 standard, stamp the wood as PS 1-09-compliant. According to the Plaintiffs, the Defendants have been certifying 36 Brazilian plywood mills with the PS 1-09 stamp—even though the Defendants know (or should know) that the Brazilian wood doesn't comply with the PS 1-09 standard. In the Plaintiffs' view, this sham certification process has allowed the Brazilian mills to sell their cheaper, non-compliant wood all over the United States—thus displacing the Plaintiffs' stronger, better, more expensive products. In their complaint, the Plaintiffs levy negligence and Lanham Act claims, which the Defendants have now moved to dismiss. This Order follows.

### THE POSTURE

    The Defendants filed a Motion to Dismiss (the "Motion") [ECF No. 182] the First Amended Complaint [ECF No. 106]. The Plaintiffs responded [ECF No. 196]. And the Motion ripened when

the Defendants filed their Reply [ECF No. 202]. The Court held a hearing on the Motion, at which the parties presented their oral arguments. At the hearing, the Court noted that the First Amended Complaint fell into the most common form of shotgun pleading, *see* Amended Complaint ¶¶ 152, 160, "where each count adopts the allegations of all preceding counts." *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). After the Court ordered the Plaintiffs to remedy the error [ECF No. 296], the Plaintiffs filed their (now-operative) Second Amended Complaint ("SAC") [ECF No. 299]. But, with the consent of the parties, the Court didn't require the Defendants to undergo the needless expense of filing a renewed motion to dismiss. Instead, the Court—again, with the parties' concurrence—agreed to consider the pending Motion to Dismiss the Amended Complaint *as if* it had been directed at the SAC. After careful review, the Court now **DENIES** the Motion.

## THE FACTS

This dispute centers around a stamp—the PS 1-09 stamp—that all structural-grade plywood must bear before it can be used as building material in the United States. *See* SAC ¶¶ 3, 75, 78, 82. The Plaintiffs—the U.S. Structural Plywood Integrity Coalition—are a collection of ten American plywood companies that manufacture PS 1-09 plywood.[1] *See id.* ¶¶ 14–22. Together, they filed this action against the Defendants—PFS Corporation ("PFS-TECO"), Timber Products Inspection, Inc. ("Timber Products" or "TPI"), and International Accreditation Service, Inc. ("IAS"). *See* Original Complaint [ECF No. 1]. Since then, the Plaintiffs have reached a settlement with IAS. *See* Mediation Report [ECF No. 143]. The two remaining Defendants, PFS-TECO and Timber Products, are the sole licensors of the PS 1-09 stamp to 36 Brazilian plywood mills that export structural plywood to the United States. *See* SAC ¶¶ 3–4, 23–55.

---

[1] The Plaintiff Coalition members are: Coastal Plywood Company; Scotch Plywood Co., Inc.; Veneer Products Acquisitions, LLC; Southern Veneer Specialty Products, LLC; Hunt Forest Products, LLC; Freres Lumbers Co., Inc.; Hardel Mutual Plywood Corporation; Murphy Company; SDS Lumber Co.; and Swanson Group, Inc. *See* Docket.

The Plaintiffs allege that these Brazilian mills are incapable of producing PS 1-09-compliant plywood. *Id.* ¶¶ 1–2. Despite this, the Plaintiffs say, the Defendants continue to certify the Brazilian plywood as meeting the PS 1-09 grade. *Id.* ¶ 4. The Defendants do this, the Plaintiffs allege, by—either intentionally or negligently—failing to require their Brazilian clients to comply with the PS 1-09 standards. *See id.* By certifying faulty plywood as PS 1-09-compliant, the Defendants have facilitated the widespread dissemination of defective structural plywood throughout the United States, all in violation of the Lanham Act, 15 U.S.C. § 1125. *Id.* ¶¶ 1–2, 4, 6.

Every piece of plywood that's used for construction in the United States must be certified and stamped as PS 1-09-compliant. *See id.* ¶¶ 3, 75, 82. The PS 1-09 standard—most recently updated in 2010—is a voluntary product standard that establishes certain requirements for (almost) every aspect of structural-grade plywood's composition and performance. *See id.* ¶¶ 69–71. It covers the manufacture of structural plywood from 70 different wood species and classifies these species into five different strength property groups based on where the trees were grown. *See id.* ¶¶ 69–71, 90. Group 1 consists of the strongest species. *See id.* ¶¶ 75, 88. And, to be used as building material in the United States, structural plywood must be manufactured from either a Group 1 species or from a species that, in performance testing, has met or exceeded the strength properties of Group 1 plywood. *See id.*

These standards, while voluntary, have become industry custom since the National Institute of Standards and Technology ("NIST")—then-known as the National Bureau of Standards—first published them in 1966. *Id.* ¶ 69. And, while the Department of Commerce, which oversees NIST, has no regulatory authority or enforcement power to require industry participants to comply with these standards, the standards are routinely implemented (and enforced) through sales contracts, federal specifications, purchase invoices, and advertising. *Id.* ¶¶ 69–71, 75. Indeed, construction codes across all 50 states require builders to use PS 1-09 structural-grade plywood. *See id.* ¶¶ 3, 75.

