## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-62225-CIV-ALTMAN

**U.S. STRUCTURAL PLYWOOD**
**INTEGRITY COALITION**, *et al.*,

     *Plaintiffs*,

*v.*

**PFS CORPORATION**,

     *Defendant.*

_____/

### <u>ORDER</u>

Our Plaintiffs are a coalition of American plywood manufacturers who've sued PFS-TECO—a U.S. certification agency whose job it is to ensure that imports of Brazilian plywood comply with American standards. When structural-plywood panels conform to those standards, agencies (like PFS-TECO) authorize the plywood mills to affix a PS 1-09 stamp onto the plywood itself. This stamp tells consumers that the panels are structural grade—which is to say, safe for construction. In this lawsuit, the Plaintiffs allege that PFS-TECO certified certain imported Brazilian plywood as PS-1-09-compliant when it wasn't. According to the Plaintiffs, this mis-labeling constitutes a form of false advertising that's caused them millions of dollars in damages. As we'll see, whether these stamps qualify as advertising (false or otherwise)—and to what extent they caused the Plaintiffs' damages—are the principal points of contention among the parties. In any event, to remedy their (alleged) injuries, the Plaintiffs assert claims under the Lanham Act and Florida's negligence law.

After more than two-and-a-half years of litigation, PFS-TECO moved for summary judgment, contending that: (1) the Plaintiffs lack standing under the Lanham Act; (2) the PS 1-09 stamps do not constitute false advertising; (3) PFS-TECO isn't liable for negligence under Florida law; and (4) the

Plaintiffs haven't suffered measurable damages.[1] This Order follows.

**THE FACTS[2]**

To be used as building material in the United States, plywood must bear a stamp—the PS 1-09 stamp. *See* Plaintiffs' Statement of Material Facts ("Pls.' SOF") [ECF No. 360] ¶ 66 ("Building codes across the country including Florida require PS 1-certified plywood" (citing the Florida Building Code [ECF No. 369-5] § 23.03.1.5)). That's because every piece of plywood that's used for construction in the United States must be certified (and stamped) as compliant with the PS 1-09 Standard (the "Standard" or the "PS 1-09 Standard"). *Id.*; *see also* PFS-TECO's Building Code Requirements for Wood-Based Structural Panels in the United States [ECF No. 369-3] ("PFS-TECO's Building Code Requirements") at 1 ("When building with plywood, oriented strand board (OSB), or waferboard, the panels must meet the requirements of the building code(s) enforced in your jurisdiction (city, state, etc.). . . . Both the [International Building Code®] and [International Residential Code®] require structural panels such as plywood and OSB, when used for structural purposes, to conform to U.S. Department of Commerce Voluntary Product Standard: PS 1, *Structural Plywood*[ ], or PS 2, *Performance Standard for Wood-Based Structural-Use Panels* (PS 2), and to be identified by the mark of an approved testing and grading agency."). Note the curious appearance of the word "require" in this document. In its MSJ, the Defendant repeatedly argues that the Standard imposes (essentially) no

---

[1] That Motion for Summary Judgment [ECF No. 348] ("MSJ") is now ripe for resolution, *see* Pls.' Response to the Motion for Summary Judgment [ECF No. 358] ("Response"); Def.'s Reply in Support of the Motion for Summary Judgment [ECF No. 374] ("Reply").

[2] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)).

2

requirements on certification agencies. The Plaintiffs disagree. This document *arguably* lends strong support to the Plaintiffs' overall position.

The PS 1-09 Standard is a voluntary standard that establishes certain requirements for (almost) every aspect of structural-grade plywood's composition and performance—including specifications for wood species, veneer grading, adhesive bonds, panel construction and workmanship, dimensions and tolerances, marking, moisture content, and packaging. *See* Defendant's Statement of Materials Facts ("Def.'s SOF") [ECF No. 349] ¶ 2; Pls.' SOF ¶ 2. The Standard governs the manufacture of structural plywood from 70 different wood species and classifies these species into five different strength-property groups based on where the trees were grown. *See* Voluntary Product Standard PS 1-09 ("Product Standard") [ECF No. 349-1] § 2.23. Group 1 consists of the strongest species. *Id.* To be used for construction, structural plywood must be manufactured *either* from a Group 1 species *or* from a species that, in performance tests, has met or exceeded the strength properties of Group 1 plywood. *See* SAC ¶¶ 75, 88.[3] The Standard's objective "is to establish recognized *requirements* for products and to provide all concerned interests with a basis for a common understanding of the characteristics of the products." Product Standard at iii (emphasis added). Note (again) that pesky word "requirements."

The Standard, while voluntary, has become industry custom since the National Institute of Standards and Technology ("NIST") published it in 1966.[4] *Id.* And so, even though the Department of Commerce, which oversees the NIST, "has no regulatory power in the enforcement of [the

_____

[3] *See also* Product Standard at §§ 2.23 (describing the wood species classification system), 5.1("All plywood panels represented as conforming to this standard shall meet or exceed all applicable requirements set for herein[.]"), 5.8.7.1 ("Panels using species as provided in Section 5.2.4 shall be qualified for use under this standard based upon testing of panel strength and stiffness in accordance with Section 5.8.7.2. Results of testing shall establish Group classification for use as required in Section 7.3.a."), 5.8.7.2 (setting out the performance requirements for bending stiffness, bending strength, planar shear strength, and shear-through-the-thickness strength).
[4] When the Standard was initially published, NIST was known as the National Bureau of Standards. *See* SAC ¶ 69.

3

Standard's] provisions," the Standard "represent[s] a consensus of all interested groups." *Id.* The Standard is thus routinely implemented (and enforced) through sales contracts, federal specifications, purchase invoices, and advertising. *Id.*; *see also* SAC ¶¶ 69–71, 75. Indeed, construction codes in all 50 states—including Florida—require builders to use PS-1-09-compliant plywood. *See* Pls.' SOF ¶ 66; *see also* Florida Building Code § 2303.1.5 For all practical purposes, then, any structural plywood that's sold *for building* in the United States must bear a PS 1-09 stamp. *See* Pls.' SOF ¶ 66.

Our Plaintiffs—the U.S. Structural Plywood Integrity Coalition—are a collection of ten American plywood companies that manufacture PS 1-09 plywood, mostly in the Pacific Northwest.[5] *See* SAC ¶¶ 14–22. Together, they've sued our Defendant, PFS TECO,[6] one of the two American agencies that's responsible for certifying imported Brazilian plywood.[7] *See id.* ¶¶ 3–4. PFS-TECO is an accredited "independent third-party certification, inspection, and testing agency of, among other things, structural plywood." Def.'s SOF ¶ 18; *see also* Pls.' SOF ¶ 18 ("Undisputed"). In that role, PFS-TECO is tasked with certifying that its clients—including, as relevant here, "fourteen (14) Brazilian plywood manufacturers who operate a total of fifteen (15) plywood mills"—comply with the requirements of the PS 1-09 Standard. *See* Def.'s SOF ¶ 22. PFS-TECO authorized those Brazilian clients to affix its proprietary version of the PS 1-09 stamp—the TECO TESTED® stamp—onto their structural-plywood products. *See id.* ¶ 23; Pls.' SOF ¶ 23 ("Undisputed"). Here's the TECO TESTED® stamp:

---

[5] The Plaintiffs' coalition members are: Coastal Plywood Company; Scotch Plywood Co., Inc.; Veneer Products Acquisitions, LLC; Southern Veneer Specialty Products, LLC; Hunt Forest Products, LLC; Freres Lumbers Co.; Hardel Mutual Plywood Corporation; Murphy Company; SDS Lumber Co.; and Swanson Group, Inc. *See generally* Docket.

[6] This action was original brought against three defendants—PFS-TECO, Timber Products Inspection, Inc. ("TPI"), and International Accreditation Service, Inc. ("IAS"). *See* Original Complaint [ECF No. 1]. Since then, the Plaintiffs have reached settlements with IAS and TPI. *See* First Mediation Report [ECF No. 143] (noting the settlement with IAS); *see also* Second Mediation Report [ECF No. 329] (noting the settlement with TPI).

[7] The other certifying agency is TPI.



*See* MSJ at 11; *see also* PFS-TECO Claim Investigation Report 19-003 [ECF No. 370-3] at 4.

But, the Plaintiffs say, PFS-TECO has allowed the Brazilian mills to apply the TECO TESTED® stamp to plywood that it knows (or has every reason to know) isn't PS-1-09-compliant. *See generally* SAC. In other words, the Plaintiffs believe that the TECO TESTED® stamp, when applied to the Brazilian mills' products, is *false. Id.* ¶¶ 100 (describing PFS-TECO's defense as "blatantly false"), 138–52 (the Plaintiffs' false-advertising counts). It's undisputed that the Plaintiffs compete with PFS-TECO for business. *See* Def.'s SOF ¶ 35 ("The APA competes with PFS TECO for business."); Pls.' SOF ¶ 35 ("Undisputed"). So, to stop this "false advertising"—and to recover damages for past harms—the Plaintiffs brought this action under the Lanham Act and Florida's negligence law. *See* SAC ¶¶ 138–52, 154–60. In the operative, the Plaintiffs claim that PFS-TECO's sham certification process has allowed the Brazilian mills to sell cheaper, non-compliant wood all over the United States—thus displacing the Plaintiffs' stronger, better, and more expensive products. *See* SAC ¶¶ 138–44, 148–49, 154–57. On what grounds do the Plaintiffs base these claims? Here's an outline of some of their best evidence.

A year before the Plaintiffs filed this lawsuit, the APA[8]—a non-profit trade association that promotes the interests of its members (including each of our Plaintiffs)—began testing Brazilian plywood that had been imported into the United States. *See* Def.'s SOF ¶¶ 33–36; Pls.' SOF ¶¶ 33–36 (not disputing this). They did this because, for several years before that, there'd been such an influx of Brazilian plywood into the American market that some American mills—including some of our Plaintiffs—"consider[ed] imported panels [ ] a threat to their business." Def.'s SOF ¶ 36; Pls.' SOF ¶ 36 ("Undisputed").[9] And (the Plaintiffs claim) the APA became concerned about the quality of Brazilian plywood because its members "had reason to suspect that it was impossible for plywood produced from [the] loblolly and slash pine grown in southern Brazil to consistently meet the bending and stiffness requirements of the PS 1-09 [S]tandard." SAC ¶ 97. So, over several months in 2017 and 2018, the "APA conducted a series of tests on nine sets of Brazilian plywood imported from seven manufacturers"—including some of the mills PFS-TECO had certified. *See* APA Product Advisory [ECF No. 1-3] at 1. In its testing, the APA found that "the tested plywood panels failed to meet the PS 1 bending stiffness requirement" for Group 1 species plywood. *Id.* In June 2018, the APA published its findings in its Product Advisory. *See generally id.*

Almost as soon as the APA issued its Product Advisory, plywood consumers began contacting PFS-TECO to express their concerns about the quality of Brazilian plywood. *See* July 2018 Emails Between Michael Patneaude, Steve Winistorfer, and Joe Brown Regarding PFS-TECO Response Letter [ECF No. 367-10] at 10 (noting "concerns from our costumers" as a result of the APA's Product Advisory). In July 2018, trying to address these concerns, PFS-TECO—in collaboration with its largest Brazilian client—issued a letter asserting that "PFS TECO is recognized as one of the

---

[8] Its formal (and more cumbersome) name is: "APA–The Engineered Wood Association." *See* Product Standard App'x C2 (noting that, in 1965, the organization was known as the "American Plywood Association" and is now called "APA–The Engineered Wood Association").

[9] *See also* SAC ¶¶ 86, 133–34 (detailing this bit of history and alleging that, between 2015 and 2018, Brazilian plywood flooded the U.S. market and caused a precipitous decline in plywood prices).

premier agencies of these products in part because PFS TECO follows the *requirements* in PS 1 to the letter."[10] Letter from PFS-TECO & Guararapes Regarding the APA Product Advisory [ECF No. 299-4] ("Joint Response to the APA Advisory") at 1 (emphasis added). There's that word ("requirements") again. "PFS TECO," the letter went on, "understands the concern regarding a recent APA Product Advisory regarding structural plywood imported into the US from Brazil. However, customers of manufacturers like [the Brazilian mill] Guararapes should appreciate that when a plywood panel carries the TECO TESTED® certification mark, it has been manufactured under a system that operated in full compliance with PS 1 *requirements*." *Id.* (emphasis added). Again, "requirements."

Since the issuance of the APA Product Advisory, PFS-TECO has maintained that its certification system fully complies with the strictures of the PS 1-09 Standard. *See, e.g.*, MSJ at 7 ("While Plaintiffs suggest that Plaintiffs' certification agency, the [APA], may use different product testing regimes and plant production monitoring than do the Brazilian mills, they cannot use the current PS 1 standard to require their preferred level of supervision. Simply put, PFS TECO undisputedly complies with all requirements of the PS 1 Standard."). Moreover (it insists), the Standard gives certification agencies a certain measure of discretion in deciding how to inspect—and certify—their clients. *Id.* at 26 ("[The] PS 1 Standard grants the certification and inspection agency discretion in implementing the standard."). For this reason (it says), nothing in the Standard *actually* prohibits any of the certification (and inspection) processes the Plaintiffs here criticize—*e.g.*, the granting of interim approvals, the reliance on subcontractors to visit Brazilian mills, and the practice of allowing Brazilian mills to select for themselves the small sample of product that will be tested. *Id.*

Still, some of the plywood PFS-TECO has received from its Brazilian clients seemed plainly non-compliant—to the point where one could, for example, "break the veneers off with [a] hand[.]"

---

[10] TPI, the other certification agency, issued a similar letter. *See* TPI Letter Responding to the APA Product Advisory [ECF No. 299-3].

Sept. 2017 Emails Between Dan Hovanec, Fabio Flor, and Steve Winistorfer Regarding Plywood Audits [ECF No. 366-7] at 1. Some of this TECO TESTED® plywood looked like this:



*Id.* at 9, 6. From the Defendant's perspective, though, the APA Product Advisory unfairly painted Brazilian plywood with a broad brush—labeling *all* Brazilian mills as unsafe and subpar, *even though* (the Defendant says) PFS-TECO's certification process was much tighter than TPI's. *See* Jan. 2018 Emails Between Steve Winistorfer, Fabio Flor, Steve Verhey, and Dan Hovanec Regarding the Stamp BC 1/2 for Mill 352 [ECF No. 363-4] at 1 ("You are right that the TECO TESTED[®] mark is considered to be of much higher quality and integrity when compared to TPI—BECAUSE IT IS! TPI has shown again and again that they will do anything to get a new client, including giving stamps before doing a single test."). And, in the Defendant's view, the APA (as PFS-TECO's direct competitor) has every incentive to besmirch PFS-TECO's reputation. *See* July 13, 2018 Letter from Steve Winistorfer, Steven Verhey, and Dan Hovanec Regarding PFS-TECO's Response to the APA Product Advisory [ECF No. 367-8] ("PFS-TECO Letter to Brazilian Mills Regarding APA Product Advisory") at 2 ("APA's motives in this case are clear: conduct a limited amount of testing and use incomplete results to paint the entire Brazilian Plywood industry as one whose products do not comply with PS 1.").[11]

---

[11] Dan Hovanec, Steven Verhey, and Steve Winistorfer are all senior employees at PFS-TECO. They serve as the Panel Products Manger, the Vice President of Panel Products and Labs, and the Vice President of the Building Products Division, respectively. *See* PFS-TECO Letter to Brazilian Mills Regarding APA Product Advisory.

Unmoved, the Plaintiffs counter that PFS-TECO has, for years, allowed its clients to stamp (and then import into the United States) non-compliant plywood. To prove this, the Coalition has commissioned two additional studies. The first was conducted by Clemson University's Glenn Department of Civil Engineering. *See generally* Clemson Study Report [ECF No. 349-23] ("Clemson Study"). In this study, Dr. Weichiang Pang tested PS-1-09-stamped panels from nine Brazilian mills to measure their strength and stiffness. *Id.* at 1. The results of this study[12]—the Plaintiffs say—show a high level of "noncompliance with required PS 1 mechanical properties" and "a 75% failure rate by nine Brazilian plywood mills[.]"[13] Response at 3. The second study was conducted by Blackwater Technical Services—a "certified laboratory, recognized and accredited by" the American National Standards Institute ("ANSI") National Accreditation Board, Miami-Dade County, the Florida Building Code, and the Texas Department of Insurance. Blackwater Testing Report [ECF No. 361-9] ("Blackwater Study") at 12.[14] Blackwater tested 100 samples of Brazilian structural plywood, using the test for "performance under uniform load" specified in Section 6.2.2 of the Standard. *See* Blackwater Study at 13–14, 17. That test showed a "deflection"[15] failure rate of 50%.[16] Response at 3.

---

[12] For these results, see Clemson Study §§ 3.1–3.9, 4.1–4.2.

[13] The Clemson Study also included TPI-certified plywood, *see generally* Clemson Study—so, not all nine of those mills went through PFS-TECO's process. But it's undisputed that *two* of them— Industria Guararapes Ltda., and Industrial Arbhores Compensados Ltda.—did. *See id.* §§ 3.1, 3.3 (summarizing the results for each of these mills).

[14] This document appears as an exhibit to—and is contained within the same PDF as—Ronald Anthony's expert rebuttal report. Since the PDF also includes a collection of other documents, the page numbering gets tricky. As an example, page 12 of the Blackwater Study is not on page 12 of the PDF. For ease of reference, then, we'll cite to the page number as it appears in the PDF (not the study).

[15] In engineering, deflection (or, as it's sometimes called, deflexion) refers to "[t]he amount of bending or twisting of a structure or machine part under load." *Deflection*, CHAMBERS DICTIONARY OF SCI. & TECH. (1st ed. 2007); *see also Deflection*, DICTIONARY OF MECH. ENG'G (4th ed. 1996) ("A linear measurement of the amount of movement of a structure and subjected to a ***bending moment***, a ***shear force*** or a ***couple***.").

[16] For the results of this examination, see Blackwater Study at 21–240.

The Plaintiffs also support their case with expert analysis.[17] They provide us with the expert opinions of Ronald W. Anthony, a wood scientist with over 35 years of experience testing wood products; Dr. Todd Shupe, the country's most published academic on the properties of southern yellow pine; Dr. Roy C. Anderson, an expert on forest-products marketing; and Thomas Montzka, a forest-management economist with decades of experience in the use of linear regression models to predict pricing in the market for wood products.[18]

In his expert report, Dr. Anthony reviewed the testing that formed the basis of *both* the APA Product Advisory *and* the Clemson Study. *See* Anthony Discl. at 4–9 (discussing the APA and Clemson studies). He concluded that both studies were conducted appropriately. *Id.* at 5–6 ("I have reviewed the APA's testing data that was summarized in the Product Advisory. In my opinion, the APA properly conducted the flat panel bending test to determine bending stiffness. . . . Based upon my review of the APA Product Advisory SP-1185 and the underlying data . . . it is my opinion that the APA performed all of its tests appropriately and in conformity with the testing methodology set out in Method C of ASTM D3043."), at 7–8 ("In my opinion, Clemson University Professor Weichiang Pang, Ph.D., and Graduate Research Assistant Lancelot Reres properly set up and calibrated the testing apparatus in order to perform the bending stiffness test in accordance with the specifications of Method C of ASTM D3043. It is also my opinion that Clemson University performed these tests in the same manner as was done by the APA.") And he concluded, based on those studies (and on

---

[17] We recognize that the Defendant has filed a *Daubert* motion challenging the Plaintiffs' reliance on these experts. *See generally* Def.'s Amended Omnibus *Daubert* Motion [ECF No. 439]. If, when we resolve that motion, we decide to strike one or more of these experts, we'll allow PFS-TECO to reraise those summary-judgment arguments that were contingent on our *Daubert* ruling.