The PS 1-09 stamp, which appears on each plywood panel, must indicate the name of the accredited certifying agency and the number of the plywood plant that produced the panel. *See id.* ¶ 82. These certifying agencies, like the Defendants here, are supposed to subject random samples of plywood to rigorous testing as a way of ensuring that the panels bearing their stamps conform to the PS 1-09 standard. *See id.* ¶ 92. In the Plaintiffs' view, the Defendants' PS 1-09 stamps are a powerful form of advertising because they allow the Brazilian plywood companies to market their products as conforming to an important American safety standard. *See, e.g., id.* ¶¶ 1–6. Unfortunately, the Plaintiffs say, those stamps are—at least when applied to the Brazilian mills at issue in this case—a species of false advertising because (the Plaintiffs submit) the stamped Brazilian plywood doesn't comport with the PS 1-09 standard. *Id.* ¶¶ 13, 96–107. The root of this problem, according to the Plaintiffs, is the Defendants' alleged failure to perform the testing and quality-assurance inspections the PS 1-09 standard requires. *See id.* ¶¶ 96–107. As the Plaintiffs see things, "it is impossible to consistently manufacture PS 1-09 compliant plywood from the extraordinarily fast-growing loblolly and slash pine plantations in southern Brazil which are the source of the raw materials for all of the Brazilian plywood producers in southern Brazil." *Id.* ¶ 93. These accelerated growth rates, the Plaintiffs insist, inevitably result in weaker (and less dense) plywood, even when the plywood panels are produced from the same pine species that are commonly found in North America. *See id.* ¶¶ 91–93.

Beginning in 2015, U.S. imports of lower-priced Brazilian structural plywood increased significantly. *Id.* ¶ 133. By 2017, these cheaper imports had pushed down the price of structural plywood across the United States. *Id.* This undercutting of the nationwide market, the Plaintiffs allege, has chipped away at the sales and profits of domestic manufacturers, causing the Plaintiffs some $75 million in annual losses. *See id.* ¶¶ 133–34, 142–45.

In June of 2018, the American Plywood Association ("APA")—the non-profit organization to which all of the Plaintiffs belong—issued a product advisory: The Defendants' Brazilian licensees,

4

the APA announced, had failed the APA's PS 1-09 testing. *See id.* ¶¶ 1, 97–98; *see also* APA Product Advisory [ECF No. 299-1]. In August of 2019, the Plaintiffs commissioned a second test of the Brazilian plywood—this time at Clemson University—which, again, revealed shocking failure rates. *See* SAC ¶¶ 100-07.

## THE LAW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243,

1246 (11th Cir. 2016). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). A complaint's "well-pled allegations must 'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

## ANALYSIS

### I.    The Lanham Act: False Advertising

Section 1125(a) of the Lanham Act creates a federal cause of action for false advertising. *See* 15 U.S.C § 1125(a) ("Any person who believes that he or she is likely to be damaged by" a false or misleading representation of fact regarding "the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" may file a civil action against the person who made such statements.).

In the SAC, the Plaintiffs assert both direct and contributory false-advertising claims under the Lanham Act. *See* SAC ¶¶ 138–152 (Counts I & II). In the Eleventh Circuit, a plaintiff advancing a direct false-advertising claim must prove the following five elements:

> (1) the statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing  decision; (4) the misrepresented service affects interstate commerce; and (5) it has been, or likely will be, injured as a result of the false or misleading statement.

*Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702 F.3d 1279, 1294 (11th Cir. 2012) (citing *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

In a contributory false-advertising claim, by contrast, a plaintiff must show (1) that the "third party in fact directly engaged in false advertising that injured the plaintiff" and (2) "that the defendant

contributed to that conduct either by knowingly inducing, or causing the conduct, or by materially participating in it." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015). To establish the defendant's contribution, "the plaintiff must allege that the defendant had the necessary state of mind—in other words that it intended to participate in or actually knew about the false advertising." *Id.* (cleaned up). "The plaintiff must also allege that the defendant actively and materially furthered the unlawful conduct—either by inducing it, causing it, or in some other way working to bring it about." *Id.* In assessing the viability of this claim, courts evaluate whether "the complaint suggests a plausible inference of knowing or intentional participation." *Id.* at 1278.

In their assault on the Plaintiffs' Lanham Act claims for direct and contributory false advertising, the Defendants advance six arguments—all unavailing.

*First*, the Defendants say, the Plaintiffs have failed to identify *any* false or misleading statements by the Defendants about the Brazilian plywood. *See* Motion at 13. In saying so, the Defendants liken our case to *Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, 624 F. App'x 81 (4th Cir. 2015). In *Baldino's*, the plaintiff, a licensed locksmith, brought a false-advertising claim against Google for knowingly publishing the ads of *unlicensed* locksmiths. *See id.* The district court dismissed the complaint, and the Fourth Circuit affirmed, holding that the plaintiff had "failed to show that the Defendants made *any* representations" of fact about the locksmiths. *Id.* at 82 (emphasis added). Google, the court explained, had not certified the locksmiths—falsely or otherwise. *See id.* Nor had it ever suggested that the locksmiths were (or were not) licensed. To the contrary, "the locksmiths who generated the information that appeared on [Google's] websites [were] solely responsible for making any faulty or misleading representations or descriptions of fact." *Id.* Google, in other words, had done nothing more than create a search engine, which the unlicensed locksmiths then used for their advertising. *See id.*

Unlike Google, however, the Defendants *have* made representations about the quality of the

Brazilian products. The Defendants, in fact, have given the Brazilian mills the authority to certify their plywood with *the Defendants'* PS 1-09 stamps. *See* SAC ¶¶ 26–55. Those stamps, in turn, serve as a proxy for the Defendants' view that the Brazilian mills comply with the PS 1-09 standard. *See id.* ¶¶ 13, 26–55, 96–107, 138. Nor is any of this mere ornamentation. Without the Defendants' stamps, after all, the Brazilian companies wouldn't be able to sell their structural plywood in the United States. *See id.* ¶¶ 1–4, 12–14.