[18] *See* Expert Witness Disclosure of Ronald W. Anthony [ECF No. 351-3] ("Anthony Discl.") at 2 (summarizing Anthony's background), 23–37 (Anthony's CV); Expert Disclosure of Dr. Todd Shupe [ECF No. 351-10] ("Shupe Discl.") at 2 (summarizing Shupe's background), 16–58 (Dr. Shupe's CV); Expert Witness Disclosure of Dr. Roy C. Anderson [ECF No. 361-4] ("Anderson Discl.") at 2 (summarizing Dr. Anderson's background), 18–20 (Dr. Anderson's CV); Expert Witness Disclosure of Thomas B. Montzka [ECF No. 361-6] ("Montzka Discl.") at 1 (summarizing Montzka's background), 14–17 (Montzka's CV).

some other evidence),[19] "that the plywood panel qualification testing and certification procedures, as well as the periodic testing and inspection audit procedures used to ensure adequate ongoing quality assurance of [PFS-TECO] in Brazil lack scientific integrity." *Id.* at 11. He also determined that "the Brazilian plywood producers in the states Paraná and Santa Catarina, Brazil, which make up 100% of the Brazilian mills certified and inspected by TPI and PFS-TECO, have consistently failed to produce PS 1-09-compliant plywood manufactured from the species from which they produce plywood for sale in the U.S. market." *Id.* at 13–14.

Dr. Shupe, for his part, likewise found that the Brazilian mills' plywood doesn't comply with the Standard. In Dr. Shupe's view, in fact, "[a]ll of th[e] test results show that high percentages of the Brazilian plywood tested failed to meet either the bending stiffness requirement or the deflection requirement for the particular plywood product under the PS-1 [S]tandard." Shupe Discl. at 6. And he explained that "the reason for these failures is a lack of veneer density and, in turn, the stiffness of the southern yellow pine veneer used in manufacturing the Brazilian plywood." *Id.* Dr. Shupe was thus of the opinion that the deficiencies he (and the other experts) had identified were endemic to the Brazilian plywood at issue in this litigation. *See generally id.*

Dr. Anderson and Mr. Montzka were asked to determine whether the influx of Brazilian plywood into the U.S. economy affected the price of plywood in the American South and West—and, relatedly, how much money the Plaintiffs lost as a result of that influx. *See* Response at 13–15. To calculate these figures, Montzka ran regression models using historical pricing data for structural plywood in the American South and West. *See* Montzka Discl. ¶¶ 4–15 (discussing this methodology). His models suggested that the overabundance of Brazilian plywood in these markets drove *down* the price of structural plywood. *Id.* ¶¶ 18–19 ("[T]he elimination of Brazilian imports [ ] effectively zeroed

---

[19] Dr. Anthony also reviewed many of the other documents produced in this case—including six depositions, eighteen declarations, hundreds of documents produced by the three original Defendants, and Dr. Shupe's Expert Witness Disclosure. *See* Anthony Discl. at 3–4.

out the impact of the negatively-signed coefficients related to that variable. Consequently, based on the OLS models U.S. plywood prices increased to where they would have been if there had been no Brazilian plywood imports[.] The difference between the prices by quarter the model predicted with the historical import levels and the prices by quarter the model predicted with no imports was used to estimate the damages suffered by the plaintiffs[.]"); *see also* Deposition of Thomas B. Montzka [ECF No. 349-31] ("Montzka Dep.") at 111:21–23 ("All I can say is that Brazil imports affected, based on my analysis, the plywood price.").

Mr. Montzka's models thus *seem* to show a direct correlation between increases in the supply of Brazilian plywood (on the one hand) and decreases in the price of American plywood (on the other). *See* Montzka Discl. ¶¶ 18–19. This was true *even when* the model accounted for the presence of some (potential) confounding variables—for instance, the price of oriented strand board ("OSB"), a substitute product that (the Defendant says) has led to plywood price decreases for over three decades.[20] *Id.* ¶¶ 6, 8 ("The two models were then used to estimate what the prices of U.S. structural plywood would have been in the absence of Brazilian plywood imports (*holding all other factors constant*) compared to what the models predicted the plywood prices were based on historical level [sic] of Brazilian imported plywood. . . . In this specific application, the dependent factor is the plywood price and independent factors evaluated included metrics like plywood production, *price of oriented strand board* (a product that competes with plywood in some applications), and housing starts." (emphases added)).

And Dr. Anderson corroborated Montzka's findings, *see* Anderson Discl. ¶¶ 24–28 (discussing his corroboration methodology), and then relied on them to calculate *how much* the Plaintiffs have been damaged, *see id.* ¶¶ 5–9 (summarizing his methodology as a whole). Based on his calculations, Dr. Anderson "estimated that the [P]laintiffs suffered damages in 2018 and 2019 totaling $103.3 million

---

[20] *See* Def.'s SOF ¶ 63 ("Oriented Strand Board ("OSB") is an alternative to structural plywood that has decreased the market share of structural plywood over the last 30 years and caused prices to decrease.").

as a result of defective structural plywood being imported from Brazil into the United States."
Anderson Discl. ¶ 4.

Unsurprisingly, PFS-TECO responds with its own experts—people like Nicholas J. Nagy,
who spent years working for the Canadian equivalent of the APA, *see* Deposition of Nicholas Nagy
[ECF No. 359-3] ("Nagy Dep.") at 16:5–19:7 (discussing Nagy's work history and comparing the
Canadian Plywood Association to the APA), and Dr. Daowei Zhang, a professor of forest economics
and policy with extensive experience in the field, *see* Expert Witness Disclosure of Daowei Zhang
[ECF No. 359-5] ("Dr. Zhang Discl.") at 42–89 (Dr. Zhang's CV). Nagy found that, with respect to
the Brazilian plywood, "PFS TECO did reasonably follow PS 1-09 provisions for qualification
testing[.]" Rebuttal Expert Witness Disclosure of Nicholas J. Nagy [ECF No. 359-4] ("Nagy Rebuttal
Discl.") at 3. Nagy's opinion was based partly on his critique of both Dr. Shupe's and Mr. Anthony's
expert reports and conclusions. *See id.* at 4–6. He, for example, argued that Anthony didn't fully
oversee the Clemson Study and that, as a result, he simply cannot say whether Dr. Pang carried out
the testing properly. *Id.* at 7–10 (alleging that the Clemson Study "follow[ed] a methodology with
which [the] laboratory had no previous experience, using [a] newly self-built apparatus without
adequate calibration processes, and making reporting omissions"—and noting that Anthony visited
the lab only once). Dr. Zhang conducted his own econometric analyses using traditional regression
techniques *and* time-series approaches—"[b]oth [of which] suggested that there [wa]s no evidence of
any negative price impact associated with the elevated U.S. imports of Brazilian plywood imports"
during the relevant period. Dr. Zhang Discl. ¶ 54.

The Plaintiffs, in short, allege that PFS-TECO cut corners in the certification processes it
applied to the Brazilian mills—this, despite knowing that those mills were producing (and importing)
plywood that didn't meet the PS 1-09 Standard. *See* SAC ¶¶ 87, 92–93, 96, 100, 103, 107, 114, 118,
119, 138–39, 143, 155. Those less-rigorous standards, the Plaintiffs claim, included infrequent

inspections, an over-reliance on insufficiently trained subcontractors, and an unwillingness to take remedial action against subpar mills. *See, e.g.*, *id.* ¶¶ 100, 114. By looking the other way at the Brazilian mills' inferior wood products, the Plaintiffs say, PFS-TECO allowed the Brazilian mills to flood the U.S. market with plywood that's (on the whole) cheaper, weaker, and less safe. *See id.* ¶¶ 119, 131–33. This glut of less expensive product (the Plaintiffs insist) then drove down the price of structural plywood throughout the United States in a way that has devastated the Plaintiffs' annual sales. *See id.* ¶¶ 131, 133–34, 142–45, 157–59. As redress, the Plaintiffs seek over $100 million in damages. *See id.* ¶¶ 145, 159 (estimating damages at $150 million).

PFS-TECO, of course, denies most of this. As relevant here, it attacks the Plaintiffs' Lanham Act standing—contending that the Coalition has failed to show that the Defendant's certification practices (whatever they were) had anything to do with the Plaintiffs' lost market share. MSJ at 7–11. It also claims that the act of certifying a piece of plywood doesn't constitute advertising for purposes of the Lanham Act—and that, even if it did, there was nothing "false" about the way the Brazilian wood was certified and stamped. *Id.* at 11–22. PFS-TECO adds that the Plaintiffs have failed to adequately (or properly) compute their damages. *Id.* at 24–26. And they maintain that the Plaintiffs' negligence proof, by its very nature, fails to meet the elements of Florida's negligence regime. *Id.* at 22–24. Finally, PFS-TECO suggests—though it never comes out and says so directly—that this dispute should be adjudicated by the PS 1-09 Standing Committee (rather than in federal court). *Id.* at 26–28.

In the over two-and-a-half years since this case was first filed, the parties have produced thousands of pages of evidence—declarations, deposition transcripts, discovery documents, and expert-witness disclosures and rebuttals. Armed with all this, we turn to the question at hand— whether PFS-TECO is entitled to summary judgment.

## THE LAW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the records, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for the trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted); *see also* FED. R. CIV. P. 56(e).

When ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). The Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). "[A]ssessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment." *Obremski v. Armor Corr. Health Servs., Inc.*, 467 F. Supp. 3d 1265, 1275 (S.D. Fla. Apr. 7, 2020) (Altman, J.) (citing *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012)).

"[I]f there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial." *Torres v. Wal-Mart Stores E., LP*, ___ F. Supp. 3d ___, 2021 WL 3634632, at *4 (S.D. Fla. Aug. 17, 2021) (Altman, J.). The Court, on the other hand, must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of [its] case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Fams.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (cleaned up)).

## ANALYSIS

The Plaintiffs allege that PFS-TECO is liable for (1) false advertising (both direct and contributory) under the Lanham Act, *see* SAC ¶¶ 138–52, and (2) negligence under Florida law, *see id.* ¶¶ 154–60. The Defendant moves for summary judgment on both claims. In addition to arguing that the Plaintiffs have failed to present enough evidence to sustain their claims, *see* MSJ at 6–26, PFS-

16

TECO also suggests (if obliquely) that disputes over the Standard's application should be adjudicated by the PS 1-09 Standing Committee—not in federal court, *id.* at 26–28. We consider—and ultimately reject—each of PFS-TECO's arguments in turn.

## I.      The Lanham Act Claims

The Lanham Act "creates a federal cause of action for unfair competition." *Optimum Techs., Inc. v. Henkel Consumer Adhesive, Inc.*, 496 F.3d 1231, 1247 (11th Cir. 2007) (cleaned up). The "general purpose" of the Lanham Act "is to protect persons engaged in commerce against unfair competition." *Id.* at 1248 (cleaned up). Our Plaintiffs contend that the Defendant engaged in unfair competition by "falsely stamping millions of square feet of structural plywood panels imported into the United States as meeting the U.S. Voluntary Product Standard PS 1-09 for structural plywood." SAC ¶ 1. According to the Plaintiffs, PFS-TECO is liable for direct and contributory false advertising because it "made false statements of fact through certifications that authorized [multiple] Brazilian plywood producers to export plywood into Florida that [it] knew or should have known did not meet the PS 1-09 grade standard." *Id.* ¶ 139.

In asking for summary judgment on the Plaintiffs' Lanham Act claim, PFS-TECO argues, first, that the Plaintiffs lack standing under the Lanham Act. MSJ at 7–11. It also contends that "[the] Plaintiffs have failed to establish that the advertisements – *i.e.*, the Stamps – are literally false or literally true but misleading." *Id.* at 11. Finally, the Defendant says, the Plaintiffs have failed to show that the TECO TESTED® stamp constitutes "false advertising" under the Lanham Act. *Id.* at 11–22. We're unmoved.

### A.      Lanham Act Standing

The Defendant's standing objection is unfounded. In a nutshell, PFS-TECO maintains that the "Plaintiffs lack standing under the Lanham Act because they have not and cannot demonstrate any damages that flow directly from the purported deception attributable to the Stamps because there

is no evidence of any proximate cause to any purported claim by [the] Plaintiff[s]." *Id.* at 7. In saying so, however, PFS-TECO ignores the specific pieces of *causation* evidence the Plaintiffs have offered in support of their lost-sales claim.[21] Now, the Defendant may be right when they say that the Plaintiffs won't be able to prove causation to the jury. But we're not before the jury today. And, at this stage of the case, the Plaintiffs must adduce *only* enough evidence to create *some* genuine dispute of material fact with respect to causation. *See Torres*, 2021 WL 3634632, at *4. On the record before us, they've done *just enough*.

Statutory causes of action "extend[ ] only to those plaintiffs whose interests fall within the zone of interests protected by the law invoked." *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1274 (11th Cir. 2015). This principle "generally" creates a "proximate-cause requirement" that "bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). In the case of Lanham Act false-advertising claims—the Supreme Court has said—the zone of interests the statute protects includes "a person engaged in commerce within the control of Congress whose position in the marketplace has been damaged by [the defendant's] false advertising." *Id.* at 137 (cleaned up). And there's "no doubt . . . [that] the zone of interest protected by the statute" includes "lost sales[.]" *Id.* Those kinds of injuries, the Supreme Court noted, are "precisely the sorts of commercial interests the [Lanham] Act protects." *Id.*

And that's precisely what the Plaintiffs say has happened to them in this case. To recap, the Plaintiffs allege that: (1) "PFS-TECO enabled large volumes of off-grade Brazilian plywood to be imported and sold in the U.S. in competition with [the] plaintiffs through the license of PS 1 stamps";

---

[21] The Lanham Act also confers standing on plaintiffs who suffer *reputational* harm as a result of the defendant's false advertising. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). But, since the Plaintiffs have disclaimed any reliance on reputational harm for their Lanham Act standing, *see* Response at 13 n.4 ("Plaintiffs do not intend to present evidence of reputational harm."), we won't consider reputational harm here.

(2) "unfair competition from off-grade Brazilian plywood falsely certified by PFS-TECO caused the erosion of PS 1 plywood prices in the U.S. West and U.S. South"; and (3) "during the relevant period, [the] plaintiffs collectively suffered more than $100 million in economic loss as a direct result, of which a substantial percentage is directly attributable to PFS-TECO." Response at 15.

And, indeed, we've already determined—albeit at the motion-to-dismiss phase—that the Plaintiffs' lost-sales allegations were sufficient to sustain a plausible Lanham Act false-advertising claim. *See U.S. Structural Plywood Integrity Coalition v. PFS Corp.* et al., 524 F. Supp. 3d 1320, 1336–37 (S.D. Fla. 2021) (Altman, J.). We now hold that, when we review all the competent record evidence in the light most favorable to the Plaintiffs (as we must, *see Pennington*, 361 F.3d at 1265)—and when we draw all reasonable inferences in the Plaintiffs' favor, *Anderson*, 477 U.S. at 255—the Plaintiffs have created a genuine issue of material fact on the question of lost-sales causation. Let's review that evidence now.

For starters, as we've explained, the Plaintiffs have retained several experts, who—after analyzing the evidence—have established a close correlation between the influx of Brazilian structural plywood into the U.S. market, the concomitant decrease in the price for structural plywood in the United States, and a concurrent decline in the Plaintiffs' annual sales. *See* Montzka Discl. ¶¶ 18–19; Anderson Discl. at 1, 12–15. Viewed in the light most favorable to the Plaintiffs, these expert reports are, standing alone, *probably* enough to withstand summary judgment. *See Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 2014 WL 1456347, at *9 (M.D. Fla. Apr. 14, 2014) (recognizing that expert opinions may be enough to create a genuine issue of material fact on the issue of lost-sales causation).

Let's start with Montzka, whose regression models suggest that the glut of Brazilian plywood in the U.S. market has suppressed the otherwise-natural price of structural plywood in the United States. *See* Montzka Discl. ¶¶ 18–19. Basing his model on historical data, Montzka was able to extrapolate a *predicted* price for structural plywood in the American South and West. *Id.* ¶ 6 (comparing

actual and predicted plywood prices in the American South and West between 2017 and 2019). This predicted price is, of course, the price Montzka would expect to see *but for* the influx of Brazilian plywood into the U.S. market. *Id.* ("The two models were then used to estimate what the prices of U.S. structural plywood would have been in the absence of Brazilian plywood imports (holding all other factors constant)[.]"). Montzka then compared his predicted price—*viz.*, what the price would have been without the Brazilian product—to the actual price of structural plywood in those markets, which (he says) was significantly higher than the predicted price he'd calculated. *Id.* (noting that, during the relevant period, the average difference between the actual and predicted plywood price was $40 per thousand square feet in the South and $47 in the West). Here's a reproduction of those models:[22]

---

[22] The Defendant is right to note that, in at least one part of his deposition, Montzka suggested that his "regression models only show correlation, not causation." Def.'s SOF ¶ 67(d) (citing Montzka Dep. at 61:23–62:2 ("Q. Okay. So before we get into the specific variable. Would you agree with me that your models, they only show a correlation relationship? It doesn't show causation? A. Correct; yes.")). But it's also true that, in another portion of his deposition, Montzka clarified his position on this issue. The relevant discussion went like this:

> Q. Okay. Would you agree with me that in building your model both supply and demand are functions of plywood?
> A. I have both elements of supply and demand inside of the same regression. At least I theorized this. Here becomes the challenge with any econometric model. The best we can do is have correlated factors. We can't prove causation. Causation frankly can *only* really be demonstrated by having a control and having a treatment and being able to measure the difference between control and treatment. *In economics we rarely get that opportunity.* Now, we can make appeals where we have a theory that we say according to economic theory this is what we would expect. Now let us test that theory to see if we can find empirical evidence for it. But at the end of the day that's – and that may give us more hope. And it may say we can't reject the no hypothesis of our theory. But at the end of the day it is still correlative, not causative.

Montzka Dep. at 60:20–61:13 (emphasis added). There's nothing surprising or particularly illuminating about this concession. In fact, it's a basic precept of statistical analysis. *See, e.g.*, RICHARD D. DE VEAUX, PAUL F. VELLEMAN & DAVID E. BOCK, INTRO STATS 159 (4th ed. 2014) ("Warning: Correlation ≠ Causation"). In any event, the Defendant will have every opportunity to probe this issue before the jury. For now, though, we think it clear that, while a regression model cannot *definitively* establish causation, Montzka's central thesis—"that Brazil imports affected, based on my analysis, the plywood price," Montzka Dep. at 111:17–23—is sufficient, when viewed in the light most favorable to the Plaintiffs, to survive summary judgment.



*See* Montzka Discl. at 13. And, in his deposition, Monztka was unequivocal on this fundamental point: "[My] analysis says that plywood price is influenced by Brazil imports as a component of supply" and that "if [Brazilian plywood] were not included as part of the U.S. supply [of structural plywood] U.S. prices are higher." Montzka Dep. at 112:1–4.

It's true, of course, that an expert opinion may be less persuasive when it fails to account for *other* factors that *might* have deprecated prices. *See*, *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003) ("Normally failure to include variables will affect the analysis' probativeness not its admissibility." (cleaned up)). But that's not what we have here. Montzka's regression models explicitly considered other relevant factors that might be at play in the U.S. market—including (notably) the impact of OSB as a substitute good In his words:

> The two models were then used to estimate what the process of U.S. structural plywood would have been in the absence of Brazilian imports (*holding all other factors constant*) compared to what the models predicted the plywood prices were based on historical level [sic] of Brazilian imported plywood.
> . . .
> In this specific application, the dependent factor is the plywood price and independent factors evaluated include metrics like plywood production, *price of oriented strand board* (a product that competes with plywood in some applications), and housing starts. These and other factors were assessed using OLS techniques as to whether or not they were statistically relevant independent variables that collectively could be used to predict the plywood prices.