A simple analogy may illuminate the difference. Imagine Google as a kind of office building that leases space to an eclectic variety of business owners—some of them doctors. Like Google, the building profits from allowing the tenants to ply their trades—and, with their earnings, to pay the rent. But the building doesn't certify that its doctor-tenants are, in fact, licensed to practice medicine any more than Google attested that the locksmiths from *Baldino's* were (or were not) licensed. The Defendants, by contrast, are like a state medical-licensing board, which tests the doctors' qualifications and, by issuing them their licenses, allows them to practice medicine within the jurisdiction. In doing so, the licensing board *is* making a powerful statement—some would say, the most important statement—about the doctors' qualifications.

Or, to use a slightly different analogy, consider a highway that allows motorists—most of them presumably licensed, some of them (probably) not—to travel freely across the state. Suppose, also, that the entity that owns the freeway profits from the motorists' use—say, via toll booths. As with Google, no one could plausibly suggest that, by permitting motorists to use the freeway, the highway company was attesting that the drivers were, in fact, licensed to drive. Nor would it be reasonable to suppose that the highway company was certifying anything else about those drivers. But the department of motor vehicles, by contrast, does certify, when it issues a driver his license, that the driver has met certain prerequisites—just as the Defendants, by issuing their stamps, are certifying that the Brazilian plywood mills have satisfied the PS 1-09 standard. In short, if it wasn't clear already,

*Baldino's* is wholly inapplicable here.

*Second*, the Defendants deny making any statements at all—false or otherwise. *See* Motion at 14. As the Defendants see things, it's the Brazilian plywood companies who make and stamp the wood, so it's the Brazilian mills whose statements are really at issue here. *See id.* ("[T]he Certification Defendants do not stamp the plywood as compliant with PS 1-09 and there is no allegation that the Certification Defendants are involved in producing the plywood. Rather, it is the third-party Brazilian plywood manufacturers who stamp the plywood . . . . It is apparent that any allegedly false statements originate with third parties."). But the Brazilian plywood companies didn't steal or forge the Defendants' stamp. The Defendants *gave* them the stamp and *authorized* them to use it. *See* SAC ¶¶ 3–9, 26–55. Indeed, these stamps bear the Defendants' names and advertise the plywood as either "TECO TESTED" or "AUDITED BY TP [Timber Products]." *See id.* These stamps are thus unquestionably statements *of the Defendants.*

To go back to our medical-licensing-board analogy, we wouldn't say that the license the board issues isn't a statement *of the licensing board* just because the doctor is the one who frames the license and then hammers it into his wall. So, too, here. The licensors (our Defendants) issued the statements when they authorized the plywood companies to imprint their plywood with the Defendants' stamps. Nor (outside of this lawsuit) would it make any business sense for the Defendants to suggest otherwise. Imagine the uproar when the Brazilian mills' clients learn that the certifications they'd come to rely on—for safety, quality, etc.—weren't the *Defendants'* certifications at all. Who would pay extra for certified plywood if they knew that the certifications had come, not from the Defendants— impartial arbiters the American building community has come to know and trust—but from the Brazilian plywood manufacturers themselves? What value, in other words, would the certification hold if it were just the self-affixed manifestation of any-old mill's efforts at self-policing? No. The Defendants' stamps only have value—and the Defendants' certification businesses only exist—

because the stamps are statements *of the Defendants*.

But, even if the stamps aren't "statements" within the meaning of the Lanham Act—as the Defendants suggest, *see* Motion at 14—the SAC also alleges that the Defendants made other "false statements" about the quality of the Brazilian plywood. So, for instance, the Plaintiffs aver that, after the APA's 2018 report regarding the massive failure rates of Brazilian plywood, the Defendants sent their clients letters. *See* PFS-TECO 2018 Letter [ECF Nos. 106-2, 299-2]; Timber Products Letter [ECF Nos. 106-3, 299-3]; SAC ¶¶ 98–101. In these letters, the Defendants tried to reassure their clients about the APA report and reiterated *their* view that the Brazilian mills *did* satisfy the PS 1-09 requirements. *See* PFS-TECO 2018 Letter ("[C]ustomers of [Brazilian] manufacturers like Guarapes should appreciate that when a plywood panel carries the TECO TESTED® certification mark, it has been manufactured under a system that operates in full compliance with PS 1 requirements. There are no exceptions."); Timber Products Letter ("All third party certification agencies in the United States must certify to the same standards, PS1 for Plywood . . . . Panels certified by Timber Products Inspection are equivalent to those certified by other accredited agencies. This letter can be shared with clients, sales groups, inspectors, or others that are in need of this information."). Despite these promises, the Plaintiffs allege, the Defendants knew or should have known—through their own regimen of inspection and certification—that the Brazilian plywood did not meet the PS 1-09 standard. *See* SAC ¶¶ 12–13, 100. The Defendants never even try to suggest that these letters don't constitute "statements" within the meaning of the Lanham Act. *See generally* Motion; Reply.

In sum, these statements of the Defendants'—their stamps, their letters—are more than enough to sustain the Plaintiffs' direct false-advertising claim (Count II).