Montzka Discl. ¶¶ 6, 8 (emphases added). We could (to be sure) conceive of a jury who, after listening to Montzka's testimony—and for many of the same reasons the Defendant emphasizes, *see* MSJ at 25–26—remains unconvinced of the necessary connection between the Defendant's certification process, the influx of Brazilian plywood, and the Plaintiffs' lost sales. But we aren't a jury—and we're not at trial. So, while we recognize that regression analysis has its limits—and we offer no opinion on the ultimate viability of Montzka's theory—we must, at this stage, accept that "regression analysis is a well recognized and scientifically valid approach to understanding statistical data, and [that] courts have long permitted parties to use statistical data to establish *causal* relationships." *In re Neurotin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 42 (1st Cir. 2013) (emphasis added) (collecting cases); *see also Ferring Pharms., Inc. v. Braintree Lab'ys, Inc.*, 210 F. Supp. 3d 252, 255–56 (D. Mass. 2016) (relying on *In re Neurotin* to deny a motion to exclude an expert's regression analysis in a Lanham Act false-advertising case); *In re high Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660–61, 666 (reversing a grant of summary judgment and permitting the use of regression analysis to show causation in an antitrust case).[23]

Of course, if Montzka were all we had, this might be a closer call. But the Plaintiffs have proffered other pieces of competent evidence that a reasonable jury might use to find causation. Here's a summary of that evidence.

*First*, the Plaintiffs give us the declaration of Gray Skipper—the Vice President of Scotch Plywood Co., one of the Coalition's members—who attested to a marked decline in Scotch Plywood's annual sales that corresponds to an increase in the supply of Brazilian plywood in the market. In 2003, Skipper said, Scotch Plywood generated $3.26 million in Florida sales. *See* Declaration of Gray Skipper [ECF No. 62-4] ("Skipper Decl.") ¶ 3. But (he observed) that "[i]ncreasing competition from Brazilian producers of plywood stamped PS 1-09 resulted in a dramatic reduction in [Scotch Plywood's] sale

---

[23] We note, in this respect, PFS-TECO's own reliance on Dr. Zhang's regression analysis.

volumes in Florida in the following two years." *Id.*[24] Specifically, Scotch Plywood's Florida sales fell from $3.26 million in 2003 to $353,499 in 2005—a decrease of almost 90%. *Id.* This staggering decline, Skipper averred, corresponded to precipitous increases in the market share of Brazilian plywood in Florida. *Id.* Indeed, Skipper "estimate[d] that Brazilian PS 1-09 plywood currently accounts for 90% of the Florida market for structural grade panels." *Id.*

*Second*, the Plaintiffs offer the declaration of Paul Duvall, the owner and manager of a Florida-based company that exports PS-1-09-compliant plywood to the Caribbean. *See* Declaration of Paul Duvall [ECF No. 61-2] ("Duval Decl.") ¶¶ 1–3. Duvall said that, "[i]n [his] experience, the PS 1-09 stamped by all plywood producers, regardless of origin, is both an advertisement and a certification that the plywood meets the requirements of the PS 1-09 grade standard." *Id.* ¶ 3. And he added that, for his customers, "a structural grade stamp is important." *Id.* Duvall likewise noted significant changes in Florida's plywood market. As he explained: "Until 2019, most of the plywood that we sold to our offshore customers was sourced from U.S. plywood producers[.]" *Id.* ¶ 4. But, Duvall observed, "the percentage of our plywood supplies sourced from the U.S. compared to import has increased throughout this period due to price." *Id.*

*Third*, the Plaintiffs point to the deposition testimony of Joshua Travis Bryant, who sits on the APA's board and serves as its finance chief. *See* Deposition of Joshua Travis Bryant [ECF No. 349-15] ("Bryant Dep.") at 13:20–25 (explaining his role in the APA). Bryant is also the CEO of Coastal, one of the Coalition's members. *Id.* at 20:11–13. When asked whether he "ha[d] any evidence

---

[24] Because Skipper is the vice president of an American mill that's a member of the Plaintiffs' Coalition, we understand how his declaration might be perceived as self-serving. But, while "[a]n affidavit cannot be conclusory, [ ] nothing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018). And, indeed, "most of [the Eleventh Circuit's] cases correctly explain that a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *Id.* For this reason, "[c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving." *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005).

consumers are influenced to purchase Brazilian plywood over [the Plaintiffs' plywood," Bryant answered simply: "yes." *Id.* at 39:15–18. Bryant went on to clarify that Coastal experienced "significant reduction[s] in sales in the areas where there seems to be a high volume of Brazilian plywood entering the market." *Id.* at 39:20–22.

*Fourth*, Steven Swanson—President and CEO of Swanson Group, Inc. (a Coalition member)—similarly testified that the lower price of Brazilian plywood was a factor that influenced consumers' decisions to purchase Brazilian over American plywood. *See* Deposition of Steve Swanson [ECF No. 349-16] ("Swanson Dep.") at 8:18–9:1 (explaining his role in the Swanson Group), 162:2–22 ("Q. Can you tell us how consumers are influenced to purchase Brazilian plywood over Swanson's plywood? . . . A. Price. . . . The marketplace responds to price.").

*Fifth*, the Plaintiffs cite the deposition testimony of Richie LeBlanc—President and CEO of Hunt Forest, another Coalition member. *See* Deposition of Richie Leblanc [ECF No. 349-13] ("Leblanc Dep.") at 6:25–7:2 (explaining his role at Hunt Forest). When asked whether he was "aware of any customers [who] stop[ed] purchasing from Hunt Forest to purchase structural plywood from Brazil with the PFS-TECO stamp," LeBlanc similarly described how the influx of Brazilian plywood had depressed plywood prices in the United States. *Id.* at 34:17–35:6. Specifically, LeBlanc said: "I am aware that there are times when we will be asked to meet a particular price in the market place and we're competing against a Brazilian structural panel." *Id.* at 34:17–23.

It's true that none of these witnesses could identify any specific consumers who had stopped purchasing U.S. plywood in favor of cheaper Brazilian imports.[25] But this fact alone cannot disqualify

---

[25] *See, e.g.*, Bryant Dep. at 39:6–9 ("Q. Can you identify any customer who has been deceived by purportedly noncomplying Brazilian plywood that contains the PFS-TECO or TPI certification mark? A. No."); Swanson Dep. at 162:11–16 ("Q. Okay. But you would agree with me that you – since you've never spoken to a consumer about what influences their decision to purchase Brazilian plywood over Swanson, you have no knowledge as to the reason for that, correct? A. Correct."); Leblanc Dep. at 35:3–6 ("Q. . . . [T]he PS 1 from PFS-TECO, are you aware of anybody who stopped purchasing from Hunt Forest to purchase the Brazilian plywood? A. No, sir.").

their testimony. These witnesses have spent years—decades in some cases—running some of the biggest players in the U.S. plywood market. They thus have an insider's look into how that market operates—and how it's changed over time. They also understand—better than most, we would suppose—how variables (like price) influence plywood-market outcomes (including, as relevant here, sales and profits). For years, after all, it has been their *business* to know these things. And they all testified that, given the cheaper price of the (allegedly) deficient Brazilian imports, the market has recently been flooded by over-supply. And this flooding, they couldn't help but notice, has driven the price of their product (and by extension) their own bottom lines into a kind of nose-dive that (they claim) has endangered their livelihoods. Like most businessmen, they don't need to sit down with individual customers to uncover their own (frightening) reality. And they certainly don't have to run consumer surveys before they can tell us—and, one day, a jury—about their observations. *See* FED. R. EVID. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; [and] (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue[.]"). Now, these businessmen may well be mistaken. Or, as the Defendant has more than once suggested, these Coalition members may have powerful incentives to dissemble. But these are credibility questions that are best left for the jury to disentangle. *See United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990) ("Credibility determinations are the exclusive province of the jury." (cleaned up)).

Unsurprisingly, courts have routinely found this combination of expert and lay opinion testimony sufficient to withstand summary judgment. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 392 F. Supp. 3d 498, 511 (E.D. Pa. 2019) (denying summary judgment in an antitrust class action, even though "the Court [was] not thoroughly convinced of [plaintiffs'] case," because, in addition to expert testimony, the plaintiffs "also rel[ied] on documentary evidence," and because the "expert report, in addition to other evidence, can provide enough to bolster a plaintiff's case in the face of

summary judgment"); *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *24 (N.D. Cal Apr. 4, 2014) ("The Court now concludes that even though Dr. Leahmer's model is not capable of demonstrating specific injury to each class member of its own accord, it is highly probative of that issue. This is because a reasonable jury could find that Dr. Leamer's model . . . in combination with other evidence presented . . . strongly suggests that each class member was impacted."); *Rozema v. Marchfield Clinic*, 977 F. Supp. 1362, 1381 (W.D. Wis. 1997) (denying summary judgment because the district court couldn't "say that a jury would be unreasonable to conclude from [the] expert report, combined with findings of a market allocation conspiracy and strong market power, that plaintiffs paid more . . . because of defendants' unlawful conduct").

Confronted with all this, PFS-TECO tries to narrow the available universe of facts that Lanham Act plaintiffs should be permitted to deploy to establish their standing. MSJ at 8. In essence, PFS-TECO suggests, Lanham Act plaintiffs should be forced to prove some combination of eleven basic facts. *Id.* Those eleven facts *mainly* fit into three buckets: (bucket 1) whether the Brazilian plywood is actually unsafe—which is to say, whether the Plaintiffs have uncovered complaints about the Brazilian product's real-world failure rate;[26] (bucket 2) whether the Plaintiffs have identified any consumers who, *because* of Brazilian plywood's cheaper price, opted not to buy the Plaintiffs' product;[27] and (bucket 3) whether PFS-TECO's Stamps say anything about the Plaintiffs or their products.[28] Contending that the Plaintiffs have failed to prove any of *these* facts, PFS-TECO says (*violà*): "[T]here

---

[26] *See* MSJ at 8 ("i. Plaintiffs are not aware of a complaint or failure of Brazilian plywood[.]").

[27] *See* MSJ at 8 ("ii. There is no evidence that PFS TECO's Stamps caused consumers to purchase Brazilian plywood over Plaintiffs' plywood; iii. Plaintiffs cannot identify any consumers or end-users who purchased Brazilian plywood over Plaintiffs' plywood because of any action by PFS TECO; iv. There is no evidence that consumers or end-users purchased OSB over Plaintiffs' plywood. . . . xi. Plaintiffs have not spoken to consumers or end-users concerning Brazilian plywood." (cleaned up)).

[28] *See* MSJ at 8 ("v. The Stamps do not state anything about Plaintiffs; vi. The Stamps do not state anything about Plaintiffs' PS 1 plywood products; vii. The Stamps do not state anything about US plywood; viii. PFS TECO's Certifications do not state anything about Plaintiffs; ix. PFS TECO's Certifications do not state anything about Plaintiffs' PS 1 plywood products; x. PFS TECO's Certifications do not state anything about US plywood[.]" (cleaned up)).

is no evidence that any sales were diverted from Plaintiffs to the Brazilian Mills because the Brazilian Mills were allegedly falsely advertising their plywood as meeting the PS 1 Standard." *Id.* That's quite the magic trick. But we aren't fooled. The Defendant's *prestige* fails for two reasons.

*First*, we've found no authority for the Defendant's position that the eleven facts it has insisted upon are the *only* kinds of evidence that *might* be relevant in a Lanham Act case on the issue of causation. And the three cases the Defendant *does* cite for this proposition never suggest that the inquiry is so limited. *See* MSJ at 8, 10, 11 (citing *Westgate Resorts, Ltd. v. Reed Hein & Assocs., LLC*, 2020 WL 674108 (M.D. Fla. Feb. 11, 2020) (Presnell, J.), and *Orange Lake Cnty. Club, Inc. v. Reed Hein & Assocs., LLC*, 2019 WL 7423517 (M.D. Fla. Oct. 4, 2019) (Berger, J.)); *see also* Notice of Supplemental Authority [ECF No. 437] (citing *Club Exploria, LLC v. Austin*, 2020 WL 6585802, *11–12 (M.D. Fla Nov. 10, 2020) (Antoon, J.)).

In *Westgate Resorts*, a group of timeshare developers and owners sued a company doing business as a "Timeshare Exit Team"—a "business [ ] helping timeshare owners get out of their obligations to timeshare businesses[.]" 2020 WL 674108, at *1. The defendant "advertise[d] extensively via talk radio and various websites to recruit new clients." *Id.* According to the plaintiffs, those ads constituted "false advertising" under the Lanham Act because they "induce[d] timeshare owners to stop making payments to [the plaintiffs] or otherwise breach their contracts." *Id.* Specifically, the plaintiffs alleged that the ads "induce[d] [the plaintiffs' clients] to cancel their timeshare interest without any factual or legal basis and stop making payment to [the plaintiffs] even though such payments are required by legally enforceable contracts to which the timeshare owners have no legal excuse or justification not to pay." *Id.* at *2 (cleaned up). To prove causation—to show, in other words, that the defendant had directed timeshare owners to stop making those payments—the plaintiffs relied on one (and only one) piece of evidence: its *own* interrogatory responses—in which it simply "identified 33 statements it *believed* to be false or misleading in [the defendant's] ads and marketing materials." *Id.* (emphasis added).

But the district court determined that not one of these statements *actually* "direct[ed] (or c[ould] be reasonably construed to direct) timeshare owners to stop making payments." *Id.* That makes a lot of sense. At summary judgment, the plaintiff had an obligation to adduce concrete evidence (not belief) to prove a fact. It relied on one piece of evidence for that fact. That piece of evidence didn't prove the fact. So, the defendant won.

Our case could hardly be more different. As we've seen, the Plaintiffs have given us several detailed and lengthy expert reports—which, when coupled with the deposition testimony of those experts, support their view that the Defendant's certification process was subpar;[29] that this shoddy process resulted in the certification of Brazilian plywood that didn't meet the Standard;[30] that this non-compliant product then flooded the U.S. market, driving down U.S. plywood prices;[31] and that this precipitous decline in the price of plywood hurt the Plaintiffs' sales.[32] And the Plaintiffs have supplemented this expert testimony with troves of witness declarations,[33] deposition testimony,[34] and

---

[29] *See, e.g.*, Anthony Discl. ¶ 21 ("Based upon my review of the [evidence], it is my opinion that the plywood panel qualification testing and certification procedures, as well as the periodic testing and inspection audit procedures used to ensure adequate ongoing product quality assurance of both TPI and PFS-TECO in Brazil lack scientific integrity.").

[30] *See, e.g.*, Anthony Discl. ¶ 22 ("[I]t is my opinion that the Brazilian plywood producers in the states of Paraná and Santa Catarina, Brazil, which make up 100% of the Brazilian mills certified and inspected by TPI and PFS-TECO, have consistently failed to produce PS 1-09-compliant plywood manufactured from the species from which they produce plywood for sale in the U.S. market.").

[31] *See, e.g.*, Montzka Dep. at 111:21–23 ("All I can say is that Brazil imports affected, based on my analysis, the plywood price.").

[32] *See* Montzka Dep. at 113:5–17 ("Q. . . . Are you offering an opinion that consumers would have purchased plaintiffs['] plywood but for the Brazilian[s] importing structural plywood? A. Yes. Q. Okay. What is the basis for that opinion? A. That utilization – past utilization rates in the U.S. were not at maximum capacity. In general – and I didn't do an analysis on this. But generally plywood demand is inelastic. And so demand – demand is. Others would have filled the gap if Brazil had not. And so I would expect that the plaintiffs, and others who are not plaintiffs, producing U.S. plywood supply could have filled that gap." (errors in original)).

[33] *See, e.g.*, Skipper Declaration ¶ 3 (discussing declining sales due to plywood competition from Brazilian mills).

[34] *See, e.g.*, Bryant Dep. at 39:20–22 (observing "significant reduction[s] in sales in the areas where there seems to be a high volume of Brazilian plywood entering the market")

internal PFS-TECO emails[35]—all in stark contrast to the absence of evidence the court found insufficient in *Westgate Resorts*.

*Orange Lake* is similarly unhelpful. In that case (as in *Westgate Resorts*), a timeshare company sued the "Timeshare Exit Team," alleging that its "false and misleading advertisements[ ] [led] [timeshare] owners to believe that [the defendants] c[ould] relieve them of their timeshares[.]" 2019 WL 7423517, at *1. In other words, the defendant's "false advertising" (the plaintiff claimed) had "induce[d] [timeshare owners] to . . . stop paying on their timeshare contracts[.]" *Id.* But the court "agree[d]" with the defendants "that[,] because none of the advertisements directed owners to cease paying timeshare obligations, the proximate causation requirement [was] not met." *Id.* at *14. In so holding, the court noted that the advertisements "create[d] the impression that [the defendant] can legally and permanently get owners out of the timeshare contracts for any reason," *id.* at *1—but they *didn't* "direct the consumer to cease making payment nor . . . [were they] intended to induce such action," *id.* at *14. And the court rejected the plaintiff's argument that, "but for [the defendant's] deceitful advertisements, their timeshare owners would not have hired the [d]efendant[ ] and not have ceased making payments"—reasoning that this link was "too remote a connection to satisfy the Lanham Act's proximate causation requirement." *Id.* And this made sense in *Orange Lake* because the plaintiff's position in that case—unlike ours—relied on an *intervening* cause: After the timeshare owners had seen the ads, they would call the defendant, and it was only *then*—during *this* intervening sales pitch—that (the plaintiff alleged) the consumers were induced to stop paying the plaintiff. Since it was the phone call—rather than the ads—that caused the non-payment, the plaintiff had failed (the court found) to show the necessary link between the ads and the claimed injury.

---

[35] *See, e.g.*, Sept. 2019 Emails Between Steve Verhey, Gerson Aldo de Souza, and Dan Hovanec Regarding the PFS-TECO Response to the Plywood Coalition Complaint [ECF No. 363-2] at 2 (noting the ongoing competition between the Coalition and Brazilian mills).

That's very different from our case—where we have no similar intervening cause: Our Plaintiffs allege that *the stamps themselves* cause consumers to purchase Brazilian plywood. It's the stamps, in other words—and not some intervening phone call about the plywood—that (according to the Plaintiffs) deceived consumers into thinking that the plywood they were buying was PS-1-09-compliant. And that's precisely the point we made in our Order Denying the then-Defendants' Motion to Dismiss: "The Plaintiff," we said there, "has [ ] adequately alleged that the Defendants' misconduct proximately caused their damages." *PFS Corp.*, 524 F. Supp. at 1337. As we explained:

> Without the Defendants' certification, of course, the Brazilian mills couldn't sell their plywood in the United States—at least not for structural purposes. And it's this "deception of consumers" by the Defendants and their Brazilian clients (telling them that the wood complies with PS 1-09 when it does not) that *causes* those consumers to "withhold trade from the plaintiff[s]"—precisely the circumstance the Supreme Court envisioned in *Lexmark*. The Plaintiffs have thus adequately alleged that the Defendants' misconduct proximately caused their damages.

*Id.* (cleaned up).

PFS-TECO's reliance on *Club Exploria* fares little better. In that case, a timeshare company sued a law firm that specialized in helping timeshare owners extricate themselves from timeshare contracts—alleging, among other things, that the law firm had engaged in false advertising. *See* 2020 WL 6585802, at *1–2. The complaint averred that "[d]isgruntled [timeshare] owners sometimes find the firm through attorney referral services, but they also find the firm through its websites, which contains colorful statements and media aimed at optimizing internet visibility." *Id.* at *1. The plaintiff "assert[ed] that [the defendant] use[d] false and misleading website advertisements to convince timeshare owners that they can easily cancel their timeshare contracts if they hire [the defendant]." *Id.* at *2. And, "[a]ccording to [the plaintiff], [the defendant] then advises owners to stop paying their loan and fee obligations, causing damages to [the plaintiff] in the form of lost principal, interest, and maintenance fee payments." *Id.* The court determined that the plaintiff failed to "provide some evidence from which a reasonable juror could conclude that its injuries were proximately caused by

the defendant." *Id.* at *9 (cleaned up). But that was because the plaintiff there "ha[d] not presented *any* expert testimony *or other evidence* to support its contention that the website advertisements were likely to be material to consumer purchasing decisions." *Id.* at *11 (emphases added). And (the court observed) the plaintiff's "assert[ion] that every owner found Aaronson through its website" was "soundly contradict[ed]" by the record. *Id.* at *12. In *Club Exploria*, in other words, the plaintiff "simply assert[ed] in a single conclusory sentence that it would be difficult to argue that the alleged falsities would not influence the purchasing decisions of Exploria customers." *Id.* at *11. Again—for all the reasons we've outlined—that's just not our case.