But the Plaintiffs have also levied a contributory false-advertising claim. *See* SAC ¶¶ 138–47 (Count I). To state a viable contributory claim, the Plaintiffs must "allege that the defendant contributed to that conduct either by knowingly inducing, or causing the conduct, or by materially

participating in it." *Duty Free Americas, Inc.*, 797 F.3d at 1277. And the Plaintiffs have done plenty of that, too. Time and again, they allege that the Defendants knew or should have known about the Brazilian mills' lack of compliance; that, despite this knowledge, they failed to stop it; and that they *conspired* with the mills to facilitate the dissemination of faulty plywood throughout the United States. *See* SAC ¶¶ 96–131. So, for example, referring to the state of things in 2018, the Plaintiffs aver that:

> At the time the letters were issued, both PFS-TECO and TPI knew and understood that their Brazilian plywood mill licensees were doctoring the makeup of the plywood panels shipped to PFS-TECO and TPI laboratories in the U.S. in order to secure their initial certification to produce PS 1-09 grade structural plywood. PFS-TECO and TPI also knew that their periodic but infrequent inspections consistently showed that their Brazilian plywood mill licensees were failing to meet PS 1-09 grade requirements and that no significant remedial steps were being required to address the off-grade problems that were rampant within their Brazilian mill membership. In fact, both PFS-TECO and TPI clearly failed to meet their inspection agency obligation by consistently looking the other way and simply ignoring the consistent failure of every one of defendants' Brazilian plywood mill licensees to meet the PS 1-09 grade standard.

SAC ¶ 100. Since it's undisputed that the Brazilian mills can't sell their structural-plywood in the United States without the Defendants' stamp, this "looking the other way" easily satisfies the "material participation" standard. *See Duty Free Americas, Inc.*, 797 F.3d at 1277. And, as we've said, the Plaintiffs have also claimed that the Defendants knowingly continued to license their PS 1-09 stamps to the Brazilian mills after the APA's 2018 test results were released. *See* SAC ¶ 101. The Plaintiffs have thus properly alleged "a plausible inference of knowing or intentional participation" on the part of the Defendants. *Duty Free Americas, Inc.*, 797 F.3d at 1278.

    *Third*, noting that they neither stamp the plywood nor profit (directly) from the plywood's sale, the Defendants contend that the stamps don't qualify as "commercial advertising." *See* Motion at 14–15. In a false-advertising claim, it's true, a plaintiff must demonstrate that the defendant engaged "in commercial advertising or promotion." *Tobinick v. Novella*, 884 F.3d 1110, 1116 (11th Cir. 2018) (quoting 15 U.S.C. § 1125(a)(1)(B)). At its core, commercial speech proposes a commercial transaction. *See Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (describing the "core notion of commercial

speech" as "speech which does no more than propose a commercial transaction" (cleaned up)). But "commercial speech encompasses not merely direct invitations to trade, but also communications designed to advance business interests." *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1203 n.22 (11th Cir. 1985). And, while the Defendants may not stamp the plywood themselves, the stamps unquestionably "advance" their "business interests." Their entire PS 1-09 business, after all, depends on the message the stamps convey, the message they *advertise*. *See* SAC ¶¶ 1–9, 75, 81–83; *see also Advertise*, *Merriam-Webster Unabridged* (https://www.merriam-webster.com/dictionary/advertise) (last visited Mar. 3, 2021) (defining "advertise" as "to make something known; to make publicly and generally known; to announce publicly especially by a printed notice or a broadcast; to call public attention to especially by emphasizing desirable qualities so as to arouse a desire to buy or patronize" (cleaned up)). Indeed, were it not for the stamps' assurance that the Brazilian plywood is, as the case may be, "TECO TESTED" or "AUDITED BY TP," SAC ¶ 9, no one would pay a premium for it, *see id.* ¶ 3 ("Building codes adopted throughout the United States require that structural grade plywood panels incorporated into the roofs, floors and walls of residential and commercial buildings in the U.S. meet the PS 1-09 structural standards. . . . [and] that each panel bear a stamp from an accredited certifying agency[.]"). Since both the plywood companies and the Defendants would be out of business without the stamp, it'd be hard to suggest (though the Defendants do try, *see* Motion at 14–15) that the stamps don't "advance" the Defendants' "business interests."

To put it all in simpler terms, the Defendants' PS 1-09 businesses only exist because plywood mills want to sell a certain quality of structural plywood in the United States. And the mills, in turn, can only sell their plywood as building material in the United States if the Defendants certify their wood as PS 1-09-compliant. *See* SAC ¶ 3. The more plywood the mills sell, the more money the Defendants make. *See id.* ¶ 109. Conversely, if the Brazilian mills were to go out of business, the Defendants would make a lot less money (or, perhaps, go out of business themselves). Since the

stamps are the principal mechanism by which this whole circle of life flourishes, the Plaintiffs have adequately pled that the stamps constitute *the Defendants'* "commercial advertising." *See Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 294 (S.D.N.Y. 2016) (concluding that, "by alleging that [the defendant] earns a commission on directed sales of [a third party's] products, the [plaintiff] adequately pleads that [the defendant] has an economic incentive to engage in such promotion").