*Second*, even if we agreed to consider *only* the three questions the Defendant says this cases poses—the Plaintiffs' awareness of complaints about Brazilian plywood (bucket 1), the Plaintiffs' knowledge of specific consumers who left the Plaintiffs' product for Brazilian plywood (bucket 2), and the extent to which the PFS-TECO stamp says anything about the Plaintiffs or their products (bucket 3)—the Defendants *still* would have failed to show "that there is no genuine dispute [of] any material fact." FED. R. CIV. P. 56(a). The Plaintiffs (it's true) concede a lack of proof with respect to the "facts" that fit into the second bucket—a bucket we'll call "conversations with consumers."[36] They do, however, submit competent proof in support of some of the other "facts"—in particular, the facts in buckets 1 and 3. *See, e.g.*, Pls.' SOF ¶ 65 ("Evidence produced by PFS-TECO and TPI include complaints regarding Brazilian plywood." (citing exhibits)), ¶¶ 67(a)–(b) (noting that the parties'

---

[36] *See* Def.'s SOF ¶¶ 61–64, 67(c), 67(e) (establishing that (1) the Plaintiffs' experts "did not conduct a survey on [whether] consumers or distributors [were] deceived by the PFS TECO's [sic] certification[,] . . . did not speak with any consumers or plywood distributors and are unaware of any consumer who was deceived by noncompliant plywood[,] . . . did not do any investigation into whether consumers prefer OSB over plywood[,] . . . [and] did no analysis into consumers['] decision-making process or preferences in purchasing Brazilian plywood over Plaintiffs' plywood"; (2) the "Plaintiffs and their experts are not aware of a consumer or distributor who purchased a plywood alternative or substitute"; and (3) "Anderson did no investigation into whether consumers would have purchased Plaintiffs' plywood over other US plywood producers but the Brazilian plywood."); Pls.' SOF ¶¶ 61–64, 67(c), 67(e) ("Undisputed").

respective stamps suggest that their products are "interchangeable" and contending that, by stamping the deficient Brazilian wood with those stamps, the Defendant was, in effect, suggesting that the Plaintiffs' wood was similarly defective).

So, let's take a closer look at that evidence. On the issue of complaints—specifically, complaints about deficiencies in the Brazilian plywood—the Plaintiffs point to several documents (all apparently produced in discovery), in which PFS-TECO employees *seem* to be discussing consumer concerns about the Brazilian product. *See, e.g.*, Questions Regarding Procedures at the Randa Mill [ECF No. 370-5] at 3 ("Have there been any PS 1-09 product complaints received by the [Randa] mill from endusers/purchasers? Yes, there have been. There was a complaint about warping in 2020. The customer sent us an email claiming for support[.]"); PFS TECO Claim Investigation Report 19-003 [ECF No. 370-3] (investigating a complaint of roof damage that may have been related to warped PFS-TECO-stamped panels from the Randa mill). This last report *both* rebuts the Defendant's argument that the Plaintiffs lack evidence of complaints or failures *and* demonstrates why so many of these questions should be left to a jury: The report discusses a 2020 incident involving Brazilian plywood that warped on a roof. The report goes through some of the warping's potential causes and concludes: "Based on the observation of panels on-site, it is likely that construction problems were primarily responsible for" the damage. PFS TECO Claim Investigation Report 19-003 at 3. But the report also noted that one of the warped panels "had three laps in the core veneer, which made the panel noncompliant with PS 1," and it added this: "If there are observations about problems with panel construction when the sheathing is removed, the mill should be contacted and presented with evidence." *Id.* A reasonable fact-finder could interpret this report in several different ways—as evidence of possible non-compliance with the Standard, for instance, or of PFS-TECO's efforts to address known potential failures, or (we have no doubt) of shoddy construction work *unrelated* to the pedigree of the wood. And that's precisely why summary judgment would be inappropriate here—

because it's the jury's job (not ours) to make these kinds of factual determinations. *See Strickland*, 692 F.3d at 1154 ("[T]he weighing of the evidence[ ] and drawing legitimate inferences from the facts are jury functions, not those of a judge." (cleaned up)).

The Plaintiffs also rely on emails in which the Defendant's employees talk openly about the failure rates of Brazilian plywood and wonder whether they should broach those issues with the mill owners directly. *See, e.g.*, Apr. 2014 Emails Between Gerson Aldo de Souza, Januario, David Kirkman, Rich Spallone, and Steve Verhey Regarding Delamination Issues [ECF No. 363-1] at 2 ("According to information received from Teco, [ ] there are many instances of this kind of situation in areas affected by excessive amounts of snow and rains."); *id.* ("Blistering after simple exposure to a rain or two is not tolerated by the standard or builders. . . . When you see blisters form, there is little question that the panels are unacceptable. During claim investigations, we focus on whether the panels were exposed to unusual wetting and conditions or not. What I have said may be different from your own expectations, but it is the standing interpretation of the standard."); Sept. 2013 Emails Between Steve Winistorfer and Steve Verhey Regarding TWP-606 Plywood Claim [ECF No. 364-10] at 1 (discussing an incident where homeowners asked a builder to replace all the plywood panels because of "several sheets[ ] that had cupping and bowing . . . [and] some delamination," and noting that "[i]t's probably a case of shared responsibility between the builder, roofing contractor, and [the Brazilian mill] Guararapes (a few panels had delam[ination])").

In one of these emails, in fact, PFS-TECO's Vice President of Panel Products and Labs (Steve Verhey), *acknowledges* that one such complaint *might* indicate a systemic failure in one of the Brazilian mills. *See* Apr. 2014 Emails Between Greg Dupuis, Steve Verhey, and Steve Winistorfer Regarding Delamination Issues [ECF No. 363-10] at 1 ("If there were 15 more problems that developed problems over the weekend, then I think the problem might be systemic, not isolated. Seems like [the Brazilian mill] Guararapes might have some bond quality problems." (errors and emphasis in

original)). And, in an email to Fabio Flor—PFS-TECO's independent contractor in Brazil—Dan Hovanec, PFS TECO's Panel Products Manager, conceded that "[t]he majority of the complaints/claims [PFS-TECO] receive[s] are related to delamination and poor bonding"—and so, "[i]f [the Brazilian mills'] panels are going to be marked as certified to a standard, they should meet the requirements of [the PS 1-09] standard." Sept. 2017 Emails Between Steve Verhey, Dan Hovanec, and Fabio Flor Regarding Plywood Audits [ECF No. 370-7] at 2–3.

Again, there may be multiple ways to construe these emails. And we offer no opinion on which of these is the most reasonable. All we decide today is that, when we view this evidence in the light most favorable to the Plaintiffs, a reasonable jury *could* find that PFS-TECO was aware of (some potentially serious) problems with the Brazilian plywood.[37] *Cf. Liberty Lobby*, 477 U.S. at 255 ("[T]he weighing of the evidence, and the drawing of legitimate inferences from the facts[,] are jury functions, not those of a judge, whether he is ruling on a motion for summary or for a directed verdict.").

The Plaintiffs have also created a genuine dispute about whether the TECO TESTED® stamp communicates something about the Plaintiffs' product. Indeed, the Plaintiffs have adduced some compelling evidence for this position—much of it from the Defendant's *own* documents. So, for instance, in an information sheet, PFS-TECO declared that its stamp stands for the following proposition: "Panels with the TECO TESTED® certification mark are *interchangeable* with panels marked by *other* certification agencies." Acceptance of the TECO TESTED® Certification Mark [ECF No. 369-4] at 1 (emphases added). PFS-TECO even went so far as to assure the public that the panels it certifies "are *equivalent to and interchangeable with* panels of the same grade and thickness and certified to the same standard *by other accreditation services*." *Id.* (emphases added). And there's much more where

---

[37] We thus find mostly irrelevant the fact that the Plaintiffs' witnesses weren't aware of complaints about the Brazilian plywood. *See* Def.'s SOF ¶ 65 (citing the depositions of eleven witnesses who had never heard any such complaints).

that came from. In a public letter from May of 2019, Steve Winistorfer—PFS-TECO's Senior Vice President of Building Products—had this to say about what his company's stamp represents:

> Plywood that is stamped with the TECO TESTED® certification mark are [sic] recognized for quality and accepted for use in construction throughout the United States and Canada. Reiterating what is stated above, panels certified to PS 1 and PS 2 by PFS TECO are <u>interchangeable</u> with those certified by other accredited third-party agencies, provided that the thickness, span rating, and grade are the same for all panels, in a given application.

Public Letter from Steve Winistorfer, Senior Vice President of PSF-TECO's Building Products Division, Regarding Equivalency of Structural Plywood Certified by PFS-TECO (May 2019) [ECF No. 369-8] at 1 (emphasis in original). This evidence makes it hard for us to agree with the Defendant's claim that the stamps say nothing about the Plaintiffs' products—that, instead, they "merely . . . identif[y] the manufacturer responsible for manufacturing the plywood, and provide[ ] information about performance category, thickness, [and] the plywood's grade." MSJ at 10–11. Now, the Defendant is right that its advertisements and public declarations never identify the Plaintiffs by name. But, as the Supreme Court has made clear, Lanham Act standing isn't limited to cases "where the defendant denigrates a plaintiff's product by name." *Lexmark*, 572 U.S. at 138. To the contrary, courts consistently apply the Lanham Act's false-advertising provisions "where the defendant damages the product's reputation by, for example, equating it with an inferior product," *id.*—precisely what (the Plaintiffs say) PFS-TECO has done here. To the extent, then, that the TECO TESTED® stamp *falsely*[38] equates the quality of the Brazilian plywood with the Plaintiffs' product, a reasonable jury *could* find that the Defendant's conduct "come[s] within the zone of interest in a suit for false advertising under § 1125(a)," because it caused "an injury to a commercial interest in [the Plaintiffs'] sales." *Id.* at 131; *see also Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) ("The Lanham Act's false advertising provision allows a plaintiff to base its claims not only on statements

---

[38] Much more on this below.

that are literally false, but also on statements that are misleading when considered in their full context."). We therefore reject the Defendant's standing objections.

### B. The Merits of the Plaintiffs' Lanham Act Claim

The Defendant also contends that the Plaintiffs have failed to meet the elements of both their direct- and contributory-false-advertising claims. *See* MSJ at 11–22; Reply at 6–11. Here, too, the Defendant forgets that we're at summary judgment—not trial—and that, at this stage of the case, all reasonable inferences must be drawn in the Plaintiffs' favor.

#### 1.       The Plaintiffs' Direct Claim

To prevail on a claim of *direct* false advertising, a Lanham Act plaintiff must show that: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). The Defendant challenges the Plaintiffs' evidence *only* as to the first three of these elements. *See* MSJ at 12–19 (arguing that the Plaintiffs didn't present evidence of falsity), 19–20 (arguing that the Plaintiffs didn't present evidence of consumer deception), 20–21 (arguing that the Plaintiffs didn't present evidence of materiality). We consider each in turn.

##### a.   Falsity

We start with falsity. "The Lanham Act's false advertising provision allows a plaintiff to base its claim not only on statements that are literally false, but also on statements that are misleading when considered in their full context." *Duty Free*, 797 F.3d at 1277. To constitute false advertising under the Lanham Act, "the statements at issue" must be *either* "(1) commercial claims that are literally false as a factual matter or (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Hickson Corp. v. N. Crossarm*

36

*Co., Inc.*, 357 F.3d 1256, 1261 (11th Cir. 2004). "Whether a statement is literally false is a finding of fact[.]" *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1225 n.12 (11th Cir. 2008); *see also Wing Enters., Inc. v. Tricam Indus., Inc.*, 511 F. Supp. 3d 957, 968–69 (D. Minn. Jan. 7, 2021) (collecting cases and noting that "treat[ing] both parts of the literal-falsity inquiry as question of fact" is "the majority approach among [the] circuits"). Generally speaking, we leave questions of fact for the jury. *See, e.g., U.S. v. Gafyczk*, 847 F.2d 685, 694 (11th Cir. 1988) ("Questions of fact are for the jury to decide."). And the Plaintiffs have offered enough evidence to get to a jury on the question of the PFS-TECO stamp's falsity.

*First*, the Plaintiffs rely on the APA Product Advisory, the Clemson Study, and the Blackwater Study to support their allegation that PFS-TECO's "Brazilian licensees' plywood does not meet the PS 1 standard's minimum bending-stiffness requirement"—and so, cannot comply with the Standard. Response at 7. The APA conducted its study over several months and found that "imported Brazilian panels did not meet the stiffness requirements of the designated species grouping or the referenced Span Rating for roof sheathing as defined in the [PS 1-09] Standard." APA Product Advisory at 1. Specifically, the APA "test report provides test results for plywood imported from Brazil through the evaluation of panel bending stiffness (EI) and bending moment capacity ($F_bS$) in accordance with Section 5.8.6. of PS 1 for span-rated panels or with Section 5.8.7 of PS 1 for other panels." APA Report – Evaluation of Imported Plywood from Brazil [ECF No. 349-21] § 1.1 ("APA Report"). The APA's tests were "conducted in accordance with ASTM D3043, Method C," using panels marked with a PS 1-09 stamp.[39] *Id.* § 1.2. The "[s]pecimens were tested in the as-received conditions"—which means they weren't tampered with or altered in any way. *Id.* § 3.1. After conducting its tests, the APA

---

[39] We say "with *a* PS 1-09 stamp," rather than "with *the* PS 1-09 stamp," because the APA study also tested products TPI had certified. *See* APA Report § 2.2 (listing the samples the APA tested). Still, more than 50% of the APA study's samples were certified by PFS-TECO. *See id.* (showing that five of the nine samples the APA tested were from PFS-TECO-certified mills).

then compared its results for the samples' "bending stiffness"[40] to the reference values[41] specified in the PS 1-09 Standard and then calculated the samples' "uniform load performance[.]"[42] *Id.* § 3.2. The report concluded: "All span-rated and no-span-rated panels tested in this study failed to meet the requirements specified in PS 1." *Id.* § 4. In its Product Advisory, the APA added: "None of the individual lots of plywood panels performed at the serviceability level documented for a Group 1 species within PS 1," and "none of the Span-Rated plywood sheathing lots . . . complies with the roof deflection criteria within PS 1." APA Product Advisory at 2.

The Clemson Study generally corroborated these findings. Clemson's final report "describes pure-moment bending tests performed at Clemson University in order to measure the strength and stiffness of PS 1-09 Brazilian plywood." Clemson Study § 1. For the tests, the sample panels "were prepared and tested in accordance with Method C of ASTM D3043[.]" *Id.* § 2.2.1. The tests were conducted on a "specialized machine . . . designed and assembled at Clemson University[.]" *Id.* § 2.2.2. The "[p]anels were loaded into the test machine," and, "[u]nless specified otherwise, all [sample panels] were tested to failure." *Id.* § 2.3. Clemson then calculated the bending strength (and stiffness) of each panel. *Id.* §§ 2.3.1–2.3.2. The Clemson Study's results "show[ed] a 75% failure rate by nine Brazilian plywood plants, [ ] related to bending stiffness." Response at 3; *see also* MSJ at 17–19 (discussing the Clemson Study without contesting this 75% failure rate); Reply at 6–7 (same).

*****

---

[40] Bending stiffness is a measure of "the amount a [panel] will deflect under a given load. The higher the stiffness, the less deflection that will occur." Tom Rickerby, *What is Bending Stiffness?* WESBEAM BLOG (Aug. 29, 2014), https://wesbeam.com/resources/articles/blog/august-2019/what-is-bending-stiffness (last visited Mar. 29, 2022). "Because bending stiffness and bending strength are the most important properties for many plywood uses, species groups were initially set up first on the basis of bending stiffness and second on the basis of bending strength." Product Standard App'x A3.
[41] A reference value is "[t]he numerical value established for the mill specification for a given mechanical or physical property" within the Standard. Product Standard § 2.48.
[42] The "uniform load" is "[t]he state where the load (stress) on a component or structure is distributed evenly over the affected region." *Uniform Load (Uniform Stress)*, OXFORD DICTIONARY OF MECH. ENG'G (2d ed. 2019).

*A brief digression to discuss the Clemson Study's sample size*: Of the nine mills whose products the Clemson Study tested, *two* were PFS-TECO-certified—Industria de Compensados Guararapes Ltda. and Industrial Arbhores Compensados Ltda. *See* Clemson Study §§ 3.1 (results for samples from Industrial Arbhores Compensados Ltda.), 3.3 (results for samples from Industria de Compensados Guararapes Ltda.). Although PFS-TECO criticizes the Clemson Study's methodologies, it (notably) doesn't suggest that either of these mills *passed* the study's strength and stiffness tests. *See* MSJ at 17–18; *see also* Anthony Discl. ¶ 17 (noting that the only mill to pass the Clemson Study was a TPI-certified mill).

And the argument the Defendant does make—that "Clemson only tested plywood on two (2) of the [fifteen] Brazilian Mills certified by PFS TECO"; that "Clemson did not test any products from the other twelve (12) Brazilian Mills identified by [the] Plaintiffs"; and that, "[t]hus, the Clemson Study cannot be utilized to demonstrate that these other twelve (12) Brazilian Mills are manufacturing plywood not in compliance with the PS 1 Standard," MSJ at 18—kind of misses the point. Here's why: It's probably fair to say that, in any given summary-judgment situation, most of the non-movant's proof will address only a small part of one element of a single claim. And it's natural for the summary-judgment-movant to attack each piece of evidence individually and, having shown that it fails to tie the whole case neatly into a bow, to challenge its ultimate relevance. And there's a tendency to do this with every piece of evidence in the case—so that, by the time the motion is done, one is left with the firm impression that the non-movant has adduced no probative evidence *at all*. But that's not how we weigh and analyze evidence. In the immortal words of Professor Dan Kahan, each piece of evidence is just a brick in a wall—no more, no less. *Now, back to our overall story.*

\*\*\*\*\*

While the Defendant hardly mentions it, the Blackwater Study mainly confirms the APA and Clemson findings. In this third study, Blackwater tested 100 samples of Brazilian structural plywood,

using the test for "performance under uniform load" specified in Section 6.2.2 of the Standard. *See* Blackwater Study at 12–14, 17. And—as we've said—Blackwater found a "deflection" failure rate of 50%. Response at 3; *see also* MSJ at 19 n.10 (noting *only* that one of the Brazilian mills PFS-TECO certified "passed the Blackwater testing"—*without* otherwise discussing the Blackwater tests); Reply at 6 (saying that "Blackwater *only* tested a limited number of Brazilian mills, a limited number of products, and a limited number of plywood panels"—*without* calling its conclusions into question).

*Second*, the Plaintiffs point to the expert testimony of Mr. Anthony, who reviewed the APA, Clemson, and Blackwater studies and opined that "[t]he high failure rates for plywood's most important mechanical property—bending stiffness—found by the APA's testing in 2017 and 2018 . . . and the Clemson University testing in 2019 strongly support the conclusion that PS 1-09 stamped plywood imported into the U.S. from southern Brazil consistently does not satisfy the PS 1-09 requirements." Anthony Discl. ¶ 21.a.