*Fourth*, the Defendants cite two cases for their view that the stamps are statements of opinion—and thus not "commercial advertising" at all. *See* Motion at 15 (citing *Wall & Associates v. Better Bus. Bureau of Cent. Va., Inc.*, 2016 WL 3087055 (E.D. Va. May 31, 2016) and *Aviation Charter, Inc. v. Aviation Res. Grp./US*, 416 F.3d 864 (8th Cir. 2005)). Neither case supports the Defendants' position here. In *Wall & Associates*, the plaintiff was a tax-settlement business that received poor ratings from the defendants, regional branches of the Better Business Bureau (the "BBB"). 2016 WL 3087055 at *1. The plaintiff alleged that the BBB and its bureaus "falsely advertise and promote [their] rating system as a national, uniform, and unbiased standard when in reality it is implemented by regional, independent licensees applying their own subjective, biased and personal criteria." *Id.* at *2 (cleaned up). The district court dismissed the action because the allegations were insufficient to establish proximate cause. *See id.* at *3. In the court's view, the BBB's ratings didn't constitute "commercial advertising" within the meaning of the Lanham Act because those ratings were "almost certainly non-actionable statements of opinion." *Id.*[2] In so holding, the court found that the plaintiff had "not adequately alleged a direct injury caused by the Defendants' characterizations of its rating system as uniform, objective, and unbiased." *Id.*

---

[2] The Court added that other courts "have considered whether a BBB grade or other similar rating can be a defamatory statement and have universally concluded that they are non-actionable opinions." *Id.* at *3 n.2.

In *Aviation Charter*, the defendant analyzed publicly available data on the plaintiff's business, performed a subjective review of that data, and defined the plaintiff's "safety" rating according to its own methodology. *See* 416 F.3d at 871. When the defendant gave the plaintiff an "unfavorable" safety rating, the plaintiff sued the defendant in federal court under the Lanham Act. *Id.* at 869. As the district court noted, however, the defendant had, in its written reports, acknowledged that the "data contained in this report is of an advisory nature only. . . . [The plaintiff] is not the official source of this data, so users are encouraged to verify the data through official sources prior to drawing any conclusions or basing decisions on this data." *Id.* at 867. The district court granted summary judgment in favor of the defendant, and the Eighth Circuit affirmed. *Id.* at 867–72. The Eighth Circuit determined that the defendant's safety rating was "a subjective interpretation of multiple objective data points leading to a subjective conclusion about aviation safety." *Id.* at 871. Thus, the "comparative rating [was] not a provably false statement of fact" that could support a viable Lanham Act claim. *Id.*

Neither case controls us here. For starters, neither the "safety rating" at issue in *Aviation Charter* nor the business rating from *Wall & Associates* involved a series of engineering tests susceptible of *objective* examination. To the contrary, both involved *subjective* assessments by third-party entities that had *no control* over market entrants. To go back to our analogies, compare our medical-licensing board, which issues its prized medical license only after concluding that an aspiring physician has met certain prerequisites, with a third-party website, like Zocdoc, that draws on a wide variety of publicly available data—viz., interviews with patients and other doctors, a review of insurance claims, documentation of malpractice lawsuits—and then spits out a score that purports to assess the aspirant-cum-physician's competency. Whereas the licensing board's certification includes a statement of fact—the aspirant *has* met the board's standards—the website's evaluation is necessarily an opinion, susceptible of various constructions. So, as an example, if the website docked a physician points for every patient who died, a physician in a very technical field—who, because of her talents, received a

disproportionate share of very sick patients—may end up with an artificially low score that doesn't accurately reflect that physician's abilities. And there are countless other ways in which an outside consultant's review of publicly available data may not adequately reflect reality. Indeed, when we're being honest about assessments of a company's "safety rating," we must acknowledge that there is no *reality*—there's just everyone's opinion of what's likely to happen in the future: is the plane likely to crash? Is the tax preparer likely to steal? Is the doctor likely to kill you? Viewed in this way, the courts in *Wall & Associates* and *Aviation Charter* got it right when they called these evaluative systems *subjective* and characterized them as necessarily conveying mere *opinions*.

But the licensing board that issues the certification—whether it's a medical board, a department of motor vehicles, or a PS 1-09 certifier—isn't offering an opinion at all: it's attesting that the aspirant *has* (objective) passed its tests, met its standards, or satisfied its prerequisites. It's true, of course, that the certifier may get it wrong. A person who failed the certifier's tests might, because of a clerical error or even a mistake about which tests were needed to pass, receive a license. This error rate *might* be what the Defendants are getting at when they say that "an evaluative statement, *e.g.*, the plywood conforms to the PS1-09 standard, based upon multiple, complex data points are not statements of facts actionable under the Lanham Act, but expressions of opinion." Reply at 8. But the possibility that the certifier might get the tests wrong—or apply the tests improperly—doesn't somehow render the tests *subjective*. We can all agree that the answers to questions of math are *objective*, even if, from time to time, a young student may erroneously believe that two and two is five.

It's worth noting, too, that the Plaintiffs aren't merely alleging that the Brazilian plywood failed to meet the PS 1-09 standards. They're also saying that, by stamping the wood, the Defendants certified that they had subjected the mills to certain quality-control processes—even though, the Plaintiffs assert, they did no such thing. *See* SAC ¶¶ 107–119 ("PFS-TECO and TPI, as the certifiers and licensors of the Brazilian PS 1-09 plywood producers . . . have completely failed to perform their

quality control and oversight functions independently and with any integrity."). Here, again, the alleged statement isn't subjective at all. Either the Defendants tested the wood—or subjected it to quality-control review—or they didn't. In all these ways, then, the stamp is an actionable statement of fact—not a mere safety rating. *See Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*, 2019 WL 2723253, at *7 (S.D. Tex. June 28, 2019) (denying defendant's motion for summary judgment, in part, because the "MTRs [Mill Test Reports, an industry-standard report] and the stamps on the flanges constitute commercial speech" under the Lanham Act).