*Third*, the Plaintiffs offer the expert testimony of Dr. Shupe—the country's most published academic on the properties of southern yellow pine, *see* Shupe Discl. at 2 (summarizing Dr. Shupe's background), 16–58 (Dr. Shupe's CV); *see also* Response to Omnibus *Daubert* Motion [ECF No. 359] at 8 (describing Dr. Shupe as "the most widely published expert on the mechanical properties of southern yellow pine")—who *likewise* found that the Brazilian mills' plywood doesn't comply with the Standard. In Dr. Shupe's view, in fact, "[a]ll of th[e] test results show that high percentages of the Brazilian plywood tested failed to meet either the bending stiffness requirement or the deflection requirement for the particular plywood product under the PS-1 [S]tandard." *Id.* at 6. And he opined that "the reason for these failures is a lack of veneer density and, in turn, the stiffness of the southern yellow pine veneer used in manufacturing the Brazilian plywood." *Id.*

*Fourth*—in what may be the most contentious of these—the Plaintiffs cite PS 1-09 § 7.2 for their position that "an inspection and testing agency must have procedures in place to govern [their clients'] activities." Pls.' SOF ¶ 3. That section provides:

> A qualified inspection and testing agency is defined to be one that:
> a. has the facilities and trained technical personnel to verify that the grading, measuring, species, construction, sanding, bonding, workmanship, and other characteristics of the products as determined by inspection, sampling[,] and testing conform to all of the applicable requirements specified herein;
> b. has developed procedures to be followed by agency personnel in performance of the inspection and testing;
> c. has no financial interest in, or is not financially dependent upon, any single company manufacturing the product being inspected or tested; and
> d. is not owned, operated[,] or controlled by any such company.

Product Standard § 7.2. According to the Plaintiffs, by defining a "qualified inspection and testing agency" as one that (among other things) "has the facilities and trained technical personnel to verify that the . . . products as determined by inspection, sampling and testing conform to all of the applicable requirements specified herein," *id.*, that  section (in so many words) *requires* certification agencies—like PFS-TECO—to *monitor* their clients with *qualified* staff members, *see* Pls.' SOF ¶ 3. And, by the way, Mr. Anthony *agrees* with this reading of the Standard. In Mr. Anthony's opinion, "in Section 7.2, it makes reference to qualified inspection and testing agency is defined to be one that has developed procedures to be followed by agency personnel in performance of the inspection and testing." Anthony Dep. at 108:12–16 (cleaned up). While Mr. Anthony conceded that the word "surveillance" doesn't appear in this part of the Standard, he maintained that "the fact that you develop spec for quality assurance purposes and you develop procedures to be followed by the agency personnel in the performance of the inspection and testing leads me to believe that there is an intent that there is some surveillance that is to take place." *Id.* at 108:21–109:2. When he was asked for the source of this opinion, Mr. Anthony was pellucid: "[Section] 7.2 [of the Standard], plus the mill specification. Those two together. If there is no ongoing evaluation of the product, those sections are superfluous." *Id.*  at 109:5–7.

*Sixth*, the Plaintiffs have proffered a set of documents that, when viewed in the Coalition's favor, suggest that PFS-TECO *may* not be monitoring its Brazilian mills properly. *See, e.g.*, Nov. 2017 Emails Between Steven Verhey, Steve Winistorfer, Jim Husom, and Fabio Flor Regarding a Letter to Plywood Client about Increase in Inspection Fee [ECF No. 362-4] at 1 (noting that PFS-TECO's clients "<u>repeatedly</u> fail qualification for glue bonds," that Flor needs "training . . . to conduct a decent inspection," and that Flor "does not ever open and inspect a bund [sic] of panels at the mills"); Email Attachment – Dan Hovanec's Notes From Trip to Brazil in May 2017 [364-12] ("Hovanec Trip Notes") at 9–10 ("One of my goals during this trip was to gain a better understanding of the inspections that Fabio [Flor] does at our plywood . . . mills. I review his quarterly reports, and I had some concerns about what is done based on those reports[.] . . . Also, Fabio does not seem to normally open a unit of panels to grade; rather, he stands at the grading line and watches as they pass. This is a problem because 1) the mills aren't always producing PS 1 products during the inspections, and 2) because to me, grading panels isn't so much about pointing out a couple of off-grade panels so that they can be downgraded."). As to this last document, there doesn't *appear* to be any evidence in the record that, after noting this deficiency, PFS-TECO did anything about it. In any case, after reviewing this—and other evidence—Mr. Anthony determined that "the plywood panel qualification testing and certification procedures, as well as the periodic testing and inspection audit procedures used to ensure adequate ongoing product assurance of [PFS-TECO] in Brazil[,] lack scientific integrity." Anthony Discl. ¶ 21.

Against all this, PFS-TECO advances seven arguments—all unavailing.

*First*, PFS-TECO contends that neither the APA Product Advisory nor the Clemson study supports the Plaintiffs' falsity claims because Drs. Yeh and Pang—who conducted the APA and Clemson studies, respectively—didn't even try to determine whether the Brazilian plywood they tested was PS-109-compliant. *See* MSJ at 15 ("Dr. Yeh . . . testified that the APA did **<u>not</u>** test Brazilian

plywood to determine compliance with the PS 1 Standard. Thus, the Product Advisory does not demonstrate that the Stamps are false[.]"), 17 ("Dr. Pang admitted that the report generated by the Clemson Study does not indicate whether a panel passed or failed."). For five reasons, we disagree.

*One*, in making this argument, the Defendant never even mentions the Blackwater Study—which, as we've seen, corroborated (to a not-insubstantial degree) Dr. Yeh and Dr. Pang's findings. *See* Blackwater Study at 16 (summary of results), 21–240 (datasheets); *see also* Rebuttal Expert Disclosure of Ronald W. Anthony [ECF No. 361-9] ("Anthony Rebuttal Discl.") § 4 ("The Blackwater uniform load test data show that 50% of the sample sets failed the PS 1 performance criteria for average deflection under load. Specifically, three of five sample sets from PFS-TECO licensees failed and two of five sample sets from TPI licensees failed. In my opinion, this 50% failure rate, using the very test that TPI and PFS-TECO experts insist should be used for span-rated panels, supports the conclusions I reached in my previous declaration and expert witness disclosure that PS 1 compliant plywood cannot consistently be produced from the fast-growing loblolly and slash pine resources that Brazilian manufacturers are using to produce PS 1 stamped plywood.").

*Two*, remember that the Plaintiffs' studies—APA, Clemson, and Blackwater—all corroborated each other. Remember, too, that each of these studies was conducted by a separate lab, owned and operated by different scientists, in unconnected parts of the country. Now, it's possible that, at trial, the Defendant will manage to identify for the jury some larger, overarching conspiracy here. So, for instance, the Defendant might show that the Plaintiffs (or their allies) were actually pulling the strings (as it were) on *each* of these separate labs. But it's also reasonable *not* to believe in conspiracies—and to suppose that the three different labs corroborated each other, not because they were all being manipulated by some sinister sylvan cabal, but because they were honestly reporting what they found. And, since the question at this stage is *only* whether a reasonable jury could find for the Plaintiffs, we have little difficulty casting the Defendant's first challenge to the lab evidence aside (at least for now).

*Three*, the Plaintiffs have shown us internal PFS-TECO emails that *appear* to corroborate some of the studies' findings—*viz.*, that there *are* structural (and endemic) deficiencies in the Brazilian plywood. *See, e.g.*, Apr. 2014 Emails Between Greg Dupuis, Steve Verhey, and Steve Winistorfer Regarding Delamination Issues at 1 ("If there were 15 <u>more</u> problems that developed problems [sic] over the weekend, then I think the problem might be systemic, not isolated. Seems like Guararapes might have some bond quality problems."); Email from Dan Hovanec to Fabio Flor Regarding Rochembach Test Report (Nov. 26, 2018) [ECF No. 364-2] at 1 ("Please see the attached qualification report for Rochembach's 1/2 CAT CD Sheathing. Unfortunately, the product did not meet the PS 1 requirements. It seemed that failures were probably related to poor bonding. The panels failed to meet the Exposure 1 requirements and Brian mentioned that many of the panels delaminated to some extent after the wetting or wet/redry cycling. Small delaminations can cause a severe reduction in stiffness which could be part of the reason for the CSL Sub-16 W/R and UNI Sub-16 W/R deflection failures."); May 2018 Emails Between Dan Hovanec, Fabio Flor, Steve Verhey, and Steve Winistorfer Regarding Lavrasul Qualification Reports [ECF No. 364-13] at 1 ("Attached to this message are five qualification test reports for Mill # 384 – Lavrasul. . . . Unfortunately, all five products failed glue bonds. In addition, two of the products exceeded the maximum thickness tolerance of their performance category[.]"); Oct. 2017 Emails Between Barry Garcia and Steve Verhey Regarding 245 Glue Bonds [ECF No. 366-6] at 1 ("I have little faith in their regular production if the stuff they specifically send to us for evaluation is bad."), 3 ("I mentioned that we had more bad FComp GB results.").[43]

---

[43] There's a lot more of these. Check out, for instance, this email:

> Sheathing panels will be exposed during installation, so it is critical that the panels have good glue-bonds (this is never unimportant, but it's worth emphasizing here). Mills need to view their test results against the PS 1 criteria, and not what they generally think is OK. Glue-bonds of 70% are not acceptable for PS 1 panels. The majority of complaints/claims we receive are related to delamination and poor bonding. . . . There

*Four*, the Plaintiffs have pointed to the expert opinions of Dr. Shupe and Mr. Anthony—both of whom unambiguously confirmed what the studies independently revealed: that the Brazilian plywood just isn't strong enough to meet the Standard. In his review, Mr. Anthony identified "five failures of the panel certification and ongoing inspection audit and periodic testing programs administered by TPI and PFS-TECO in Brazil." Anthony Discl. ¶ 21. In his opinion, "the Brazilian plywood producers in the states of Paraná and Santa Catarina, Brazil, which make up 100% of the Brazilian mills certified and inspected by TPI and PFS-TECO, have consistently failed to produce PS 1-09-compliant plywood manufactured from the species from which they produce plywood for sale in the U.S. market." *Id.* ¶ 22. Dr. Shupe reviewed a "substantial body of scientific literature showing that southern yellow pine species will grow at highly accelerated rates in highly favorable site

---

is one other specific issue I'd like to mention: some plywood from Mill 252 recently came through our lab, and it looked bad in terms of construction and workmanship. We observed huge laps (some up to 6 inches), huge gaps, narrow and short veneers, and even a lot of inner veneers with inconsistent thicknesses. Some of the panels were not bonded well: we were able to break away at the veneers with our hands, and there was hardly any wood failure on the glue-lines. And perhaps the most alarming thing about this was that the 10-15 panels that were supplied to us were hand-picked from two entire units as the best panels.

Sept. 2017 Emails Between Dan Hovanec, Fabio Flor, and Steve Winistorfer Regarding Plywood Audits [ECF No. 366-7] at 2; *see also* Email from Steve Winistorfer to Fabio Flor Regarding Rochembach Stamp Proofs (Jan. 8, 2016) [ECF No. 364-7] at 1 ("Because the glue bonds in the test failed . . . , he will need to pay particular attention to the glue bonds in the future . . . . More than 90% of all the claims we hear about are related to delamination, so if Rochembach can make sure their glue bonds are good, they should have no other problems with panels in the U.S."); Email from Steve Winistorfer to Fabio Flor Regarding SOMAPAR Panels (July 17, 2015) [ECF No. 366-3] at 1 ("Given how poorly many of the glue bonds did, here's what we would like to do . . . ."); Apr. 2014 Emails Between Gerson Aldo de Souza, Januario, David Kirkman, Rich Spallone, and Steve Verhey Regarding Delamination Problem: 3/4 T & G [ECF No. 363-1] at 2 ("Blistering after simple exposure to a rain or two is not tolerated by the standard or builders. . . . When you see blisters form, there is little question that the panels are unacceptable."), 4 ("I just talked to Rich and unfortunately his customer called and reported more delamination. We had a considerable amount of rain this weekend and when the framers got to the jobsite they found an additional 15 sheets of 3/4 T & G had delaminated."); Sept. 2013 Emails Between Greg Dupuis, Steve Verhey, and Steve Winistorfer Regarding TWP-606 Plywood Claim [ECF No. 363-3] at 1 ("Attached are some photos of the jobsite claim we inspected yesterday in Bradenton, FL. They didn't come out as well as I had hoped. What we saw was several sheets that had cupping and bowing. There was also some delamination.").

conditions"—like those in Brazil—in a way that affects "patterns of wood density." Declaration of Dr. Todd Shupe Opposing the Defendant's Omnibus *Daubert* Motion [ECF No. 359-10] ¶ 4. He opined that "the incorporation of high percentages of low density juvenile wood into veneers utilize[d] for plywood manufacture present significant issues regarding compliance with the bending stiffness and deflection requirements for the PS 1 product standard." *Id.* The literature Dr. Shupe analyzed "comparing loblolly pine grown in the Brazilian state of Santa Catarina and the U.S. South reveal[ed] a major difference in the ratio of juvenile to mature wood between the two regions." Shupe Discl. ¶ 9. And Dr. Shupe explained that "the reason for [the failures documented in the APA and Clemson studies] is a lack of veneer density, and, in turn, the stiffness of the southern yellow pine veneer used in manufacturing the Brazilian plywood." *Id.* ¶ 10. Dr. Shupe therefore concluded "that the Brazilian plywood tested was not manufactured with sufficiently dense southern yellow pine veneer to consistently meet the PS-1 requirements for bending stiffness or deflection." *Id.*

*Five*, we just disagree with PFS-TECO's *premise*—which takes slightly out of context something both Dr. Yeh and Dr. Pang said in their depositions. In their depositions, recall, both men admitted that they didn't *fully* test the Brazilian plywood to determine whether it conformed to the Standard. *See, e.g.*, Deposition of Dr. Borjen Yeh [ECF No. 349-8] ("Yeh Dep.") at 158:8–13 ("Q. [In an email, you said,] '[f]or span-rated sheathing, though, the only way we can do to test them to span-rating requirement, just like a new qualification?' A. Correct. Q. Did you do that? A. No."), 160:17–19 ("Q. You didn't do full testing that would be needed for PS 1-09 compliance; right? A. Correct."); Deposition of Dr. Weichiang Pang [ECF No. 349-4] ("Pang Dep.") at 39:4–9 ("I'm not hired to judge the pass and fail of the panel, I was hired to test and establish and quantify the bending stiffness and strength of the panel, judging the pass/fail criteria for example the number of panels, the average value and so on, that wasn't part of my service, it wasn't."). From these concessions, PFS-TECO leaps to its conclusion—that the studies are essentially meaningless. *See, e.g.*, MSJ at 15 ("Dr. Yeh . . . testified

that the APA did **not** test Brazilian plywood to determine compliance with the PS 1 Standard. Thus, the Product Advisory does not demonstrate that the Stamps are false[.]" (citation omitted)).[44] This is silly—as Dr. Yeh made clear later in his deposition:

> Q. [Y]ou knew people would criticize it because performance tests were required to prove that the panel failed to meet the span rating; right? You knew that?
> A. Correct. But, again, this is an evaluation we are trying to do. We are not trying to qualify the product. So there's no compliance or noncompliance issue. It is in the data. That's all.
> . . . .
> A. *We show that the stiffness doesn't meet the requirement.* . . .
> Q. . . . In order to qualify any plywood to be compliant with PS 1-09, the testing that you performed is not enough. You need to do what's in 5.8.6 and 5.8.7; correct?
> A. *No. Not correct.*
> . . . .
> Q. Sir, I just want to know are you testifying under oath to the ladies and gentlemen of the jury that the testing that you performed in this case is sufficient to qualify a product to being compliant with PS 1-09, qualify.
> A. That's not what I said. I said they are not qualified because their data doesn't meet a requirement. You don't understand. *When you qualify the product, every test [is] a minimum requirement. If there is one test fail, that whole qualification fail.*

Yeh Dep. at 161:12–164:21 (emphases added & errors in original).[45] Dr. Pang, for his part, said something similar: When asked why he used "Method C" testing, rather than "vacuum testing," he explained that "you can use vacuum chamber test, and also the bending test, the Method C bending test. The Method C bending test can give you stiffness and strength. We are not here to say whether it pass or fail the requirement." Pang Dep. at 143:17–25. Rather, Dr. Pang "was asked to perform testing to figure stiffness and strength of the panel[.]" *Id.* at 208:12–14.

---

[44] *See also* MSJ at 17 ("Dr. Weichiang Pang . . . admitted that the Clemson Study did **not** test the Brazilian plywood for conformity with the PS 1 Standard. Therefore, the Clemson Study does not demonstrate that the Stamps are false nor does it provide that the Brazilian Mills are producing plywood that is not compliant with the PS 1 Standard." (citation omitted)); *see also* Def.'s SOF ¶¶ 41–42 ("The APA's testing was **not** conducted for the purposes of determining whether produced [sic] in Brazil complied with the PS 1 standard." (citation omitted)).

[45] *See also id.* at 158:23–159:2 (explaining that he didn't conduct the test for span-rating because he was doing an evaluation—not a qualification—and adding this critical line: "If the purpose is to do the evaluation, to do the evaluation, then you can pick any part of the requirement to confirm the product can perform").

What Drs. Yeh and Pang are driving at here is that they aren't licensed PS 1-09 qualifiers, that they weren't tasked with running the full gamut of PS 1-09 qualifying tests, and that they didn't (as a result) conduct a full qualification exam on these panels. At the same time, both men were clear that the qualification of PS-1-09 plywood hinges, to a significant degree, on a couple of core tests—one of which is the test for bending stiffness that they performed. Indeed, according to Mr. Anthony, a panel's bending stiffness is its "most important mechanical property"—and the most indicative of its compliance with the Standard. Anthony Discl. ¶ 21.a ("The high failure rates for plywood's most important mechanical property—bending stiffness—found by the APA's testing in 2017 and 2018 . . . and the Clemson University testing in 2019 strongly support the conclusion that PS 1-09 stamped plywood imported into the U.S. from southern Brazil consistently does not satisfy the PS 1-09 requirements."). And Mr. Anthony didn't just pull this opinion out of a hat. *See* Product Standard App'x A ¶ A3 ("[B]ending stiffness and bending strength are the most important properties for many plywood uses[.]"). Viewed in this context, it makes sense for Dr. Yeh to say that he didn't need to run the full battery of qualification tests on this (deficient) plywood because it was so clear from the test he *did* run that the plywood was non-compliant.

To understand why this is so, imagine (for a moment) a Dr. Jeter who owns a lab in Miami for the testing of spherical objects. Dr. Jeter doesn't work for Major League Baseball; he isn't affiliated with Major League Baseball; and he isn't authorized by Major League Baseball to do anything—let alone to certify baseballs for use in Major League games. But, owning equipment for the measurement of spheres, Dr. Jeter tests a sampling of balls and observes that 100% "weigh less than five . . . ounces avoirdupois[.]" MLB, *Official Baseball Rules* (2021 ed.), available at https://img.mlbstatic.com/mlb-images/image/upload/mlb/atcjzj9j7wrgvsm8wnjq.pdf (last accessed Mar. 29, 2021) § 3.01 ("The ball shall be a sphere formed by yarn wound around a small core of cork, rubber or similar material, covered with two strips of white horsehide or cowhide, tightly stitched together. It shall weigh not

less than five nor more than 5¼ ounces avoirdupois and measure not less than nine nor more than 9¼ inches in circumference."). At this point, Dr. Jeter doesn't need to conduct any further testing to determine that the balls in question are "unqualified" for use in Major League Baseball games. And he doesn't need to be a licensed ball certifier to render this opinion. That the ball didn't meet *one* of the necessary criteria in the rulebook is sufficient for him to conclude that the ball wouldn't meet Major League Baseball's standards. So, too, here. As Dr. Yeh succinctly explained: "When you qualify the product, every test [is] a minimum requirement. If there is one test fail, that whole qualification fail." Yeh Dep. at 164:18–21.[46]

*Second*, PFS-TECO calls the entire APA study into question by virtue of a four-sentence disclaimer the APA attached to its Product Advisory. *See* MSJ at 15; *see also* Def's SOF ¶ 43 ("The Product Advisory contains a disclaimer, which Dr. Yeh testified as a result, the test results [sic] cannot be relied upon."). That disclaimer reads:

> This Product Advisory is based on *APA – The Engineered Wood Association*'s continuing program of laboratory testing, product research and comprehensive field experience. Neither APA, nor its members[,] make any warranty, expressed or implied, or assume any legal responsibility for the use, application of, and/or reference to the opinions, findings, conclusions or recommendations included in this Product Advisory. Consult your local jurisdiction or design professional to ensure compliance with code, construction and performance requirements. Because APA has no control over the quality of workmanship or the conditions under which Brazilian plywood panel products are used, it cannot accept responsibility for product performance or designs as actually constructed.