In *Boltex* (a dispute between two carbon-steel-flange manufacturers), the plaintiff accused the defendant of misrepresenting the manufacturing processes—and thus the structural integrity—of the defendant's flanges. *Id.* at *1. Like structural plywood, carbon-steel flanges are subjected to a series of manufacturing processes. *See id.* One of these processes is called "normalization"—a heat treatment that makes steel more durable. *Id.* Since normalization involves extra time and resources, normalized flanges cost more than unnormalized ones. *Id.* As with structural plywood, some customers will only buy flanges that are normalized in accordance with certain published industry standards. *Id.* And, like PS 1-09 plywood, "customers cannot simply look at a flange to determine whether it has been normalized; rather, customers rely on the manufacturers to let them know whether a flange has been normalized or not." *Id.* Manufacturers tell clients about the quality of their flanges *both* through MTRs—"liken[ed] to a birth certificate for a flange because it indicates certain specifications about the flange," *id.* at *1—*and* by stamping the flanges (with an "N" for "normalized"), *id.* at *6. The *Boltex* Court concluded that the reports and stamps constituted "commercial advertising," in part, because "customers depend on the MTRs as an accurate reflection of what they purchased." *Id.* at *7.

Like the stamps in *Boltex*, the Defendants' PS 1-09 stamps—whether administered by the Brazilian mills or by the Defendants themselves—advertise that the plywood satisfies PS 1-09 specifications. And, like the customers in *Boltex*, purchasers of structural plywood rely on the PS 1-09

stamp as a proxy for its quality. *See, e.g.*, SAC ¶ 81 ("Engineers rely on the mechanical properties included in the PS 1-09 standard when designing structural components such as storm shutters."). The court's well-reasoned decision in *Boltex* thus strongly supports the Plaintiffs' view that the PS 1-09 stamps are commercial statements of fact for purposes of the Lanham Act.

*Fifth*, the Defendants argue that their certification of the Brazilian mills was not the proximate cause of the Plaintiffs' injuries. *See* Motion at 15. Here, the Defendants point out that the protection of § 1125(a) "extends only to those plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1274 (11th Cir. 2015) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). A statutory cause of action, like a false-advertising claim, "is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Lexmark*, 572 U.S. at 132. To "fall within the zone of interests protected by" the Lanham Act, a plaintiff must show injury to a commercial interest—such as reputation or sales—and must demonstrate that the injury followed *directly* from the defendant's actions. *See id.* at 133 ("We thus hold that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff.").

Admittedly, as in *Lexmark*, this is not the paradigmatic false-advertising claim, in which "one competitor directly injures another by making false statements about his own goods or the competitors' goods and thus inducing customers to switch." *Id.* at 137. "But although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under Section 1125(a)." *Id.* "[W]hen deception of consumers causes them to withhold trade from the plaintiff," such as "a competitor who is forced out of business by a defendant's false advertising," a Lanham Act claim may be viable. *Id.* at 133–34.

And that's exactly what the Plaintiffs have alleged here. The Plaintiffs say that the Defendants'

certification of non-compliant plywood has hurt the Plaintiffs' sales. *See* SAC ¶¶ 9, 13, 142–50. Specifically, the Plaintiffs repeatedly claim that the Brazilian plywood is cheaper to produce—in large part because of a lack of compliance with PS 1-09. *See id.* ¶ 133 ("The low prices charged for these off-grade Brazilian plywood products masquerading as PS 1-09 structural plywood caused, beginning in September 2017, a substantial decline in the price of PS 1-09 structural panels in the United States."). This, in turn, means that the Brazilian mills can sell their wood in the United States at a far lower price point—thus displacing the Plaintiffs' better (but more expensive) wood from the market. *See id.* ¶ 134 ("Prices have dropped to such low levels at present that many U.S. plywood producers including multiple Plaintiffs are operating at a loss."); *id.* ¶ 144 ("Plaintiffs currently estimate that the massive volumes of off-grade plywood flowing into U.S. markets from southern Brazil since September 5, 2017 have resulted in at least a $50 per 1,000 square feet average drop in the market price."). This displacement has resulted, the Plaintiffs say, in roughly $150 million in damages. *See id.* ¶ 145 ("Plaintiffs have suffered losses of roughly $75 million in each of the last two years dating back to September 1, 2017. As of the date of this filing, Plaintiffs have suffered collective damages of roughly $150 million."). Without the Defendants' certification, of course, the Brazilian mills couldn't sell their plywood in the United States—at least not for structural purposes. *See id.* ¶¶ 3–6, 138–42. And it's this "deception of consumers" by the Defendants and their Brazilian clients (telling them that the wood complies with PS 1-09 when it does not, *see id.* ¶¶ 83, 138–43) that *causes* those consumers to "withhold trade from the plaintiff[s]"—precisely the circumstance the Supreme Court envisioned in *Lexmark*. 572 U.S. at 133–34. The Plaintiffs have thus adequately alleged that the Defendants' misconduct proximately caused their damages.