APA Product Advisory at 3. But this lawyer-composed gobbledygook is totally inapposite here. For one thing, Dr. Yeh was clear that "[t]his is a standard disclaimer," *see* Yeh Dep. at 49:7, and that it doesn't affect his results in any way, *see id.* at 49:19–50:18 ("Q. Okay. So you'll agree with me, Dr. Yeh, that is the implication from the disclaimer; correct? . . . A. Again, this is basically a disclaimer. They

---

[46] Mr. Anthony recognized this dichotomy, too. While he acknowledged that "[n]one of these tests were qualification tests," he nevertheless found the tests probative insofar as they showed that "the sets of Brazilian panels fail [the PS 1-09 requirements] nine out of ten times." Anthony Discl. ¶ 25.

just tell people there are factors outside of our control which we cannot cover all the cases. So the users will need to make their own decision . . . The users will need to make their own judgment. They need to judge by themselves. Q. . . . Would you agree with me that the implication of this disclaimer is that you can't rely on the testing results? Yes or no? A. No.").

For another, the disclaimer—even by its own terms—doesn't undermine the APA's findings. At most, the disclaimer is an ambiguously worded liability shield that foists back onto the reader the obligation to determine whether to use the tested product and, if so, how and in what circumstances. *See* APA Product Advisory at 3 ("Consult your local jurisdiction or design professional to ensure compliance with code, construction and performance requirements."). And it deflects culpability—as it should—for any injuries the reader might (in future) sustain from the improper use or installation of the product the APA was testing. *Id.* ("Because APA has no control over the quality of workmanship or the conditions under which Brazilian plywood panel products are used, it cannot accept responsibility for product performance or designs as actually constructed."). And this is what Dr. Yeh was getting at when he said: "Essentially what we say because there are many variations in the use and installation of the product, we cannot guaranty, we cannot, you know, basically cover all the cases. So this disclaimer is [the] typical disclaimer you can find in most APA publications." Yeh Dep. at 49:8–13. Note, in this respect, that the disclaimer—honestly analyzed—isn't exactly an endorsement of Brazilian plywood, either. In any case, what the disclaimer doesn't say—and what it cannot be fairly read to suggest—is that the APA Product Advisory is a hollow, meaningless document unsuitable for any serious purpose.

*Third*, PFS-TECO insists that the Standard "does *not* require the certification agency to select the samples for initial qualification or ongoing testing"; "does *not* prohibit interim approvals of mills"; does *not* require regular ongoing surveillance or ongoing testing"; "does *not* set forth the minimum number and type and frequency of testing that must occur within a given year"; "does *not* prohibit the

use of subcontractors"; "does *not* address ongoing inspections and testing requirements for quality assurance"; "does *not* require an inspection agency to issue corrective action requests if a non-conformity is found"; "does not require the bending stiffness test to be conducted quarterly or annually[.]" MSJ at 13 (citing Def.'s SOF ¶¶ 6–8, 10–13, 15). But the Plaintiffs contest many of these assertions with competent evidence. Take an easy example: PFS-TECO quotes Mr. Anthony's admission that the Standard doesn't "give any requirement that any ongoing periodic testing is required in any time increment." Def.'s SOF ¶ 11 (quoting Anthony Dep. at 137:3–6). In saying so, however, the Defendant just ignores the rest of what Mr. Anthony had to say on this issue:

> A. . . . So in Section 7.2, it makes reference to qualified inspection and testing agency is defined to be one that has "developed procedures to be followed by agency personnel in performance of the inspection and testing."
> Q. Okay. I think my question was – that's not my question. I want to make sure that we're on the same page. My question is, does PS 1 have any surveillance requirement?
> A. I don't see the word "surveillance," but the fact that you develop a mill spec for quality assurance purposes and you develop procedures to be followed by the agency personnel in the performance of the inspection and testing leads me to believe that there is an intent that there is some surveillance that is to take place.
> Q. Okay. And you're referring to this section right, 7.2?
> A. 7.2, plus the mill specification. Those two together. If there is not an ongoing evaluation of the product, those sections are superfluous.

Anthony Dep. at 108:8–109:7. And this makes sense. Why, after all, would the Standard (in Section 7.2) mandate a long (and detailed) litany of seemingly-specific requirements if it didn't intend for the certification agency to ensure that those requirements were being met? Like CLEs in the legal profession, the licensing board doesn't so much care *when* you do them—so long as you get them done. And this—a reasonable jury could find—was Mr. Anthony's point.

As for the rest of the Defendant's claims, we think they're probably compelling points for closing argument. And we *could* see a reasonable jury going either way on many, if not all, of them. Section 7.1 of the Standard, after all, says only this: "Plywood represented as being in conformance with this Standard shall bear the stamp of a qualified inspection and testing agency which (1) either inspects the manufacture (with adequate sampling, testing of the bond line, and examination of quality

of all veneers) or (2) has tested a random sampling of the finished panels in the shipment being certified for conformance with this Standard." Product Standard § 7.1. We've seen no evidence that PFS-TECO does the latter, so the answer to the questions the Defendant poses comes down to what Section 7.1 means when it *requires* that the sampling, testing, and quality examination of all veneers be "adequate." Mr. Anthony, as we've seen, was clear that PFS-TECO's testing and certification processes are (in his opinion) inadequate. *See* Anthony Discl. ¶ 21 ("[I]t is my opinion that the plywood panel qualification testing and certification procedures, as well as the periodic testing and inspection audit procedures used to ensure adequate ongoing quality assurance of both TPI and PFS-TECO in Brazil lack scientific integrity."). The Defendant's expert, Mr. Nagy, disagrees. *See* Nagy Rebuttal Discl. ¶ 7 ("I find that PFS TECO did reasonably follow PS 1-09 provisions for qualification testing[.]"). That sounds a lot like the kind of dispute we empanel juries to resolve.

Two more things on the Defendant's third argument. *One*, much of the debate surrounding the adequacy of PFS-TECO's certification procedures is really window dressing, because the ultimate question under Section 7.2 is whether *the plywood itself* meets the Standard's prerequisites. Since the Plaintiffs have produced sufficient evidence to get to the jury on this (primary) issue, we'd deny summary judgment—*even if* we agreed with the Defendant on its inspections-and-procedures contentions. *Two*, by whittling down to (virtually) nothing the Standard's certification requirements, the Defendant seems to be suggesting—as it did in its motion to dismiss, *see* MTD [ECF No. 182] at 14—that its stamp signifies *nothing*. But that can't be right. Indeed, to crib from our Order Denying the Motion to Dismiss, it would make little business sense for the Defendant to suggest that its stamps mean whatever it thinks they should mean. Imagine the uproar when the Brazilian mills' clients learn that the certifications they'd come to rely on—for safety, quality, etc.—signified nothing at all. Who would pay good money for certified plywood if they knew that the certification signaled *only* the wood's compliance with whatever transitory guidelines each individual certifier deemed "adequate" at the

time? What value, in other words, would the certification hold if it were just the self-imposed (and evanescent) guidepost of an otherwise-unregulated regulator? No. It's at least *reasonable* to infer that the Defendant's stamps have value—and that the Defendant's certification business exists—precisely because the stamps mean *something*. And we think a reasonable jury could conclude that *that* something is conformity, not to a certifier's whim, but to a universal standard—the same standard that, for what it's worth, the American building community has come to know and trust for both safety and serviceability. *See* Pls.' SOF ¶ 67(b) ("[B]uilding codes around the United States require builders to use PS 1 stamped plywood in structural applications."); *see also* PFS-TECO's Building Code Requirements at 1 ("When building with plywood . . . the panels must meet the requirements of the building code.").

This, by the way, is *precisely* what PFS-TECO thinks (outside the context of its litigation position here, of course). As the Plaintiffs note, PFS-TECO Senior Vice President, Steve Winistorfer, sent an email in January 2018, in which he said that the TECO TESTED® stamp "means something here [in the U.S.], whether [Flor] realize[s] it or not." Jan. 2018 Emails Between Steve Winistorfer, Fabio Flor, Steve Verhey, and Dan Hovanec Regarding Stamp BC 1/2 for Mill 352 at 1. And this is consistent with what the Defendant's own expert said in his deposition. *See* Deposition of George Woodson [ECF No. 360-3] ("Woodson Dep.") at 14:11–15:3, 38:16–19, 39:13–17 (explaining that the stamp is PFS-TECO's "way of saying it's equivalent to another third-party stamp and saying it's certificated to a product standard"; noting that the "purpose of the PS 1 standard [is] to provide a common understanding of products that people are buying among the consumers, the producers"; and conceding that the way "a consumer know[s] whether or not a plywood panel satisfies the PS 1 standard" is when "[t]he customer sees the stamp, that's the only way he would know").

*Fourth*, the Defendant notes that its stamps do not—and, realistically, cannot—indicate that *every* individual panel conforms to the Standard. *See* MSJ at 14–15. Fair enough. But Section 5.1 of the Standard requires that "[a]ll plywood panels represented as conforming to this Standard shall meet or

exceed all applicable requirements set forth herein." Product Standard § 5.1. And the Reinspection Procedures listed in PS 1-09's Appendix B *appear* to mandate that 95% of plywood panels be on grade. *See* Product Standard App'x B § B7.3 ("If reinspection established that a disputed item is more than 5% below grade or out of dimensional tolerance for the product description as invoiced, that product fails to pass the reinspection and the nonconforming panels need not be accepted."); *see also* Woodson Dep. at 116:2–6 ("I think plywood consumers would expect, like most . . . they would expect five percent off grade."). And the reality is that all three of the Plaintiffs' studies found failure rates significantly higher than 5%. *See generally* APA Report (100% failure rate for bending stiffness); Clemson Study (75% failure rate for bending stiffness); Blackwater Study (50% failure rate for deflection). And, while it's true that the Plaintiffs' plywood likewise is imperfect, *see* Def.'s SOF ¶ 71 ("Each of the Plaintiffs have had failures of their PS 1 stamped plywood and/or produced off-grade plywood."); Pls.' SOF ¶ 71 ("Undisputed."), none of the evidence suggests that the Plaintiffs' panels fail at nearly the same rate as the Defendant's—at least when we credit, as we must at this stage of the case, the studies the Plaintiffs rely on. That's sufficient for us to send this question to the jury.

*Fifth*, the Defendant points out that the APA and Clemson studies tested plywood from only *some*—but not *all*—of their fourteen Brazilian clients. *See* MSJ at 18–19 ("APA and the Clemson Study only tested plywood from a limited number of Brazilian mills[.] . . . APA only considered plywood from four (4) of the fourteen (14) mills [sic], and Clemson University only tested plywood from two (2) of the fourteen (14) mills [sic] certified by PFS TECO. . . . Thus, there is no evidence that the 7 Mills would not meet the testing required to demonstrate compliance with the PS 1 Standard."). The Defendant thus asks us to grant summary judgment as to the seven mills whose wood was never tested. *Id.* at 19 ("PFS TECO is entitled to summary judgment as to [the] Plaintiffs' false advertising claims as to the 7 Mills, because Plaintiffs have entirely failed to demonstrate PFS TECO made any

false statement concerning the seven (7) Mills."). But Dr. Shupe specifically testified that the deficiencies the Plaintiffs say they have identified are endemic to the region:

> [The] growth of southern yellow pine species in the states of Parana and Santa Catarina in southern Brazil is rapid due to a combination of advanced genetics, high rainfall, good soils and a substantially expanded growing season compared to that of the southern U.S. For trees intended to be peeled into veneer for manufacture into plywood, site conditions and silvicultural practices can significantly affect veneer density and plywood strength and stiffness properties. The literature I have reviewed shows a dramatic difference between the percentage of juvenile wood in loblolly pine grown in southern Brazil compared to the U.S. South[.] . . . In my opinion, converting loblolly pine trees at the ages of 17 to 20 years old into veneer will result in substantially different wood density and stiffness properties between the veneer produced from trees grown in Santa Catarina compared to those grown in the southern U.S. Further, once the veneer from the loblolly pine trees harvested at these ages in these two regions is manufactured into plywood, there will be significant differences in the bending stiffness values of the Brazilian panels compared to those manufactured in the southern U.S. . . . Brazilian plywood stamped as PS-1 was tested for bending stiffness or deflection by the APA in 2018, Timber Products Inspection in 2018 and Clemson University in 2019. All of these test results show that high percentages of the Brazilian plywood tested failed to meet either the bending stiffness requirement or the deflection requirement for the particular plywood product under the PS-1 standard. In my opinion, the reason for these failures is a lack of veneer density and, in turn, the stiffness of the southern yellow pine veneer used in manufacturing the Brazilian plywood. Based upon the fairly robust level of scientific literature on the topic, it is my opinion that the high failure rates of the Brazilian plywood for bending stiffness or deflection, as found by the APA, Clemson University and Timber Products Inspection in its own surveillance testing in 2018, show that the Brazilian plywood tested was not manufactured with sufficiently dense southern yellow pine veneer to consistently meet the PS-1 requirements for bending stiffness or deflection. This conclusion is entirely consistent with the much higher percentage of juvenile wood making up the southern yellow pine veneer used by Brazilian plywood manufacturers.

Shupe Discl. ¶¶ 8–10. Mr. Anthony fully corroborated this conclusion. *See* Anthony Rebuttal Discl. § 4 (opining "that PS 1 compliant plywood cannot consistently be produced from the fast-growing loblolly and slash pine resources that Brazilian manufacturers are using to produce PS 1 stamped plywood"). And the three studies—which, of course, tested wood from *different* mills—seem to confirm this view. *See* APA Report § 2.2 (listing samples from eight different mills); Clemson Study § 3.1–3.9 (providing results for nine different mills); Blackwater Study at 13 (listing samples from ten

different mills). If this is true (and, at this stage, we must assume that it is), then a reasonable jury *could* find that the problem inheres in *all*—rather than just *some*—Brazilian wood.

      *Sixth*, PFS-TECO says that the APA and Clemson studies used the wrong methodologies. *See* MSJ at 15–18 ("Dr. Yeh . . . testified that the APA did **not** test Brazilian plywood to determine compliance with the PS 1 Standard. . . . [I]nstead of utilizing the proper test . . . the Product Advisory utilized a modified Method C of ASTM D3043 in Section 6.2.3.1 of the PS 1 Standard[.] . . . Dr. Weichiang Pang . . . admitted that the Clemson Study did **not** test the Brazilian plywood for conformity with the PS 1 Standard. . . . [The] Plaintiffs hired Clemson to conduct a biased study on Brazilian plywood for bending stiffness and strength using a large panel bending test (that is the Method C under ASTM D3043)."). But this objection seems to be directed—not so much at the *admissibility* of these expert opinions—but at their ultimate weight in the eyes of the jury. *See City of S. Miami v. DeSantis*, 2020 WL 7074644, at *3 (S.D. Fla. Dec. 3, 2020) (Bloom, J.) ("The presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight, not admissibility." (cleaned up)). And that's just not grounds for summary judgment. In any event, we'll soon set the Defendant's *Daubert* motion, *see* Defendant's Amended Omnibus *Daubert* Motion [ECF No. 440], for a hearing—at which we'll address the Defendant's objections to this expert testimony in more detail. As we've said, if we end up excluding all (or part) of the experts' opinions, we'll allow the Defendant to reraise this argument.

***

      In the end, the "potential ambiguity of an advertisement" should be treated "as a question of fact"—and so, "if a reasonable jury could find that [the defendant] unambiguously conveyed a false message in the challenged statements, either explicitly or by necessary implication, then summary judgment on this element is inappropriate." *Wing Enters.*, 511 F. Supp. 3d at 969. Because a reasonable

56

jury could find that the statements PFS-TECO made—in the course of certifying its Brazilian clients' plywood—were false, we deny this aspect of the motion.[47]

### b. Materiality

"The materiality requirement is based on the premise that not all deceptions affect consumer decisions." *Johnson & Johnson*, 299 F.3d at 1250. A representation is "material" when it's "likely to influence the purchasing decision." *J-B Weld Co., LLC, v. Gorilla Glue Co.*, 978 F.3d 778, 796 (11th Cir. 2020). So, to "succeed on a claim of false advertising, the plaintiff must establish that the defendant's deception is likely to influence the purchasing decision." *Johnson & Johnson*, 299 F.3d at 1250 (cleaned up). Unlike the consumer-deception element, the "plaintiff must establish materiality even when . . . the defendant's advertisement is literally false." *Id.* "A plaintiff may establish this materiality requirement by proving that the defendants misrepresented an inherent quality or characteristic of the product." *Id.* (cleaned up).

The Plaintiffs provide more than enough evidence for this element.

*First*, they point to Nagy's testimony that, in purchasing structural plywood, consumers *do* rely on the agencies' certification stamps. *See* Plaintiffs' SOF ¶¶ 24, 76. The relevant exchange went like this:

> Q. Does a plywood manufacturer need a PS 1 stamp to sell panels in the U.S. structural market?

---

[47] Because the Plaintiffs have created a genuine issue with respect to the stamps' falsity, we needn't delve into the parties' separate contentions on the degree to which consumers were deceived. That's because, if an "advertisement [is] literally false, then the [plaintiff] is not required to present evidence of consumer deception." *Osmone, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010); *see also, e.g.*, *BPI Sports, LLC v. ThermoLife Int'l, LLC*, 2021 WL 4972975, at *5 (S.D. Fla. July 27, 2021) (Smith, J.) ("If an advertisement is deemed to be literally false, the plaintiff need not present evidence of consumer deception."); *TocMail Inc. v. Microsoft Corp.*, 2021 WL 5084182, at *5 (S.D. Fla. July 16, 2021) (Cannon, J.) (same.) "Many courts—including the Eleventh Circuit—routinely presume that literally false advertising actually deceives consumers." *Safari Programs, Inc. v. Collecta Int'l Ltd.*, 2018 WL 3730894, at *2 (S.D. Fla. Apr. 16, 2018) (O'Sullivan, Mag. J.) (citing *Johnson & Johnson*, 299 F.3d at 1247 ("Once a court deems an advertisement to be literally false, the movant need not present evidence of consumer deception.")), *report and recommendation adopted*, 2018 WL 3730220 (S.D. Fla. May 1, 2018) (Ungaro, J.).

A. For any uses where it would be used structurally, yes. Like the building codes.

Q. Do purchasers rely on the stamps to determine if the panels are on grade?

. . . .

A. Purchasers, which – what type of purchasers are you meaning?

Q. Well, let's walk through. If you are a wholesaler, and you're buying directly from the manufacturer, are you buying – are you specifying PS 1 stamped panels to purchase?

. . . .

THE WITNESS: I would believe that a wholesaler that was buying from our member companies from CANPLY,[48] if they were intending to sell the product into the U.S. market, they would want it to be certified to PS 1, yes.

. . . .

Q. And if you're a home builder, would you want to purchase PS 1-stamped plywood for residential or commercial construction?

A. Well, a home builder certainly wouldn't have purchased directly from any of the mills, but any of the products they would purchase from a wholesaler or a Home Depot or whatnot, I would expect that they would be wanting – needing plywood that had the PS 1 stamp, yes.