      *Sixth*, and finally, the Defendants contend that the Plaintiffs have failed to "allege a single fact to support their claim that the Certification Defendants had control, participated in or knew the Brazilian mills were not compliant, or were otherwise responsible to ensure the Brazilian producers

were compliant with the PS 1-09 standard after the Certification Defendants certified the mills." Motion at 15–16. In saying so, though, the Defendants simply ignore the Plaintiffs' well-pled allegations. Starting with control, the Plaintiffs go into great detail about the Defendants' very close relationships with their Brazilian clients, including by describing which Defendant certified each mill as PS 1-09-compliant—and by noting the date on which the certification came through. *See* SAC ¶¶ 26–55. The Plaintiffs also lay out the extensive degree of control each Defendant exercises over the Brazilian mills: As "a condition to the certification of plywood mills in Southern Brazil to produce PS 1-09 structural plywood," the SAC avers, "defendants PFS-TECO and TPI require each Brazilian mill to enter into a licensing agreement under which its certifier (PFS-TECO or TPI ) becomes the *exclusive provider of inspection services*," *id.* ¶ 25 (emphasis added)—inspection services that, as we've discussed, are the lifeblood of the Brazilian mills' American structural-plywood interests, *see id.* ¶¶ 3–6, 139.

Moving onto knowledge, the Plaintiffs repeatedly assert that the Brazilian plywood does not satisfy the PS 1-09 standards. *See, e.g.*, *id.* ¶ 83 ("75% or more of the 1.5 billion square feet of Brazilian PS 1-09 stamped plywood exported to the U.S. in 2017-18 failed to meet the most important property of structural plywood panels, specifically bending stiffness."); *id.* ¶ 138 ("[B]oth inspection agencies knew or should have known that none of these producers could consistently and reliably produce PS 1-09 compliant structural plywood from the loblolly and slash pine plantations growing in southern Brazil."). Indeed, the Plaintiffs maintain that the Brazilian plywood *cannot*—for a variety of biological reasons—satisfy the PS 1-09 requirements. *See id.* ¶ 140 ("[D]ue to the extraordinarily fast-growing character of the loblolly and slash pine resource available to the Brazilian plywood producers in southern Brazil, it is not ordinarily possible to reliably produce on grade PS 1-09 compliant structural plywood."). That's why, the Defendants say, the Brazilian plywood consistently fails in independent studies to meet the PS 1-09 bar. *See id.* ¶¶ 95, 155. And, the Plaintiffs add, the Defendants—given

their close relationship with the mills and their expertise in the field—have long known all of this to be true. *See id.* ¶¶ 12, 138–39. The Plaintiffs, in short, have adequately alleged that the Defendants knew—or should have known—that the Brazilian wood didn't comply with the PS 1-09 standards.

For all these reasons, the Defendants' Motion to Dismiss the Plaintiffs' Lanham Act claims is **DENIED**.

## II.   Negligence

Whether the Defendants had a legal duty towards the Plaintiffs is a question of law. *See McCain v. Fla. Power Corp.* 593 So. 2d 500, 503 (Fla. 1992) ("[D]uty exists as a matter of law and is not a factual question for the jury to decide: Duty is the standard of conduct given to the jury for gauging the defendant's factual conduct."). Under Florida law, the duty of care in a negligence action may arise from one of four sources: "(1) legislative enactments or administrative regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Dorsey v. Reider*, 139 So. 3d 860, 863 (Fla. 2014) (cleaned up) (citing *McCain*, 593 So. 2d at 503 n.2). For a duty to stem from the fourth category—"the general facts of the case"—the conduct at issue must be "such that it creates a 'foreseeable zone of risk' posing a general threat of harm to others." *Id.* When a defendant's conduct creates a foreseeable zone of risk, "a legal duty will ordinarily be recognized to ensure the conduct is carried out reasonably." *Id.*

The Florida Supreme Court has distinguished between the oft-confused elements of duty and proximate cause. As the court has explained, while both require a degree of foreseeability, the existence of a duty—decided by the Court—turns on whether "the activity at issue created a *general* zone of foreseeable danger of harm to others." *Id.* at 863-64 (emphasis added). Once this duty has been established, the element of proximate causation—reserved for the factfinder—demands "a factual showing that the dangerous activity foreseeably caused the specific harm suffered by those claiming injury." *Id.*

The Plaintiffs bring their negligence claim (Count III of the SAC) under Florida's "foreseeable zone of risk" test. Response at 7, 21; *see also* SAC ¶¶ 154–60. In asking the Court to dismiss this count, the Defendants advance only one argument—that the Plaintiffs' economic injuries weren't a reasonably foreseeable consequence of the Defendants' faulty certification and inspection of the Brazilian plywood. *See* Motion at 17 ("[T]he Certification Defendants are not in the business of protecting Plaintiffs against risk of economic loss due to competition, price fluctuations or consumer preferences."). More specifically, the Defendants concede that, since the PS 1-09 standards are primarily intended to protect the structural integrity of American buildings, the Defendants' alleged failure to properly inspect and certify the Brazilian plywood created a foreseeable risk that the consuming public might be injured by a falling or decaying structure. *See id.* at 17 ("[R]elying on Plaintiffs' own allegations, the types of injuries the Certification Defendants are designed to protect against are those related to health and safety." (cleaned up)); Reply at 9 (acknowledging that the Defendants' "quality assurance certifications and inspections" are "designed to protect the public from potential 'health and safety' concerns regarding the structural grade requirements"). But, they insist, what the "foreseeable zone of risk" did *not* include is anything beyond the integrity of the buildings themselves—i.e., the Plaintiffs' claims of marketplace displacement. *See* Motion at 17; *see also* Reply at 9.