Q. Do building inspectors look for the PS 1 stamp when they inspect new construction?

A. Building inspectors absolutely should.

Nagy Dep. at 20:13–21:20.

*Second* (they note), building codes across the country require that structural plywood be PS-1-09-compliant. *See* PFS-TECO's Building Code Requirements at 1. And this, of course, is the case here in Florida. *See* Florida Building Code § 2303.1.5 ("Wood structural panels, when used structurally (including those used for siding, roof and wall sheathing, subflooring, diaphragms and built-up members), shall conform to the requirements for their type in DOC PS 1, DOC PS 2 or ANSI/APA PRP 210. . . . Wood structural panel components shall be designed and fabricated in accordance with the applicable standards listed in Section 2306.1 and identified by the trademarks of an *approved* testing and inspection agency indicating conformance to the applicable standard.").

---

[48] CANPLY is the Canadian Plywood Association—essentially Canada's version of the APA. *See* Nagy Dep. at 17:5–12 ("Q. What was the focus of the Canadian Plywood Association, CANPLY? A. Very similar in many regards to the APA where it was providing services to the Canadian plywood industry. We would – whatever services our board would support, and it was a general range of services: technical services, codes and standards work, product certification, product development.").

*Third*, they rely on the testimony of George Woodson—another one of the Defendant's experts, who spent many years representing consumer interests on the PS 1-09 Standing Committee. *See* Woodson Dep. at 36:18–37:21. Specifically, Woodson was asked whether it's "fair to say that the PFS-TECO stamp on a plywood panel . . . indicated that that panel complies with the PS 1 standard to a consumer[.]" *Id.* at 14:23–25. His response: "Yes, that's the purpose." *Id.* at 15:3. In other words (he explained), the stamp is PFS-TECO's "way of saying it's equivalent to another third-party stamp and saying it's certificated to a product stand[ard]." *Id.* at 14:15–17. The "purpose of the PS 1 standard," he continued, is "to provide a common understanding of products that people are buying among the consumers, the producers." *Id.* at 38:16–19. So, he went on, the only way "a consumer know[s] whether or not a plywood panel satisfies the PS 1 standard" is when "[t]he customer sees the stamp, that's the only way he would know." *Id.* at 39:13–17. Finally, Woodson was clear that the stamps tell consumers the plywood "meets the building code." *Id.* at 14:19.

*Fourth*, the Plaintiffs tap into a stockpile of emails that seem to show "PFS-TECO knows full well that consumers rely on its PS 1 certification stamps." Response at 11. So, for example, in one such email, PFS-TECO's Senior Vice President, Steve Winistorfer, tells Fabio Flor, PFS-TECO's Brazil-based subcontractor (in charge of inspecting the Brazilian mills), that "US customers expect the plywood they buy to meet PS 1 in all ways." Jan. 2018 Emails Between Steve Winistorfer, Fabio Flor, Steve Verhey, and Dan Hovanec Regarding Stamp BC 1/2 for Mill 352 at 1. And (he adds): the TECO TESTED® stamp "means something here [in the U.S.], whether [Flor] realize[s] it or not." *Id.* In another set of emails—directly after the APA issued its Product Advisory—Michael Patneaude, an employee at a major Tampa-based plywood importer, wrote to Steve Winistorfer, explaining that the Product Advisory's criticism of the Brazilian mills' compliance with industry standards had led to "concerns from customers[.]" July 2018 Emails Between Michael Patneaude, Steve Winistorfer, and Joe Brown Regarding TECO Response Letter at 1–2.

*Fifth*, the Plaintiffs show us a public PFS-TECO document, in which the Defendant made its view on the materiality of the PS 1-09 Standard pretty clear: "When consumers see a certification mark on a product or in connection with services," the Defendant wrote, "they can assume the goods or services meet the standards of safety or quality that have been clearly established and advertised by the certifier." PFS-TECO Document Explaining PFS-TECO's Certification Marks [ECF No. 370-1] at 1. The document goes on:

> What do PFS TECO Certification Marks Signify? PFS TECO's certification marks signify that various engineered wood products (EWP) like . . . plywood meet PFS TECO's quality and performance standards. PFS TECO certifies products only after thoroughly testing them. That way, when builders, code officials, and others in the building design and construction communities see the PFS Checkmark or TECO TESTED® designations on EWPs, they know that the products meet PFS TECO's performance requirements and those of the particular standard to which they are certified (e.g., PS 1 or PS 2 for plywood[).] . . . PFS TECO's certification marks are used to clearly inform consumers of the product characteristics that are certified, and used so that the marks are physically applied to the certified products themselves[.]

*Id.* We recognize (of course) that there are several different ways to read this document. But one such way—perhaps even the most reasonable way—is that the document emphasizes just how important (read: material) the PS 1-09 stamp is to plywood consumers across the country.

Trying to parry, the Defendant points out that the Plaintiffs' "experts have not conducted any survey on consumers, . . . did not speak with any consumers in their investigation and formulation of their opinions in this matter[,] . . . [and that the] Plaintiffs' corporate representatives testified that they have not spoken to any consumer or distributor, and therefore, did not have knowledge regarding what impacts a consumer's purchasing decision." MSJ at 20–21.[49] But, contra the Defendant's position, the law doesn't require the Plaintiffs' materiality evidence to come in any specific form.

---

[49] PFS-TECO also (half-heartedly) insists that the "Plaintiffs have presented no evidence of consumer reliance and no evidence that consumers consider the Stamps material to their purchasing decisions." MSJ at 21. For all the reasons we've highlighted in this Section, we disagree. *See* Nagy Dep. at 20:13–21:20; Florida Building Code § 2303.1.5; Woodson Dep. at 14:15–15:3, 36:18–39:17; PFS-TECO Document Explaining PFS-TECO's Certification Marks at 1.

Instead, "the plaintiff must establish" only "that the defendant's deception is likely to influence the purchasing decision." *Johnson & Johnson*, 299 F.3d at 1250. And, far from mandating that this materiality proof come in the form of consumer surveys or customer depositions, the Eleventh Circuit has taken a commonsense approach: "A plaintiff may establish this materiality requirement by proving that the defendants misrepresented an inherent quality or characteristic of the product." *Id.* As we've said, the Plaintiffs have done precisely that—with or without consumer surveys.

Relying on the Eleventh Circuit's decision in *J-B Weld*, PFS-TECO says that "the inherent quality or characteristic formulation . . . does not replace the consumer-oriented nature of the materiality inquiry with a scientific one[.]" Reply at 9 (cleaned up). But the Plaintiffs' materiality evidence isn't "scientific"; it's based (rather)—as *J-B Weld* requires—on what *the Defendant* (and its experts) said about the degree to which *consumers* demand the PS 1-09 stamp. In any event, a closer look at *J-B Weld* reveals it to be mostly inapposite here. The question in that case was whether the phrase "steel bond epoxy" on the packaging of glue tubes influenced consumers' purchasing decisions. *J-B Weld*, 978 F.3d at 797–98. The plaintiff, an adhesive manufacturer, sued Gorilla Glue, a competing adhesive manufacturer, *id.* at 783–84, for (among other things) false advertising under the Lanham Act, *id.* at 785. In essence, the plaintiff alleged that Gorilla Glue had violated the Lanham Act by including the phrase "steel bond epoxy" on the packaging of its non-epoxy two-part adhesive. *Id.* at 796. The plaintiff's argument thus "command[ed] the inference that a consumer would consider [the plaintiff's glue] to be an epoxy adhesive, but would *not* consider [the defendant's] MMA-based adhesive to constitute an 'epoxy' adhesive, due to the chemical differences between the two formulas." *Id.* at 797. But, the court said, the plaintiff did "not present[ ] any evidence that consumers are so scrupulous about the chemicals in their adhesives" and never *even* suggested that "consumers likely categorize 'epoxies' as all two-part resin-and-hardener adhesives, *regardless of the chemical constitution of the resin.*" *Id.* (emphasis added).

61

Our case is very different. As we've seen, the Defendant's *own experts* testified that consumers rely on the "stamp [to] tell[ ] them that [the plywood] meets the building code"—in part because "PS 1 is something specified for a building code," Woodson Dep. at 14:18–21; *see also* Nagy Dep. at 20:13–16 (noting that the stamp is necessary to sell structural plywood in the United States "under the building codes"); the Defendant's *own emails* make clear that, according to its understanding, "US customer expect the plywood they buy to meet PS 1 in all ways," Jan. 2018 Emails Between Steve Winistorfer, Fabio Flor, Steve Verhey, and Dan Hovanec Regarding Stamp BC 1/2 for Mill 352 at 1; and the Defendant's *own public document* on the value (read: materiality) of its stamp emphasizes that, "[w]hen consumers see a certification mark in a product . . ., they can assume the goods or services meet the standards of safety or quality that have been clearly established and advertised by the certifier," PFS-TECO Document Explaining PFS-TECO's Certification Marks at 1.

***

As a member of this Court recently explained: "Although the Eleventh Circuit appears not to have characterized the materiality standard specifically in Lanham Act cases, it has noted in related contexts that materiality is a mixed question of law and fact that requires delicate assessments of the inferences that a reasonable person would draw from a given set of facts, and therefore, that such assessments are peculiarly ones for the trier of fact." *TocMail Inc. v. Microsoft Corp.*, 2021 WL 5084182, at *3 (S.D. Fla. July 16, 2021) (Cannon, J.) (cleaned up). We agree—and likewise leave this question for the trier of fact.

### 2. The Plaintiffs' Contributory Claim

To state a contributory-false-advertising claim under the Lanham Act, "the plaintiff must show that a third party . . . directly engaged in false advertisement that injured the plaintiff" and "that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it." *Duty Free*, 797 F.3d at 1277. The Defendant doesn't challenge the

Plaintiffs' proof on this first element, *see generally* MSJ; it has thus forfeited any such challenge, *see, e.g.*, *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances"); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

To establish the second element, the plaintiff must provide evidence "that the defendant contributed to" the false advertising. *Duty Free*, 797 F.3d at 1277. "This means that the plaintiff must [provide evidence] that the defendant had the necessary state of mind—in other words that it intended to participate in or actually knew about the false advertising." *Id.* The plaintiff must also show that the defendant "materially furthered the unlawful conduct—either by inducing it, causing it, or in some way working to bring it about." *Id.* In assessing the viability of a contributory-false-advertising claim, courts consider several factors—including: "the nature and extent of the communication between the third party and the defendant regarding the false advertising; whether or not the defendant explicitly or implicitly encouraged the false advertising; whether the false advertising is serious and widespread, making it more likely that the defendant knew about and condoned the acts; and whether the defendant engaged in bad faith refusal to exercise contractual power to halt the false advertising." *Id.* at 1278

The Defendant claims "there is no evidence that PFS TECO induced or knowingly or intentionally participated in any of the allegedly false statements made by the Brazilian Mills." MSJ at 21. "There is no evidence," the Defendant insists, "that other than merely having a licensing agreement, PFS TECO controls or participated in Brazilian Mills' businesses." *Id.* at 22. Here, PFS-TECO is all on its own.

*First*, there's plenty of evidence that the Defendant knew about the (allegedly) shoddy product coming from Brazil. So, for instance, we have several emails in which PFS-TECO employees openly discussed some of the problems they were seeing with their Brazilian plywood. *See e.g.*, Jan. 2016 Emails Between Steve Winistorfer and Fabio Flor Regarding Rochembach Stamp Proofs [ECF No. 364-6] ("Rochembach Stamp Proofs Emails") at 4 ("We have decided to issue approval for the 3/4 CAT 48/24. . . . But there is one that gave us concern – the Uniform Load Roof-48 Dry test that has an average deflection at 35 psf of 0.185 [inches]. The maximum allowed is 0.200 [inches]. . . . [T]hey would not have passed the 0.200 [inches] deflection requirement of this test. The glue bond results failed the PS 1-09 boil test. The PS 1-09 requires that wood failure be at least 85% and the overall average of our samples was 82%. While this was close, the values still need to improve."), 6 ("The specimens that the mill sent were beyond the permitted thickness of 23/32 panels. They were even too think to be considered 3/4."); July 2016 Emails Between Steve Verhey and Fabio Flor Regarding Randa Gluebond Test Results [ECF No. 367-1] at 1 ("It's hard to get representative performance from panels when there are bad glue bonds. Mills should not be failing glue bonds when they send panels to us. It's a bad sign of their ability to make plywood and undermines our confidence in them."); May 2018 Emails Between Steve Verhey, Guilherme Ranssolin, Steve Winistorfer, and Dan Hovanec Regarding Information [ECF No. 366-10] ("Information Email") at 1 ("We frequently see problems with inconsistent panel thickness and poor bond quality from Brazil, so your problems are not new to us."); Aug. 2018 Emails Between Steve Verhey, Dan Hovanec, and Fabio Flor Regarding Randa BC 1/2 Stamps [ECF No. 367-4] at 1 ("Too many mills from Brazil fail glue bonds with panel submittals. . . . Glue bonds are basic and we shouldn't be seeing the variability that we do, when mills submit panels."); Nov. 2018 Email from Dan Hovanec to Fabio Flor Regarding Rochembach Test Report [ECF No. 364-2] at 1 ("Unfortunately, the product did not meet the PS 1 requirements. It seemed that failures were probably related to poor bonding.").

Indeed, when he returned from visiting PFS-TECO's clients in Brazil, Dan Hovanec—a PFS-TECO employee—reported that the Brazilian mills were mis-using the TECO TESTED® stamp. *See* Hovanec Trip Notes at 3 ("[A mill employee] told me that there are D-D plugged panels for the European market. I asked if they bear a TECO TESTED grade stamp, and he confirmed that they do. I asked if they are explicitly marked as DpD, and he said they are, but I did not see a stamp. I expressed my concern that D-plugged is not a veneer grade in PS 1 and I don't think panels can be marked this way.").[50] And, Hovanec said, at a different mill, he saw "several mistakes" on the stamps themselves: "[T]he thicknesses were wrong for all ¾ CAT sanded panel stamps," and "the mill has a stamp for CC Exposure 1 sheathing, though it has never been used." *Id.* at 5. At a third client, Hovanec noted that the mill "does not actually have a machine to test glue bonds specimens," even though "they cannot sell any certified production until [the mill] has a way to test glue bonds[.]" *Id.*

And there's enough evidence for a jury to find that PFS-TECO "materially furthered the unlawful conduct—either by inducing it, causing it, or in some way working to bring it about." *Duty Free*, 797 F.3d at 1277. So, for instance, Woodson (the Defendant's expert) testified that PFS-TECO didn't retain any data on whether (and to what extent) its clients meet the Standard—this, despite knowing (as we've just seen) that much of the Brazilian plywood did *not* meet that Standard. *See* Woodson Dep. at 101:2–14 ("Q. Doesn't it concern you that PFS-TECO does not have access to that kind of data? A. Doesn't have access to what data, the daily production records? . . . . Q. No. The data showing that their client's plywood panels satisfy the PS 1 standard. . . . A. It wouldn't surprise me that they – because they don't have – they don't conduct surveillance testing, so they wouldn't have that data."). And, in an internal email, Steve Winistorfer seemed to corroborate this conclusion. *See* Email from Steve Winistorfer Regarding Call from President of APA Regarding Tests of Brazilian Plywood to Steve Verhey, Dan Hovanec, and Jim Husom (June 28, 2018) [ECF No. 366-4] at 1 ("I

---

[50] The numbering is off on this document—so, we cite the PDF's page numbers instead.

am fairly confident that we have the records to support the approvals we've issued, but also know that we have little to no data of ongoing surveillance testing these products.").

The Plaintiffs also point to the deposition of Steve Verhey—a senior PFS-TECO employee—who admitted that the Defendant allows the Brazilian mills to select the samples they want PFS-TECO to test. Here's that exchange:

> Q. . . . Do you believe allowing the mill to select its own sample set to be tested for qualification testing is consistent with the certification standards of ISO 17025? . . .
> A. Absolutely. . . .
> Q. . . .Would you agree that 17065 has a number of provisions that emphasize the importance of impartiality in the product certification decisions?
> A. Yes.
> Q. And is it your opinion that allowing the mill to self-select the qualification is consistent with that impartiality under 17065?
> A. Yeah, you just said it yourself. The impartiality replies [sic] to our action to the certification decision that we make. Then there is a mechanism under the certification scheme . . . in ISA 17067 that allows manufacturers to sample production.

Deposition of Steven Verhey [ECF No. 360-2] ("Verhey Dep.") at 51:24–58:16. And there's a lot more evidence that PFS-TECO allows its clients to engage in this kind of self-selection. *See, e.g.*, PFS-TECO, Project No. 18-143a [ECF No. 368-9] at 2 (noting that the plywood was "[s]ampled by [the] Client"); Report on Madeireira Ranssolin Ltda. Testing [ECF No. 368-10] at 2 (noting that the qualification testing "was performed on material sampled by [the] Client"). As the Plaintiffs see it, this process of self-selection allowed the Brazilian mills to "game the system" by sending cherry-picked (and thus non-representative) samples to the U.S. for certification testing. Response at 2 ("PFS-TECO . . . allowed [its] Brazilian mills to game the system from the outset by selecting their own sample sets of plywood panels for certification testing.").

The Plaintiffs have also produced emails that (they say) show PFS-TECO employees *allowing* the Brazilian mills to mitigate their products' failure rates by, for instance, retesting non-compliant plywood. In the following email exchange, for instance, Fabio Flor, PFS-TECO's subcontractor in

Brazil, and Steve Winistorfer talk about retesting plywood panels from the SOMAPAR mill after the mill's panels failed a glue-bond test:

> [Zhaozhen Bao, senior scientist at PFS-TECO:] Glue bond test was completed and the results are shown in the attached pdf file. It failed in both VP and boil. . . . [I]t is a failed test in glue bond. . . .
>
> [Winistorfer:] Results of the panel bending strength were OK but stiffness was in the Group 3 range. And both sets of glue bond results failed to meet the Exp 1 requirements. Here's what I recommend: . . . If the mill wants to run another set for testing, they could take one of two approaches but in either case they need to do something that improves the quality of the panels. This could be improving the glue bonds but may also involve using higher quality veneers. Form the glue bond results, the guys at the Eugene lab believe the quality of the inner veneers may have been low. Low quality inner plies could be the reason for low stiffness and also poor glue bonds. . . . [Fabio,] [p]lease share this with the mill and let us know how they would like to proceed.
>
> [Flor:] SOMAPAR [mill] already paid U$ 2,000 for full Group classification, so I think we should conclude the PS and STT and send the report. At this moment they are waiting for this, and they would like to know how many panels they need to send for re-testing (?) Let me know.
>
> [Winistorfer:] We will complete this project and give a full report as you recommend. To do another set, they would need to send 25 panels again but they need to do something that improves the quality.
>
> [Flor:] Mr. Marcon (Production Mgr) from SOMAPAR asked if we could give interim approvals for BC 23/32.[ ] They agreed and will send 25 panels again.
>
> . . .
>
> [Winistorfer:] Fabio, Given how poorly many of the glue bonds did, here's what we would like to do. Please have the mill figure out what they need to do to improve the glue bond results. Then have them cut 20 12" x 12" samples (from 20 different panels) and send them to Eugene for GB testing. If they pass we will give preliminary approval at Group 3. Then the mill should send 25 4x8 panels to do another full qualification and everything needs to pass to give full approval. This might also give them an opportunity to get something more than a Group 3 [species classification].[51]

July 2015 Emails Between Steve Winistorfer, Fabio Flor, Brian Thompson, and Zhaozhen Bao Regarding SOMAPAR Panels [ECF No. 364-9] ("SOMAPAR Glue Bonds Emails") at 2–8. And there's more like this. *See, e.g.*, Rochembach Glue Bonds Emails at 4 ("We have decided to issue approval for 3/4 CAT 48/24. . . . The glue bond results failed the PS 1-09 boil test. . . . While this was close, the values still need to improve.").