But Florida's "foreseeable zone of risk" test isn't as narrow as the Defendants have supposed. Instead, as we've said, that test asks only whether a defendant's conduct "created a broader 'zone of risk' that poses a *general* threat of harm to others." *Dorsey*, 139 So. 3d at 866 (emphasis added & cleaned up) (quoting *McCain*, 593 So. 2d at 502). In *Dorsey*, the Florida Supreme Court held that "each defendant who creates a risk is required to exercise prudent foresight whenever others *may* be injured as a result. This requirement of reasonable *general* foresight is the core of the duty element." *Id.* at 864 (emphasis added) (quoting *McCain*, 593 So. 2d at 503). At the pleadings stage, then, a plaintiff must

allege "*only* that [the defendant's] conduct created a *general* zone of foreseeable danger of harm. The *exact* type of injury that results is *not required* to be anticipated." *Id.* at 866–67 (emphases added).

And the Plaintiffs have done precisely that. They have alleged, for instance, that the Defendants failed to fulfill "their responsibilities to accurately certify, inspect and test Brazilian plywood licensees." SAC ¶ 154. And they have submitted that, "[g]iven the long experience of Defendants PFS-TECO and TPI as certification, inspection and testing agencies . . . it was entirely foreseeable that these Defendants' failure to perform their core oversight functions would result in off-grade product from Brazil entering the U.S. market[.]" *Id.* ¶ 156. They have thus adequately pled that the Defendants' conduct created a *general* risk of foreseeable harm. Lying about a structural plywood's compliance with safety standards, after all, is a dangerous game that undoubtedly creates foreseeable risks.

The Defendants try to cabin the foreseeability inquiry by requiring the Plaintiffs to "allege that it was foreseeable . . . that the importation of non-compliant plywood would cause the reduction in price in the marketplace which would then cause Plaintiffs' injury." Motion at 16–17. But (again) the Plaintiffs *have* alleged this—another example of the Defendants misreading the SAC. *See* SAC ¶ 156. In any event, the Defendants appear to conflate foreseeability as it applies in the context of duty with the separate requirement that a defendant's breach proximately (that is, foreseeably) cause the plaintiff's injuries. *See, e.g.*, *Williams v. Davis*, 974 So. 2d 1052, 1057 n.2 (Fla. 2007) ("[E]stablishing the existence of a duty under our negligence law is a minimum threshold legal requirement that opens the courthouse doors to the moving party, and is ultimately a question of law for the court rather than a jury. The determination of whether that duty was breached in a particular instance, however, will ordinarily be reserved for the fact-finder, be it judge or jury." (citations omitted)). As the Florida Supreme Court has explained, whether a defendant's failures proximately caused the plaintiff's injuries "generally must be left to the fact-finder to resolve." *McCain*, 593 So. 2d at 504.

In the end, the Defendants' alleged failure to perform the core responsibilities of testing, inspecting, and certifying a structural product creates a general and foreseeable risk of harm. *See* SAC ¶¶ 4–7, 154–59. That's enough at this stage of the case. *See Dorsey*, 139 So. 3d at 865–66 (stating that, "to find a duty of care," the court need find "only that [defendant's] conduct created a *general* zone of foreseeable danger of harm" (emphasis added)). The most obvious of these harms—the Defendants are right—is the risk that structurally unsound buildings might fall and cause injuries to innocent third parties. *See* Motion at 9 (suspecting that the PS 1-09 certifications and inspections are "designed to protect the public from potential 'health and safety' concerns regarding the structural grade requirements"). Perhaps it's obvious, too, that these injuries might cause economic damages to the companies whose businesses are housed in these unsound structures. But it's also foreseeable (though, perhaps, somewhat less so) that the act of facilitating the importation of cheaper, sub-standard products would cause economic injuries to domestic manufacturers who (so the allegation goes) have had to pay more money (and so must charge more money) to keep their standards high. *See* SAC ¶¶ 154–59 (characterizing as foreseeable the risk that the Defendants' failure to adequately inspect the Brazilian licensees "would result in off-grade product from Brazil entering the U.S. market and undermining fair competition"). The Defendants have cited no case (and the Court has found none) for the bizarre proposition that only the *most* obvious harms fall within the "foreseeable zone of risk"—to the exclusion of all others.

One final thing: Generally, it's true that "a party has no legal duty to prevent the misconduct of third persons." *Dorsey*, 139 So. 3d at 864. But, again, the Plaintiffs have alleged that the Defendants are *themselves* the tortfeasors who facilitated the distribution of faulty plywood in the United States by rubber-stamping the Brazilian wood as PS 1-09-compliant when, in fact, they knew (or should have known) that it wasn't. *See, e.g.*, SAC ¶ 12 ("Defendants made false descriptions of fact through certifications, accreditations and licensing agreements that authorized 36 Brazilian plywood producers

to export plywood into Florida that Defendants knew or should have known did not meet the PS 1-09 grade standard."). The Plaintiffs, in other words, aren't (as the Defendants suggest) trying to hold the Defendants accountable for the "misconduct of third persons" at all.

The Defendants' Motion to Dismiss the Plaintiffs' negligence claim is therefore **DENIED**.

***

After careful review, the Court hereby **ORDERS AND ADJUDGES** that the Defendants' Motion to Dismiss [ECF No. 182] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 3rd day of March 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record