---

[51] Recall that the Standard classifies wood species into five groups—with Group 1 being the strongest and Group 5 the weakest.

The Plaintiffs have also pointed us to an email in which PFS-TECO agreed to "forego the full qualification testing" for Brazilian Eucalyptus plywood *simply* because PFS-TECO was "aware that the Eucalyptus veneer [is] more dense and generally stronger than the pine veneer." May 2019 Emails Between Dan Hovanec, Gerson Aldo de Souza, Fabio Flor, and Diego Oliveria Regarding Process to Add Eucalyptus to Approved Products [ECF No. 364-4] at 1.

These documents—especially when coupled with the extraordinary failure rates uncovered in the APA, Clemson, and Blackwater studies—provide compelling evidence for three of the four *Duty Free* factors: "the nature and extent of the communication between the third party and the defendant regarding the false advertising; whether or not the defendant explicitly or implicitly encouraged the false advertising; [and] whether the false advertising is serious and widespread, making it more likely that the defendant knew about and condoned the acts[.]" In particular, the evidence—viewed as a whole and taken in the light most favorable to the Plaintiffs—suggests that PFS-TECO was in constant communication with its Brazilian mills about *both* their failing plywood *and* (sometimes) their deficient stamp use; that PFS-TECO "implicitly encouraged" the false advertising by refusing to do much about it and by creating an environment in which the Brazilian mills could operate without very much supervision; and that the problem was both "serious and widespread"—thus making it "more likely" that PFS-TECO "knew about" it and "condoned" it.

Now, it's true (as ever) that much of the Plaintiffs' evidence can be construed in several ways. *See, e.g.*, SOMAPAR Glue Bonds Emails at 3–4 (noting that Winistorfer was *reluctant* to grant interim approval "[b]ecause glue bonds are so important to the integrity of the panels"); Hovanec Trip Notes at 3 (reporting that a representative from the Guararapes mill "mentioned that he respects PFS TECO's approach for certification, and that he has been approached by [another certification agency] . . . . [who] offered to certify the mill immediately and wouldn't require the mill to have a correlation in place before the mill can perform its own QC testing"). But that's precisely the point. Because these

documents are susceptible of multiple *reasonable* interpretations, we'll let a jury decide whether they establish "that the defendant contributed to [the false advertising] either by knowingly inducing, or causing the conduct, or by materially participating in it." *Duty Free*, 797 F.3d at 1277.

### C. Damages

We likewise reject the Defendant's damages objections. "The final element of a Lanham Act false advertising claim is that the false advertising caused injury to [the] plaintiff." *Air Turbine Tech., Inc. v. Atlas Copco AB*, 295 F. Supp. 2d 1334, 1244 (S.D. Fla. 2003) (Marra, J.). But "Lanham Act damages may be awarded even when they are not susceptible [of] precise calculations." *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986); *see also Borg-Warner Corp. v. York-Shipley, Inc.*, 293 F.2d 88, 95 (7th Cir. 1961) ("[D]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded.").

To attack the Plaintiffs' damages claim, the Defendant argues that the Plaintiffs' lost-profits computation is "[b]ased [e]ntirely on [s]peculation." MSJ at 24. We disagree.[52]

"The monetary damages available to a Lanham Act trademark plaintiff can be divided into five rough categories: recovery of the defendant's profits, actual business damages and out-of-pocket losses (like corrective advertising), lost profits, punitive damages, and attorneys' fees." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019). The trial judge has "[g]reat latitude in awarding damages," and "[t]his is especially true of an award fashioned pursuant to the Lanham Act which expressly confers upon district judges wide discretion in determining a just amount of recovery for trademark infringement." *Holiday Inns, Inc. v. Alberding*, 683 F.2d 931, 935 (5th Cir.

---

[52] The Defendant also insists (again) that "the evidence proffered by Plaintiffs and their experts purporting to show lost profits damages is deficient to allow a trier of fact to find causation (*i.e.*, that PFS TECO's false advertisement caused Plaintiffs to lose sales) under the Lanham Act." MSJ at 25. But we've already determined that the Plaintiffs have done enough to establish the necessary link between the Defendant's (allegedly) false advertising and the Plaintiffs' (claimed) lost profits. *See supra* Section I.A. A reasonable jury *could* find, in other words, that the Defendant's "false advertising caused injury to [the] plaintiff." *Air Turbine*, 295 F. Supp. 2d at 1244.

1982) (citing 15 U.S.C. § 1117); *see also Burger King v. Mason*, 710 F.2d 1480, 1495 (11th Cir. 1983) (noting that 15 U.S.C. § 1117 "vests considerable discretion in the district court").

"The primary limiting principle is that damages may not be speculative." *Hard Candy*, 921 F.3d at 1354 (cleaned up). "A plaintiff must prove with reasonable probability, not absolute certainty, that it suffered damages due to the trademark infringement." *Abbott Lab'ys v. Adelphia Supply USA*, 2019 WL 569148, at *45 (E.D.N.Y. Sept. 30, 2019). For example, "[p]roof of a decline in sales combined with evidence tending to discount the importance of other market factors, such as evidence of positive business conditions and the success of similar businesses not subject to the defendant's tortious conduct, can be sufficient to establish a causal connection between the plaintiff's decline in sales and the misconduct of the defendant." *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 262 (E.D.N.Y. 2008) (quoting Restatement (Third) of Unfair Competition § 36 cmt. h (1995)).[53]

The Plaintiffs' damages evidence isn't speculative. To the contrary, it's based on (1) Montzka's regression analysis and (2) Dr. Anderson's expert calculations. *See* Response at 18–20. Let's drill down on each of these—starting with Montzka. As we've explained, "regression analysis is a well recognized and scientifically valid approach to understanding statistical data, and courts have permitted parties to use statistical data to establish causal relationships." *In re Neurotin*, 712 F.3d at 42 (collecting cases); *see also In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1359 (N.D. Ga. 2000) ("Regression analysis is a well-worn statistical technique used in a variety of contexts to examine the nature of the

---

[53] Although these cases all involved claims of trademark infringement, we see no reason *not* to apply their reasoning to the false-advertising claims at issue here. In fact, there's good reason to suppose that the very same standard should govern both types of Lanham Act claims. *See Duty Free*, 797 F.3d at 1276 ("Because the[ ] same principles motivated the false advertising provision [and the trademark-infringement provision], the same reasoning supports the conclusion that a plaintiff can state a claim for contributory false advertising. . . . Moreover, while the two causes of action are derived from the same principles and contained in the same statute, the Supreme Court has recognized that the false advertising provision of the Lanham Act entails *broader* protections." (emphasis added)).

relation, if any, between two or more variables."). And Montzka's models—which considered several possibly-confounding variables, including the impact of OSB on the U.S. plywood market—concluded that the influx of Brazilian plywood has caused significant declines in the price of U.S. plywood. *See* Montzka Discl. ¶¶ 6, 8, 18–19; Montzka Dep. at 111:17–112:4. And PFS-TECO's legitimate critiques of Montzka's methodologies (and inferences), *see* MSJ at 25–26,[54] may well be fertile ground for cross-examination—but they aren't a sufficient basis for us to grant summary judgment.

    As for Dr. Anderson, the Defendant criticizes his analysis because he (1) "relied on Montzka's regression models" and (2) "did no investigation into whether consumers would have purchased [the] Plaintiffs' plywood over other US plywood producers but for the Brazilian plywood." *Id.* at 26. We'll address each of these objections in turn.

    *First*, PFS-TECO discounts Dr. Anderson's conclusions because (it says) his "opinions are nothing more than a wholesale adoption of the Plaintiffs' theories and as such, [his] opinions are nothing more than entirely speculative and inadmissible." Reply at 12. Here, again, the Defendant simply ignores the record. In his deposition, for example, Dr. Anderson testified that he *independently corroborated* Montzka's findings. The exchange looked like this:

> Q. . . . Your estimate of the plaintiffs' damages in this case is relying on Thomas Montzka's regression model analysis, right?
> A. That's correct.
> . . .
> Q. Okay. Did you do anything to independently verify the accuracy of Thomas Montzka's regression model?
> A. Well, as [ ] is included in my report, I have this corroboration piece that's in there. In my opinion, that shows that the magnitude of the price change calculated by Mr. Montzka is reasonable, because there was a similar event that occurred in the supply of plywood as what would have happened had there been no Brazilian plywood. In

---

[54] ("Montzka . . . admitted his opinions are based on 'imponderable [sic] of what might have happened' and on a 'hypothetical.' Montzka further conceded that his opinions are based on the assumption that consumers **would have** purchased [the] Plaintiffs' plywood if Brazilian plywood was not on the market. Similarly, Montzka admitted that his regression models only show correlation and do not show causation." (citations omitted)).

> that case, the price change in the market was even higher than what Mr. Montzka
> calculated, so . . . . [t]hat shows that, you know, damage estimates, in terms of dollars
> per unit, changes price calculated from Mr. Montzka regression analysis was
> reasonable.

Deposition of Dr. Roy C. Anderson [349-27] ("Anderson Dep.") at 57:10–58:14 (errors in original).

Here's the independent verification Dr. Anderson was talking about (the one he outlined in his report):

> To corroborate my damage estimate, I analyzed actual historical structural plywood
> price changes in the U.S. West and the U.S. South before, and after, a period when
> there were several permanent plywood plant closures that significantly reduced
> structural plywood production capacity. The plywood price changes associated with
> the plywood supply capacity changes are similar to the market impact that would have
> occurred had Brazilian imports of structural plywood into the U.S. been eliminated
> during the 2018 and 2019 damage period. I completed this analysis to demonstrate the
> real-world response of U.S. structural plywood prices to changes in the structural
> plywood supply-demand balance and illustrate that my damage estimates are
> reasonable.

Anderson Discl. ¶ 9. While the Defendant may find Dr. Anderson's corroboration technique

inadequate, *see* Anderson Dep. at 89:11–93:1 (questioning whether Dr. Anderson's corroboration

method was appropriate given that the data he used for it may have included assumptions about the

market), that doesn't make it "a wholesale adoption of the Plaintiffs' theories[.]" In his expert report,

moreover, Dr. Anderson—in addition to outlining his own methodology, calculations, and results, *see*

*generally* Anderson Discl.—attested that he'd reviewed Montzka's methods *and found them reliable*, *see id.*

¶¶ 17–19. As he explained:

> [E]ach regression model [in Montzka's analysis] included other explanatory variables
> found to be significantly correlated to U.S. structural plywood prices. . . . Importantly
> for the regression analysis applied in both the U.S. West and U.S. South, all of the
> plywood prices (the dependent variable in the regression) and the explanatory variables
> (e.g., % of Brazilian imports, exchange rates, plywood supply, and demand drivers,
> etc.) are known actual historical values. In other words, regression isn't being used to
> predict the future, it is being used to examine the past. This eliminates the need to
> predict future values of explanatory variables. These circumstances increase the
> likelihood that the regression modelling results are accurate.

*Id.*

As for the Defendant's *second* objection to Dr. Anderson—that he interviewed no consumers—the Defendant doesn't explain why any such interviews would have been necessary. And the one case the Defendant *does* cite for this proposition—*Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268 (N.D. Ala. Nov. 16, 2016)—doesn't advance its position.

In *Snac Lite*, the plaintiff—a nut butter manufacturer—alleged that the defendant (also a seller of nut butter) misrepresented the nutritional contents of its (the defendant's) specialty nut butters. 2016 WL 6778268, at *1. Claiming (as here) lost profits flowing from the defendant's "false advertising," the plaintiff sued under the Lanham Act. *Id.* The Northern District of Alabama granted the defendant's motion for summary judgment because the "Plaintiff ha[d] put forth *no summary judgment evidence* indicating there is a nexus between the alleged false advertising and [the] Plaintiff's loss of sales." *Id.* at *13 (emphasis added). It's true that—as in our case—the plaintiff there "presented no Rule 56 evidence that a single consumer chose to buy [the] Defendant's products instead of [the] Plaintiff's products." *Id.* But (unlike what we have here) the "Plaintiff's evidence [also] fail[ed] to account for other relevant factors that may have influenced Plaintiff's sales besides the alleged false advertisement"—an unpardonable omission given that the plaintiff and his expert had "*conceded* that [the] Defendant's appearance on the television show *Shark Tank* would have a positive impact on the Defendant's marketing." *Id.* (emphasis added). The plaintiff's expert had similarly failed to consider (1) "evidence indicat[ing] that[,] during the relevant time period, [the] Plaintiff experienced a decline in sales with respect to certain customers who never stocked [the] Defendant's products," and (2) evidence suggesting that the plaintiff's lost sales resulted (in large part) from "a salmonella contamination at one of its manufacturer's plants." *Id.*

As this recitation should make plain, the major deficiencies the court highlighted in *Snac Lite* are mostly absent from Dr. Anderson's report. And that's because Dr. Anderson—unlike the expert in *Snac Lite*—relied on a regression analysis that *did* account for other (possibly-confounding) factors.

*See* Anderson Discl. ¶ 17 (noting that Montzka's regression "included other explanatory variables"—including, for instance, "both plywood supply and demand drivers; variables representing global currency effects on U.S. plywood prices (i.e., exchange rates); structural panel market pressure-related variables; and variables representing the North American supply-demand balance").

We accept *some* of the Defendant's (valid) critiques of Dr. Anderson's work. And we emphasize (again) that the Defendant will be permitted to flesh out these critiques fully in front of the jury. But we disagree that Dr. Anderson's report is so flawed as to entitle the Defendant to summary judgment.[55]

## II.    Negligence

Under Florida law, a negligence claim has four elements: (1) "[a] duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks"; (2) "[a] failure on the defendant's part to conform to the standard required"—what we call "a breach of the duty"; (3) "[a] reasonably close causal connection between the conduct and the resulting injury"; and (4) "[a]ctual loss or damage[.]" *O'Donnell v. United States*, 736 F. App'x. 828, 831 (11th Cir. 2018) (citing *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1227 (Fla. 2010)). The Defendant challenges the Plaintiffs' proof only as to the first and second elements. *See* MSJ at 23–24.

Whether there's a duty "is not a factual question for the jury to decide[.]" *McCain v. Fla. Power*

---

[55] And this conclusion applies with equal force to the Plaintiffs' negligence damages. "In lost profit cases, Florida's courts have clearly held that once causation is proven with reasonable certainty, uncertainty as to the precise amount of lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate damages." *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1217 (11th Cir. 2006). "[A]t the summary judgment stage, a party need not present exacting proof of the precise amount of lost profits it intends to claim." *Matrix Health Grp. v. Sowersby*, 2019 WL 4959917, at *8 (S.D. Fla. Oct. 7, 2019) (Altman, J.) (citing *May v. Nygard Holdings Ltd.*, 203 F. App'x 949, 951 (11th Cir. 2006)). The models Mr. Montzka and Dr. Anderson have put forward are sufficient to map out a "reasonable yardstick" of the Plaintiffs' damages. They, in fact, have given us a surprisingly exact number—$103.3 million. *See* Anderson Discl. ¶ 4. We thus reject the Defendant's request for summary judgment (MSJ at 24–26) on the Plaintiffs' negligence damages.

*Corp.*, 593 So. 2d 500, 503 (Fla. 1992). "Duty is the standard of conduct given to the jury for gauging the defendant's factual conduct." *Id.* The duty element focuses on "whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." *Id.* at 502. Under Florida law, the duty of care in a negligence action may arise from one of four sources: "(1) legislative enactments or administrative regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Dorsey v. Reider*, 139 So. 3d 860, 863 (Fla. 2014) (cleaned up) (citing *McCain*, 593 So. 2d at 503 n.2). For a duty to stem from the fourth category—"the general facts of the case"—the conduct at issue must be "such that it creates a 'foreseeable zone of risk' posing a general threat of harm to others." *Id.* When a defendant's conduct creates a foreseeable zone of risk, "a legal duty will ordinarily be recognized to ensure the conduct is carried out reasonably." *Id.*

In its MSJ, the Defendant appears to parrot the argument it advanced in its Motion to Dismiss—namely, that it has no legal duty towards the Plaintiffs because (1) the "PS 1 Standard does not create a legal duty for PFS TECO to protect Plaintiffs' economic interests in selling their plywood"; (2) "there is not (and never was) a contract between PFS TECO and Plaintiffs which would support any contractual duty to protect Plaintiffs from competition or purported but unsubstantiated corruption"; and (3) "PFS TECO did not undertake any actions or fail to take any actions concerning the testing of Brazilian plywood mills on behalf of Plaintiffs." MSJ at 23. But, as we explained in our Order Denying the Motion to Dismiss, "Florida's 'foreseeable zone of risk' test isn't as narrow as the Defendants have supposed." *PFS Corp.*, 524 F. Supp. 3d at 1339. "Instead," we said, "that test asks only whether a defendant's conduct 'created a broader zone of risk that poses a *general* threat of harm to others.'" *Id.* (quoting *Dorsey*, 139 So. 3d at 866). And we concluded:

> In the end, the Defendants' alleged failure to perform the core responsibilities of testing, inspecting, and certifying a structural product creates a general and foreseeable risk of harm. The most obvious of these harms—the Defendants are right—is the risk that structurally unsound buildings might fall and cause injuries to innocent third

> parties. Perhaps it's obvious, too, that these injuries might cause economic damages to the companies whose businesses are housed in these unsound structures. But it's also foreseeable (though, perhaps, somewhat less so) that the act of facilitating the importation of cheaper, sub-standard products would cause economic injuries to domestic manufacturers who . . . have had to pay more money (and so must charge more money) to keep their standards high. The Defendants have cited no case (and the Court has found none) for the bizarre proposition that only the *most* obvious harms fall within the "foreseeable zone of risk"—to the exclusion of all others.

*Id.* We see no reason to divert from our prior holding here.

On the element of breach, the Defendant simply regurgitates the main thrust of its challenge to the Plaintiffs' Lanham Act claim. *See* MSJ at 24 ("[S]ince none of the [Defendant's actions] are prohibited by the PS 1 Standard, [those] actions identified by [the] Plaintiffs cannot serve as a basis to demonstrate that PFS TECO is breaching the standard of care."). For all the reasons we've highlighted already—*q.v.*, our discussion of the viability of the Plaintiffs' Lanham Act claim—we think a reasonable jury *could* find that the Standard *does* prohibit the Defendant's actions and that (as a result) the Defendant *did* breach the duty it owed the Plaintiffs.

## III.    The Proper Forum

In a final attempt to secure summary judgment, the Defendant implies that this Court is an inappropriate forum to hear this case. The Defendant suggests that the Plaintiffs seek "to substitute this Court—and potentially seek to have a jury decide—what level of review of mill production is sufficient under PS 1 to protect the public" and "to have this Court change this voluntary standard and impose requirements that the industry has not approved." MSJ at 27. From the Defendant's perspective, "when the[ ] Plaintiffs maintain that a jury should determine whether their touted mill monitoring practices should be required of all mills producing PS 1 plywood, they destroy the voluntary industry system for approval authorized by the voluntary standard and its purposes as reviewed and approved by NIST" and effectively create a "court-administered receivership." *Id.* But the Defendant cites no legal authority for this argument—which is reason enough to disregard it, *see In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial

brief or raised for the first time in the reply brief are deemed waived."). In any event, we've found no law for the proposition that Lanham Act plaintiffs must exhaust their claims *before* seeking redress in federal court. And there's certainly nothing on the face of the Lanham Act itself to indicate that this kind of exhaustion is what Congress intended when it promulgated the law. So, there isn't much more to say about this throw-away argument the Defendant elected to append to the back of its MSJ.

*   *   *

After careful review, we **ORDER AND ADJUDGE** that the Defendant's Motion for Summary Judgment [ECF No. 348] is **DENIED**. This case will proceed to trial.

**DONE AND ORDERED** in the Southern District of Florida this 30th day of March 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record